**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

v.

DAQUAN ALTARI ALFORD and
DAQUAN ALTERIKI ALFORD,

Defendants.

No. 4:22-CR-00010

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JANUARY 24, 2025**

A seemingly straightforward warrant application sought to search Daquan Alford's apartment because Daquan Alford had engaged in a drug transaction nearby. But the approved warrant visited the sins of the father upon the son. A subsequent *Franks* motion revealed that Pennsylvania State Police Trooper Robert H. Williamson was describing two *distinct* persons, both named Daquan Alford. Daquan Altari Alford rented the apartment, while his father, Daquan Alteriki Alford, was being investigated for drug dealing. After the search, it became clear that both Daquan Alfords *did* live in the apartment—in violation of parole—and that they possessed illegal drugs there. The complex questions in this case are whether they can bring a Fourth Amendment challenge through a motion to suppress, and whether any Fourth Amendment violation has occurred here.

The Court concludes that despite the Alfords' parole statuses, they are entitled to bring this motion to suppress. Society is prepared to accept that parolees have an expectation of privacy, even when they are up to no good.

Because the Alfords may bring this motion to suppress, the Court proceeds to analyze the affidavit of probable cause under the *Franks* standard to determine whether it contains intentional or reckless material omissions or false statements. Several omissions and false statements intentionally or recklessly misrepresent the truth and render this affidavit deficient.

Most obviously, the Alfords' identities are of obvious and central importance to the affidavit here. The record also demonstrates that Williamson knew that the "confidential informant" in this case was not a confidential informant at all, as she had been deactivated from that status for lying to the police. Although officers need not fill their affidavits with extraneous details or all their subjective misgivings about such informants, they may not take the probable cause determination out of the reviewing magistrate's hands and decide that issue for themselves. That is what happens when, in an affidavit hinging largely upon the informant's word, such undeniably relevant credibility information is omitted.

In addition to these deficiencies, Defendants have shown by a preponderance of the evidence that the affidavit distorts the statements of this informant and of the landlord of the premises, embellishing their specificity to create a closer

connection between the criminal activities in this case and the apartment searched. Officers may summarize evidence in equivalent terms, but what they may not do is embellish or add to that evidence and falsely attribute the modified statement to the original speaker. All told, while a better corroborated and properly drafted affidavit of probable cause likely could have obtained a search warrant here, the failures apparent from the record in this case demonstrate a careless and lackadaisical approach that cannot be countenanced.

Ultimately, the affidavit tells a substantially different story than the facts on the ground. Correcting the affidavit to clarify Trooper Williamson's material omissions and strike Williamson's false statements, his affidavit does not support probable cause to search, both because the informant was unreliable and her word uncorroborated, and because there is an insufficient nexus to the premises searched. It is critical to ensure that a detached and neutral magistrate has an opportunity to review an accurate statement of all relevant facts before deciding whether a warrant will issue. Given the importance of deterring any incursions upon the magistrate's review of warrant applications, the deliberateness of this conduct, and the number and centrality of these errors in the affidavit, Williamson's conduct was sufficiently culpable to require suppression of this evidence.

Accordingly, the Defendants' motions to suppress will be granted.

## I.    PROCEDURAL BACKGROUND

In January 2022, the United States filed an indictment against Defendants, Daquan Alteriki Alford ("Alteriki") and Daquan Altari Alford ("Altari"), based on evidence seized from a search of Altari's apartment. The three-count indictment against Alteriki charged him with Distribution of Controlled Substance Resulting in Death in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and Maintaining Drug-Involved Premises in violation of 21 U.S.C. § 856(a)(1).[1] The two-count indictment against Altari, filed in a separate case, charged him with Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) and Maintaining Drug-Involved Premises in violation of 21 U.S.C. § 856(a)(1).[2] Alteriki signed a plea agreement in July 2023, but he withdrew his guilty plea in August 2023.[3]

In November 2023, Altari filed a motion to suppress evidence, contending that the affidavit of probable cause supporting a search warrant for Altari's apartment contained intentional or reckless omissions or misrepresentations supporting suppression under the Supreme Court of the United States' decision in

---

[1]    Indictment as to Daquan Alteriki Alford, Doc. 3.
[2]    Indictment as to Daquan Altari Alford, Doc. 3, *United States v. Daquan Altari Alford*, No. 4:22-cv-0011 (M.D. Pa. 2023).
[3]    Plea Agreement, Doc. 44; Rejection of Plea, Doc. 51.

*Franks v. Delaware*.[4] In January 2024, while that motion was pending, the United States filed a motion for joinder in both cases, seeking to join the trials of Altari and Alteriki,[5] which the Court granted in March 2024.[6] The United States then filed a superseding indictment charging both defendants with the same counts in the case docketed at 4:22-cr-00010 in April 2024 and dismissed the indictment against Altari in the case docketed at 4:22-cr-00011 in May 2024.[7]

Accordingly, Alteriki and Altari are now co-defendants in the same case and are scheduled to have a joint trial. In May 2024, Altari refiled his motion to suppress evidence regarding the superseding indictment.[8] In June 2024, the Court concluded that Altari had met the "substantial preliminary showing" required to obtain a *Franks* hearing[9] and granted an evidentiary hearing regarding Altari's suppression motion.[10]

Later in June 2024, Alteriki filed a motion to suppress evidence also based upon a *Franks* theory, and the Court granted Alteriki a hearing as well.[11] Alteriki's

---

[4]  438 U.S. 154 (1978); *United States v. Daquan Altari Alford*, No. 4:22-cv-0011, Motion to Suppress, Doc. 69.

[5]  Motion for Joinder, Doc. 60; *United States v. Daquan Altari Alford*, No. 4:22-cv-0011, Motion for Joinder, Doc. 81

[6]  Order, Doc. 69; *United States v. Daquan Altari Alford*, No. 4:22-cv-0011, Order, Doc. 95.

[7]  *United States v. Daquan Altari Alford*, No. 4:22-cv-0011, Order Granting Motion to Dismiss Indictment as to Daquan Altari Alford, Doc. 100.

[8]  Motion to Suppress Evidence, Doc. 87.

[9]  *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Franks*, 438 U.S. at 171).

[10]  Memorandum Opinion and Order, Doc. 91 at 11.

[11]  Motion to Suppress, Doc. 94; Order, Doc. 112.

motion argues that the search warrant lacked probable cause and was overbroad.[12] Alteriki also filed a motion to dismiss the indictment based upon outrageous government conduct.[13] Alteriki then filed a motion to compel discovery prior to the hearing, which the Court denied after conducting an in camera review.[14]

The first evidentiary hearing took place on July 24, 2024.[15] Following the hearing, the Court granted counsel the opportunity to file supplemental briefing regarding the motions to suppress.[16] In its supplemental brief, the United States argued—for the first time—that the Alfords could not challenge the search of Altari's apartment because at the time of the search, Defendants were parolees living there in violation of the terms of their parole, and therefore maintained no reasonable expectation of privacy there.[17] But no evidence had been elicited at the hearing to support the Government's contentions, so it attached several exhibits to demonstrate the Alfords' parole status at the time of the search.[18]

The Government noted that, as additional facts were taken from Government exhibits, it was prepared to establish these facts through witness testimony "and would respectfully request that the Court permit the record on the motion to suppress to be reopened to allow for that further presentation of evidence, if

---

[12]  Brief in Support, Doc. 95 at 4–13.
[13]  Motion to Dismiss, Doc. 96.
[14]  Motion to Compel Discovery, Doc. 92; Scheduling Order, Doc. 116.
[15]  *See* Notice of Filing of Official Transcript, Doc. 129.
[16]  Order, Doc. 128.
[17]  Brief in Opposition, Doc. 130 at 30-36.
[18]  Altari Parole Paperwork, Doc. 130-6; Alteriki Parole Paperwork, Doc. 130-7.

needed."[19] Both Defendants' supplemental briefs objected to considering this argument and urged the Court to deem it waived.[20] But counsel also maintained that the Court reopen the record and convene another hearing if it decided to consider this argument, rather than basing the argument on new exhibits attached to a post-hearing supplemental brief.[21] The Court granted a second evidentiary hearing, rather than deeming the Government's argument waived.[22] Noting the complexity of the expectation-of-privacy issue raised by the Government, the Court also granted counsel the opportunity to present oral argument on this issue.[23]

The second evidentiary hearing took place on October 27, 2024.[24] The Court granted leave for counsel to file additional supplemental briefing after the hearing.[25] The motions to suppress are now ripe for disposition.

## II.    FACTUAL BACKGROUND

The Court will now set out the relevant factual background. I will begin by describing the contents of the affidavit of probable cause at issue in this case. I will

---

[19]  Brief in Opposition, Doc. 130 at 3 n.1.

[20]  Reply Brief, Doc. 135 at 15–18; Reply Brief, Doc. 136 at 2–4.

[21]  Reply Brief, Doc. 135 at 18 n.3 ("To the extent the Court is going to consider the merits of the Government's standing argument, Mr. Alford requests that the Court reopen the record and convene another hearing so that these facts can be established."); Reply Brief, Doc. 136 at 4 n.2 ("If for whatever reason the Court does not strike the exhibits, the evidentiary hearing should be reopened and witnesses presented subject to full confrontation under the Sixth Amendment and all other applicable Federal Rules of Criminal Procedure and Federal Rules of Evidence.").

[22]  Scheduling Order, Doc. 137.

[23]  *Id.*

[24]  *See* Notice of Filing of Official Transcript, Doc. 145.

[25]  Order, Doc. 142.

then turn to the testimony elicited at the first evidentiary hearing, comparing the relevant testimony with what was alleged in the warrant. Finally, I will lay out the additional evidence presented at the second evidentiary hearing.

### A.    The Warrant

This whole suppression motion revolves around the materiality of any intentional or reckless false assertions or omissions contained within an affidavit of probable cause authored by Trooper Williamson on May 1, 2022. So it's important to first spell out what the affidavit actually said.

The face of the affidavit states that it seeks to search the residence of "Occupant/Renter-Daquan ALFORD 12/12/96, PA OLN:31321123," which is Apartment 3, 832 High Street, Williamsport, Pennsylvania (the "Apartment").[26] This birth date and Pennsylvania OLN both correspond to Altari, not Alteriki.[27]

The beginning of the warrant sets out Trooper Williamson's training and experience and describes generic information about drug traffickers' practices.[28] Most relevantly, it notes that "drug traffickers frequently build 'stash places within" various locations, including "the residence[s] of relatives."[29] It also describes how "[w]hen drug transactions take place at a residence[, i]t is common

---

[26]    Application for Search Warrant, Doc. 88-1 at 1.
[27]    Altari's Brief in Support, Doc. 88 at 3 n.1.
[28]    Application for Search Warrant, Doc. 88-1 at 2–3, ¶¶1–14.
[29]    *Id.* at 2, ¶4. *See also id.* at 2, ¶5, 3, ¶9.

to have an increase of foot traffic where visitors will only stay for brief periods of time."[30]

The affidavit then describes facts relevant to Alteriki's drug trafficking activities.[31] This section of the warrant refers to Alteriki as "the Defendant, Daquan 'Baby' ALFORD,"[32] and subsequently, as "ALFORD."[33] In doing so, the warrant never describes any activities of Altari. First, the affidavit states that Williamson "made contact with Pennsylvania Confidential Informant 2410-17-0472."[34] That so-called Confidential Informant ("CI"), later identified as Krista Pardoe, "related and identified that a known male, the Defendant, Daquan 'Baby' ALFORD requested her to rent a vehicle for him, in order to travel to Newark, New Jersey to procure an unknown amount of heroin."[35] Williamson stated that according to Pardoe, "it is known to her—from making previous trips with ALFORD—that he traffics [sic] large amount [sic] of heroin to the Williamsport area."[36] Pardoe rented the vehicle and provided pictures of it to Trooper Williamson on April 29, 2021, and "ALFORD related he left the Williamsport area at approximately 1253 hrs."[37]

According to the affidavit, Pardoe "related the following" to Trooper Williamson when she spoke with him on May 1, 2021 at approximately 8:26 a.m.

---

[30] *Id.* at 3, ¶13.
[31] *Id.* at 4–5, ¶¶15–21.
[32] *Id.* at 4, ¶15.
[33] *Id.* at 4, ¶15; 4–5, ¶¶15–20.
[34] *Id.* at 4, ¶15.
[35] *Id.*
[36] *Id.*
[37] *Id.* at 4, ¶16.

Once again, the description refers exclusively to "ALFORD" to describe the

activities of Alteriki.

> -At approximately 0215 hrs, the CI met with ALFORD in the area of 588 Wildwood Bld, Williamsport City, Lycoming County, Pennsylvania.
> -ALFORD asked the CI to "take a ride" with him, which she did so.
> ALFORD drove the CI to the area of the 700 blk of First Avenue, Williamsport City, Lycoming County, Pennsylvania and made a phone call to an unknown black male.
> -ALFORD proceeded to meet with unknown black male and provided subject with a backpack containing the drugs he obtained from the Newark, New Jersey area. Prior to handing the backpack to the unknown male, ALFORD showed the informant a large quantity of suspected cocaine (identified by ALFORD) and a large quantity of heroin (identified by ALFORD) to the CI.
> Alford related he did not have cash on his person to pay the CI for renting the Hyundai rental car, however provided the CI with what she related to be two (2) bundles of heroin. The bundles of heroin were described as being white bags with a purple stamp with the words "Roxanne".
> The unknown black male then proceeded to carry the backpack he received from ALFORD towards the residence of 832 High Street, Williamsport City, Lycoming County, Pennsylvania.
> The CI and ALFORD departed.[38]

According to his affidavit, Trooper Williamson learned "[t]hrough a separate

witness" that Pardoe returned directly home and went directly to her bedroom.[39]

An emergency 9-1-1 call was subsequently placed at 10:38 a.m.[40] As a result of the

call, Pardoe was discovered deceased in the bedroom of her residence; she had

---

[38]  *Id.* at 5, ¶17.
[39]  *Id.* at 4, ¶18.
[40]  *Id.* at 4, ¶19.

overdosed on a bundle of the drugs Alteriki paid her with.[41] As was also made clear after Pardoe's death, despite her telling Williamson that Alteriki had given her two bundles of fentanyl-laced heroin, she had in fact received three bundles, one of which she had partially used prior to her death.[42] A review of Pardoe's cellphone revealed messages between herself and Alteriki, again identified as "ALFORD" in the affidavit.[43] Pardoe stated at 3:43 a.m.: "Yo this shit is fire, think it's been awhile since I had some that good;" "ALFORD," i.e. Alteriki, responded "Don't text me on here," "Text my phone" "Number."[44] The seized baggies that Alteriki had provided Pardoe, labeled "Roxanne," field tested positive for fentanyl.[45]

Following this paragraph is the only reference to Altari's activities in the body of the warrant—but he is also identified only as "Daquan ALFORD."[46] Paragraph 22 of the warrant states:

> On May 1, 2021 at approximately 1800 hrs, Tpr. Jonathan THOMPSON contacted the landlord of the 832 High Street, Williamsport City, Lycoming County, Pennsylvania residence. At this time, the landlord confirmed the 3rd floor argument was rented by Daquan ALFORD and Kiam ALFORD. While Tpr. THOMPSON was speaking with the landlord, he/she related he/she has received several complaints of a high volume or [sic] foot traffic coming/going from the 3rd Floor apartment of the same residence.[47]

---

[41] *Id.* at 4–5, ¶¶18–20.
[42] *Id.* at 4–5, ¶¶17, 20.
[43] *Id.* at 5, ¶20.
[44] *Id.*
[45] *Id.* at 5, ¶21.
[46] *Id.* at 5, ¶22.
[47] *Id.*

The affidavit concludes: "I have probable cause to believe that 832 High Street, Apt 3 in the City of Williamsport . . . is currently being utilized by Daquan ALFORD and possibly others to store, distribute suspected heroin/fentanyl and/or cocaine in the Williamsport area."[48]

The search warrant authorized the seizure of controlled substances, drug paraphernalia, "any and all books, records, receipts, notes, ledgers, letters (opened and unopened), and other papers" depicting drug and other commercial transactions, currency, electronic items utilized to aid in the illicit trafficking of controlled substances, address and telephone books, and indicia of occupancy, residency, rental, or ownership of the premises to be searched.[49]

## B.    Evidentiary Hearing I

With this overview of the warrant's key contents in mind, the facts in the evidentiary record relevant to assessing whether any falsehoods were created by statements or omissions, together with Trooper Williamson's state of mind when he drafted the affidavit, may be contextualized.

Trooper Williamson was the only witness who testified at the first evidentiary hearing. At the time of the hearing, he had been an officer for 13 years,

---

[48]    *Id.* at 5, ¶25.
[49]    Application for Search Warrant, Doc. 88-1 at 6.

beginning with the Williamsport Police in 2011.[50] He currently serves as a vice and narcotics officer.[51] In preparation for these roles, Williamson received Police Academy training, including training on how to prepare search warrants and training "to ensure that all of the information that needs to be in the warrant affidavit is clearly and completely specified."[52]

In his tenure as a police officer, Trooper Williamson estimated that he has made "hundreds" of search warrant applications in his career, chiefly before a magistrate judge in state court.[53] Williamson also testified that he is "required to review the search warrant before it's presented to the issuing authority" and to "make sure that [he has] included all the permanent information in the Affidavit so it's accurate and complete."[54] Regarding the specific warrant at issue here, Trooper Williamson had "access to an Assistant District Attorney to get approval before [he] submitted it to the Magistrate," and had "ample time to review th[e] search warrant in this case."[55]

### 1.    The Alfords' Identities

As highlighted above, Williamson's affidavit did not differentiate between the Defendants, referring only to Altari's identifying information on the cover page

---

[50]    Notice of Filing of Official Transcript of Proceedings held on 7/24/2024 ("Transcript I"), Doc. 129 at 73:12–29.
[51]    *Id.* at 74:2–4, 14–16.
[52]    *Id.* at 74:5–75:16.
[53]    *Id.* at 75:24–76:14.
[54]    *Id.* at 75:10–16.
[55]    *Id.* at 75:17–23.

and otherwise referencing Alteriki's alias ("Daquan 'Baby' ALFORD") or else referring simply to "Daquan ALFORD" or "ALFORD."[56] At the evidentiary hearing, Williamson testified that he was familiar with both Altari and Alteriki, and was "aware that [they] are a father/son."[57] Because Williamson had worked in Lycoming County and Williamsport "essentially since 2011," he "had knowledge of the Alfords, and more specifically, that there was a father/son Daquan Alford," from "general police incidents."[58] Williamson's criminal complaints against Altari and Alteriki also referred to the defendants by using their middle names.[59]

### 2.    Pardoe's History

The evidentiary hearing also more completely fleshed out Trooper Williamson's interactions with Krista Pardoe, who he identified as a "confidential informant," as well as several omissions regarding her status. Williamson explained that Pardoe had initially been utilized by Trooper Tyler Morse, who she contacted again when she reached out with information on Alteriki.[60] As Morse had been promoted to a different position, he notified Williamson, who met with Pardoe at the Montoursville Barracks.[61] Pardoe explained that Alteriki had "contacted her wanting her to rent a rental car so that he could travel to New Jersey

---

[56]  *See generally* Application for Search Warrant, Doc. 88-1.
[57]  Transcript I, 21:3–7; 91:24–92:2.
[58]  *Id.* at 25:16–24.
[59]  Defendant's Exhibit 116, Altari Criminal Complaint and Affidavit; Defendant's Exhibit 117, Alteriki Criminal Complaint and Affidavit.
[60]  *Id.* at 13:11–21.
[61]  *Id.* at 13:22–25.

to get drugs."[62] According to Williamson, Pardoe related that she was sober, had no current addictions, and was currently employed, and she did not appear to be under the influence of drugs when he spoke to her, although he did not test her for the presence of drugs or search her person for drugs.[63] She explained that she was coming forward to have her criminal history expunged or removed and had no current charges, but had previously been addicted to crack cocaine.[64]

But Williamson also learned from Morse before he prepared the warrant application that "during her [Pardoe's] last incident . . . in which she cooperated with the State Police, she conducted a controlled buy with him, received an extra amount of crack cocaine than what was actually ordered, and concealed that extra amount on her person."[65] Pardoe was discontinued as an informant once a search revealed those drugs.[66] Trooper Williamson knew that Pardoe had been deactivated as an informant because Trooper Morse told him so.[67]

Nevertheless, the affidavit refers to Pardoe as "Pennsylvania Confidential Informant 2410-17-0472" and as "the CI;" nothing in the affidavit reveals that she had been discontinued as a confidential informant.[68] Trooper Williamson stated that he only referred to Pardoe by her confidential informant number to accurately

---

[62]    *Id.*
[63]    *Id.* at 14:1–3; 67:1–18; 103:4–104:1.
[64]    *Id.* at 14:3–11.
[65]    *Id.* at 14:15–15:1; 68:22–25.
[66]    *Id.*
[67]    *Id.* at 46:16–16; 47:9–11.
[68]    Application for Search Warrant, Doc. 88-1 ¶¶15–18, 20.

identify her.[69] To reactivate Pardoe as a confidential informant, however, Williamson would have had to follow various PSP protocols which were not followed in this case, including completing a new debriefing questionnaire and informant condition statement.[70] "Informants/SOIs who are declared unreliable shall not be reactivated without consent of the Director, Bureau of Criminal Investigation."[71]

Although Williamson was "aware" and "knew, when [he] was communicating with Krista Pardoe, that not only was she deactivated, but that she had committed an act during her status as a confidential informant that was illegal and dishonest," these details were never disclosed in the affidavit.[72] When asked why he omitted Pardoe's motivation for cooperating, the reason for her deactivation, or the fact of her deactivation at all, Williamson testified that:

> That's something that I typically don't include unless it is rather significant or I just won't utilize the informant if I don't believe they're being truthful. In this specific case, I was under the impression that she was living a clean, sober life for the better part of three years, and that she was otherwise providing truthful information.[73]

---

[69]   Transcript I, Doc. 129 at 47:5–6.
[70]   *Id.* at 50:10–51:22; Defendant's Exhibit 1, Pennsylvania State Police Confidential Informant Policies, at 16.
[71]   Defendant's Exhibit 101, Pennsylvania State Police Confidential Informant Policies, at 16.
[72]   Transcript I, 53:22–54:2, 54:22–55:9.
[73]   32:14–23.

### 3.    Pardoe Meets with Alteriki

Trooper Williamson contacted the Lycoming County District Attorney's office, briefed them on the situation and Pardoe's background, and asked whether "this is something that we're interested in because of her past."[74] A plan was devised for Pardoe to rent the vehicle which would be stopped via a traffic stop, with the plan of "orchestrat[ing] it in a way that she would not ever be in contact with the controlled substances."[75]

But Pardoe went rogue. In her 8:30 a.m. call with Williamson, she revealed that "she took it upon herself, along with her fiancée at the time, to travel to Williamsport" to meet with Alteriki.[76] At the hearing, Williamson related that much of this interaction matches what is alleged in his affidavit, including that it took place at 2:30 a.m., that Alteriki called an unknown black male once the car was parked to whom he handed a backpack containing a "large amount of drugs," and that Alteriki paid her in several bundles of drugs rather than in cash for renting the car.[77]

According to Trooper Williamson, where an informant arranges a drug deal, the informant and their vehicle are ordinarily thoroughly searched, multiple law enforcement assets would be utilized to surveil the informant, and the informant

---

[74]  *Id.* at 15:11–15.
[75]  *Id.* at 15:15–18; 33:14–24.
[76]  *Id.* at 16:16–23.
[77]  *Id.* at 16:16–23; 17:10–15, 17:24–18:4.

would return to law enforcement to be searched again after the transaction.[78] But because Pardoe had gone off script, no officer surveilled Pardoe's interactions with Alteriki during the drive; the events were completely unsupervised.[79]

### 4. Pardoe's Description of the Drive

Trooper Williamson's testimony also revealed a different course of events than was identified in the affidavit regarding Pardoe's conversation with Williamson after she "took a ride" with Alteriki at 2:15 a.m. As detailed above, Paragraph 17 of the affidavit contains a description of what Pardoe "related" to Williamson about the interaction.[80] The first statement, that Pardoe "met with ALFORD in the area of 688 Wildwood Blvd, Williamsport," remains unchanged— Williamson testified that Pardoe identified this specific address to him.[81] However, two other allegations in Paragraph 17 substantially changed at the hearing.

First, according to the affidavit, Pardoe "related [that] . . . ALFORD drove [her] to the area of the 700 blk of First Avenue, Williamsport."[82] But at the hearing, Williamson explained that Pardoe "didn't give, you know, block information or anything to that degree that I described in my report."[83] Instead, Williamson "follow[ed] her [Pardoe] on the map as to what she was describing or

---

[78]  *Id.* at 34:8–24.
[79]  *Id.* at 67:9–12; 76:22–77:12.
[80]  Application for Arrest Warrant, Doc. 88-1 ¶17.
[81]  Transcript I, Doc. 129 at 96:20–97:2.
[82]  Application for Arrest Warrant, Doc. 88-1 ¶17.
[83]  Transcript I, Doc. 129 at 16:25–2.

how [he] interpreted her direction of travel to their destination."[84] "[S]he related that they turned from an alley . . . turned left onto First Avenue, and then came to a stop somewhere . . . within the intersection;" Williamson could not remember if the car came to a stop north or south of the intersection.[85]

Ultimately, Williamson testified, Pardoe "described somewhere in the area of First Avenue and the High Street intersection."[86] According to Williamson's recollection, "she described it as First Avenue and High Street," which he described as "the 700 block of First Avenue."[87] Pardoe never described the destination as "the 700 block of First Avenue," but "she was able to identify First Avenue and High Street . . . she was describing the location in one manner; [he] was following her [on the map] and we were in the spot. She was just describing it in generalized terms," and Williamson deduced "based upon what she told [him]" that "it must have been the 700 block."[88]

Second, according to the affidavit, Pardoe "related [that] . . . [t]he unknown black male then proceeded to carry the backpack he received from ALFORD towards the residence of 832 High Street."[89] But Trooper Williamson clarified at the hearing that Pardoe "didn't provide the exact address" and did not "know,

---

[84]    *Id.* at 17:2–6.
[85]    *Id.* at 36:7–18.
[86]    *Id.* at 35:11–14.
[87]    *Id.* at 96:20–14; 98:8.
[88]    *Id.* at 97:22–98:21.
[89]    Application for Arrest Warrant, Doc. 88-1 ¶17.

between two houses which one he walked towards."[90] Instead, this address "was later identified as 832 High Street."[91] Logan Charles, Pardoe's fiancée, had apparently been "present following Daquan, Sr., and Krista on their ride."[92] So Charles, who "was present at the 2:00 a.m. meeting [with Alteriki] as well," was contacted by Pennsylvania State Police Trooper Jonathan Thompson.[93] Thompson "physically drove him [Charles] to this area that, as he was present following Daquan, Sr., and Krista on their ride, he was able to physically point out 832 High Street as the residence that the two were – those were the residences in question."[94] Once Charles "was able to identify 832 High Street to Trooper Thompson as the residence that Ms. Pardoe was referring to," Williamson "identified 832 as the subject residence" based on what Thompson had relayed to him about this identification.[95]

Based on Williamson's "understanding in speaking with [Pardoe]," 832 High Street was visible from the location of the parked car.[96] But when asked whether he had "any information that [he] had from any source that this person," the unknown black male who received the backpack, "was either entering or

---

[90]  *Id.* at 17:6–20; 61:15–23 ("she was able to narrow the location down to one of these two houses . . . . [s]he didn't know an exact address, but said that it was one of these two, in this area,"); 62:15–24 ("She did not specifically tell me the numerical address, no, because she did not know it.").

[91]  *Id.* at 17:15.

[92]  *Id.* at 62:2–5.

[93]  *Id.* at 20:7–11.

[94]  *Id.* at 62:2–12.

[95]  *Id.* at 20:7–11; 62:12.

[96]  *Id.* at 36:15–18.

leaving 832 High Street," Williamson stated: "I don't know what Logan Charles told Trooper Thompson or what the extent of them traveling to the area entailed."[97] So evidently, Williamson did not know whether the door to the 832 High Street residence was visible at the time the unknown black male walked "towards" that building.

### 5.    Identifying the Renter of the Apartment

As alleged in Trooper Williamson's affidavit, Trooper Thompson then related to Williamson that Apartment 3 in 832 High Street was rented or leased by Daquan Alford and Kiam Alford, Altari's cousin.[98] According to Williamson's testimony at the hearing, he was aware when he drafted the affidavit that Altari, not Alteriki, was identified as a renter of the apartment in this conversation between Thompson and the landlord.[99] He also agreed that "the landlord never indicated that Daquan Alteriki Alford rented that apartment."[100] But the affidavit refers only to "Daquan ALFORD" as the renter of Apartment 3,[101] which—if it referred to Alteriki—would establish a much more direct connection between Alteriki and the premises to be searched. Williamson said that the affidavit's ambiguity in this respect was "an oversight on [his] behalf," and that he "never"

---

[97]  *Id.* at 94:15–21.
[98]  Application for Arrest Warrant, Doc. 88-1 ¶22; Transcript I, 20:22–21:2, 26:2–6.
[99]  Transcript I, Doc. 129 at 21:24–22:24; 91:13–23.
[100]  *Id.* at 42:15–43:9; 25:11–24 (Williamson did not recall "being told anything about Alteriki Alford or Senior actually utilizing Apartment 3.").
[101]  Doc. 88-1 ¶22.

had any intention of misleading the magistrate judge in this paragraph.[102] "I mean it was completely unintentional. I just – it was a complete oversight, I guess . . . It was an oversight on my behalf, unintentional oversight."[103]

After the search warrant was executed, Williamson listed Alteriki's parole-listed address of 608 Seventh Avenue in the arrest warrant for Alteriki.[104] Williamson stated at the hearing that he knew that this was Alteriki's parole-listed residence at the time of the search and arrest warrants.[105] The criminal complaints Williamson drafted for Alteriki and Altari also stated: "[i]t was determined by the landlord of the building that Apartment 3 was rented and/or utilized by the Defendant, Daquan Alteriki Alford, the Co-Defendant, Daquan Altari Alford, and a subject, Kiam Alford."[106] Williamson agreed during the hearing that these statements did not reflect what the landlord had actually said, and that he knew the landlord had never said that Alteriki lived at Apartment 3 when drafting the criminal complaints.[107] Williamson testified that this was an "oversight."[108]

Williamson's knowledge of Apartment 3's renters creates a somewhat confusing gap in how he determined to search it. This gap is purportedly filled by the fact that "based on [his] training and experience," Williamson "know[s] that

---

[102] *Id.* at 24:2–11, 29:20–22.
[103] *Id.* at 26:7–15.
[104] Defendant's Exhibit 119, Arrest Warrant, at 1.
[105] Transcript I, Doc. 129 at 72:15–25; 91:13–23.
[106] Defendant's Exhibit 116, Altari Criminal Complaint and Affidavit, at 6; Defendant's Exhibit 117, Alteriki Criminal Complaint and Affidavit, at 4; Transcript I, Doc. 129 at 72:15–25.
[107] Transcript I, Doc. 129 at 42:15–43:9; 43:19–44:5.
[108] *Id.* at 42:15–43:9.

drug traffickers frequently build stash places . . . to insulate themselves from law enforcement by utilizing residences that are . . . occupied by relatives or other associates to separate themselves by the contraband,"[109] an experience-based observation that Williamson includes within Paragraph 4 of his affidavit.[110]

### 6.    High Foot Traffic

The affidavit also states that in the conversation between the landlord and Trooper Thompson, the landlord "related he/she has received several complaints of a high volume of foot traffic coming/going from the 3rd Floor apartment."[111] However, in a subsequent report authored by Thompson on May 4, 2021, he wrote that according to the landlord who owned both 830 and 832 High Street, "tenants from 830 had complained about excessive traffic in the area."[112] On cross-examination, Williamson stated that he "composed the search warrant based off of the conversation that Trooper Thompson and [he] had on May 1st."[113] Williamson's testimony never explicitly clarified what Thompson actually represented on this issue, however—whether Thompson stated during this conversation that the landlord had complained of high foot traffic through 832 High Street, Apartment 3, as reflected in the affidavit, or instead, whether

---

[109]  *Id.* at 29:8–13.
[110]  Application for Arrest Warrant, Doc. 88-1 ¶4.
[111]  *Id.* ¶22.
[112]  Defendant's Exhibit 110, Homicide Action Report, at 1 ("Smith further related that DGM also owns the building at 830. He said that tenants from 830 had complained about excessive traffic in the area."); Transcript I, Doc. 129 at 39:8–23.
[113]  Transcript I, Doc. 129 at 40:18–41:7

Thompson stated during this conversation that the landlord had referenced complaints of "excessive traffic in the area" from "tenants from 830," as reflected in Thompson's May 4 report.

## C.    Evidentiary Hearing II

The scope of the second evidentiary hearing was narrower. Pennsylvania State Police Parole Agent Robert Marzzacco, who has eight years of experience as a parole agent,[114] testified about the Pennsylvania parole system generally. Marzzacco explained that parolees are still serving their original sentences while released to the community, and their release is in no small part contingent upon successfully providing an acceptable address to the parole board.[115] Pennsylvania parolees sign a release order agreeing that they cannot change their residence without written permission from parole staff and agreeing to parole searches without warrant and upon reasonable suspicion.[116] Accordingly, living at an unauthorized residence without informing a parole officer is a violation of parole.[117] The consequences of violating parole conditions can range from revocation to written warnings,[118] and Marzzacco classified living at an

---

[114]  Notice of Filing of Official Transcript of Proceedings held on 10/27/2024 ("Transcript II"),, Doc. 145 at 10:18–25.

[115]  *Id.* at 11:18–12:20.

[116]  *Id.* at 13:3–11; 13:18–14:7.

[117]  *Id.* at 14:25–15:10.

[118]  *Id.* at 14:18–24; 33:6–8.

unauthorized residence as a "technical violation," in contrast to a "nontechnical violation" such as criminal charges.[119]

Both Altari and Alteriki were on parole at the time of the search, were subject to the parole condition requiring that they stay in authorized residences, and did not inform the parole board that they were residing at the Apartment or indicated that any change of residence to the High Street Apartment was necessary.[120] Altari also engaged in deception to conceal this residence from parole officers. According to Marzzacco's review of parole records, Altari met with parole officers at his authorized residence in January 2021, and represented that this was his home address when in fact he was living at the Apartment.[121] Altari's name was listed on both the Apartment's prior October 22, 2020 lease and the then-effective November 3, 2020 lease.[122]

Likewise, Alteriki met with parole officers at his authorized residence in March 2021, and represented that he was still staying at that address rather than the Apartment.[123] But unlike Altari, Alteriki was never listed on the Apartment's lease, so nothing in the record reflects when he began living there, or how often he stayed there. Marzzacco agreed based on his review of the Alfords' records that there was

---

[119]  *Id.* at 33:18–34:1.
[120]  *Id.* at 15:14–16:21, 18:15–24, 21:1–20, 22:6–25, 23:9–16, 24:6–14; Government Exhibit 6, Altari Parole Conditions; Government Exhibit 7, Alteriki Parole Conditions.
[121]  Transcript II, Doc. 145 at 21:21–22:5.
[122]  *Id.* at 44:2–13; 44:23–17; Government Exhibit 11, October 22, 2010 Lease, at 9; Government Exhibit 12, November 3, 2020, at 9.
[123]  *Id.* at 24:15–25:3.

no reasonable suspicion of parole violations prior to their arrest.[124] The parole board did not become aware that Altari and Alteriki were residing at the Apartment until May 1, 2021, the day of their arrest.[125]

Tyler Morse, who has been a Pennsylvania State Police Trooper since June of 2012, testified that he carried out Williamson's search warrant.[126] At the time of the search, it was clear, based on personal effects throughout the Apartment, that the Apartment was lived-in.[127] Morse then interviewed Altari, who stated that he and Alteriki both lived at the apartment but never stated how long Alteriki had been living there.[128] According to Altari's lease, unauthorized subletting or illegal acts are prohibited and forfeit the tenant's right to a notice to quit.[129]

Trooper Williamson testified again at the second evidentiary hearing. He explained that he went to Alteriki's authorized parole residence at 608 Seventh Avenue to look for him, but that he was not there.[130] Another resident told Williamson that she had not seen Alteriki for "approximately six months."[131]

---

[124] *Id.* at 25:24–26:4.
[125] *Id.* at 25:4–14.
[126] *Id.* at 35:13–20; 37:2–6.
[127] *Id.* at 47:24–50:25; Defendant Daquan Altari Alford's Exhibits 1–13.
[128] *Id.* at 37:13–19; 51:10–18.
[129] Government Exhibit 11, October 22, 2010 Lease, at 4–5; Government Exhibit 12, November 3, 2020, at 4–5.
[130] Transcript II, Doc. 145 at 56:4–25.
[131] *Id.* at 56:4–25.

Williamson also observed that the room was sparse, small, and did not appear to be lived-in.[132]

\* \* \*

As a result of the search warrant, officers seized drug paraphernalia from the Apartment, including narcotics from Altari and Alteriki's rooms.[133] The Alfords' motion to suppress evidence primarily argues that Williamson's false statements and omissions within the warrant are sufficient to deprive it of probable cause. That motion to suppress poses three main issues that the Court will analyze in three parts. The first is whether the Alfords have Fourth Amendment "standing" here. The second is whether a Fourth Amendment violation has occurred under *Franks v. Delaware*. The third is whether this evidence should be suppressed even though a constitutional violation has occurred.

## III.    FOURTH AMENDMENT STANDING

The Fourth Amendment to the United States Constitution protects people from unreasonable searches and seizures.[134] "A defendant seeking to suppress evidence pursuant to the Fourth Amendment's exclusionary rule 'must demonstrate that his Fourth Amendment rights were violated by the challenged search or

---

[132] *Id.* at 58:24–59:12.
[133] *Id.* at 41:8–43:12; 38:15–41:6; Government Exhibits 4.1–4.5, 5.1–5.7.
[134] U.S. Const. amend. iv.

seizure.'"[135] So before moving to the merits of the suppression motion, the Court must conclude that the Alfords have the right to bring this motion by concluding that their "Fourth Amendment rights are implicated," a concept often described through the "shorthand" of "standing."[136] "The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."[137]

The Government concedes that the Alfords would ordinarily maintain an expectation of privacy in the Apartment[138] but contends that because residing in the Apartment violated a condition of parole, the Alfords were "wrongfully present" and had no expectation of privacy. After carefully reviewing relevant precedent, the Court concludes that the Alfords do retain Fourth Amendment standing.

Today, the *Katz* test[139] is the most common approach to analyzing Fourth Amendment protections. But "[t]here is another way. From the founding until the 1960s, the right to assert a Fourth Amendment claim didn't depend on your ability to appeal to a judge's personal sensibilities about the 'reasonableness' of your

---

[135] *United States v. Hawkins*, 646 F.App'x 254, 256 n.3 (3d Cir. 2016) (quoting *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010)).

[136] *United States v. Katzin*, 769 F.3d 163, 170 n.6 (3d Cir. 2014) (en banc). This shorthand can be misleading as whether a person has "a cognizable Fourth Amendment interest in the place searched" is "not distinct from the merits and 'is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018).

[137] *United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992).

[138] Transcript II, Doc. 146 at 68:13–16.

[139] *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., Concurring) (summarizing the majority's holding to mean that a person has Fourth Amendment rights where he has a "reasonable expectation of privacy").

expectations or privacy."[140] The Supreme Court held in 2012 that "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test" predating it.[141] And "the Fourth Amendment's property-baseline" "keeps easy cases easy."[142] "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment has 'undoubtedly occurred.'"[143] Eschewing reasonableness arguments, this case begins and ends by acknowledging that the Alfords called the Apartment home.[144] The Idaho Supreme Court recently reached this exact holding.[145] At the same time, the Third Circuit did not recognize the continued viability of this traditional test until after *United States v. Jones*, leaving this Court with nearly no recent in-Circuit guidance.[146] And

---

[140] *Carpenter v. United States*, 585 U.S. 296, 397–98 (2018) (Gorsuch, J., Dissenting).

[141] *United States v. Jones*, 565 U.S. 400, 409 (2012) (Scalia, J.); *Byrd*, 584 U.S. at 403 (same).

[142] *Florida v. Jardines*, 569 U.S. 1, 11 (2013).

[143] *Id.* at 5 (quoting *Jones*, 565 U.S. 400, 406–407 & n.3 (2012)); *United States v. Montalvo-Flores*, 81 F.4th 339, 343 (3d Cir. 2023) (Hardiman, J., Dissenting) (Under "'the traditional property-based understanding of the Fourth Amendment,' evidence that one is the owner or lessee of the searched home or car is often enough to shift the burden to the Government.").

[144] *See Chapman v. United States*, 365 U.S. 610, 617 (1961); *Minnesota v. Carter*, 525 U.S. 83, 95 (1998) (Scalia, J., Concurring) (citing *Oystead v. Shed*, 13 Mass. 520, 523 (1816)); *Bumper v. North Carolina*, 391 U.S. 543, 548 n.11 (1968) (explaining as to relative of homeowner who resided in house that "there can be no question of [his] standing to challenge the lawfulness of the search" because "the house searched was his home"). The phrase "wrongful presence" was first introduced prior to *Katz* but was not linked to reasonable expectations of privacy until it was revisited in *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978).

[145] *State v. Maxim*, 454 P.3d 543, 546–49 (Idaho 2019) (applying traditional Fourth Amendment test to probationer's home despite his consent to suspicionless parole searches and analyzing the scope of his waiver as a distinct issue from the issue of Fourth Amendment standing).

[146] *See Katzin*, 769 F.3d at 181 (en banc) ("*Jones* fundamentally altered [the Fourth Amendment's] legal landscape by reviving—after a forty-five year hibernation—the Supreme Court's prior trespass theory.").

though the Court raised this theory at argument,[147] all counsel rely exclusively on *Katz*. So the Court follows suit here.

The now-preeminent Fourth Amendment *Katz* test asks whether a defendant "exhibited an actual (subjective) expectation of privacy and, second, whether his expectation was one that society is prepared to recognize as reasonable."[148] Looking to facts known to the Alfords at the time of the search,[149] the Government does not contest their subjective expectation of privacy but argues instead that any expectation of privacy they do have is not objectively reasonable.

But "when it comes to the Fourth Amendment, the home is first among equals."[150] In her concurrence to *Florida v. Jardines*, in which the majority applied the traditional test to the search of a home, Justice Elena Kagan opined that she would have preferred to reach the same conclusion via *Katz*.[151] "A decision" "looking to Jardines' privacy interests," Justice Kagan emphasized, "would have looked . . . well, much like this one," given "'that "privacy expectations are most

---

[147] Transcript II, Doc. 145 at 64:24–66:17.

[148] *Montalvo-Flores*, 81 F.4th at 343 (citing *Katz*, 389 U.S. at 361 (Harlan J., Concurring)) (cleaned up).

[149] The Court noted some ambiguity on this question at the hearing, but because the Alfords would prevail either way, the Court need not resolve it now. *Compare United States v. Thomas*, 65 F.4th 922, 925 (7th Cir. 2023) *with United States v. Castellanos*, 716 F.3d 828, 835 (4th Cir. 2013) (Davis, J., Dissenting).

[150] *Jardines*, 569 U.S. at 6.

[151] *Id.* at 13 (Kagan, J., Concurring) (internal citations omitted).

heightened"' in the home and the surrounding area."[152] As Justice Kagan explained:

> It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property "naturally enough influence[s]" our "shared social expectations" of what places should be free from governmental incursions. And so the sentiment "my home is my own," while originating in property law, now also denotes a common understanding—extending even beyond that law's formal protections—about an especially private sphere. Jardines' home was his property; it was also his most intimate and familiar space.[153]

The Government attempts to rebut these rather weighty Fourth Amendment protections through a two-pronged argument. First, that parolees "start the day with drastically-reduced expectations of privacy."[154] Second, that "there is a forfeiture by wrongdoing component to the Fourth Amendment."[155] Having narrowed this argument in briefing, the Government contends that there is no danger of a slippery slope as its arguments rely on the unique combination of these two factors.[156]

The Court concludes that the Government's two prongs, neither individually nor in combination, deprive the Alfords of the robust expectation of privacy attaching to their home. First, the Alfords' parole statuses have no impact on their expectations in the context of this search. Second, the Government's "forfeiture by

---

[152] *Id.* (ellipses in original) (quoting majority opinion).
[153] *Id.* at 13–14 (Kagan, J., Concurring).
[154] *Id.* at 9:4–12.
[155] Transcript II, Doc. 145 at 9:13–17.
[156] Supplemental Brief, Doc. 144 at 9–11.

wrongdoing" theory is theoretically inconsistent with the Fourth Amendment as applied to defendants in lawful possession of the premises searched.

## A.    Parole Status and the Fourth Amendment

The first pillar of the Government's argument, and its chief response to the Court's reading of this body of wrongful presence cases that will follow, is that parolees, or parole violations, or certain types of parole violations, are special. The Government argues that "the reach of the theory underlying the Court's decision should be (and would be) limited to defendants on parole."[157] This Court's analysis leads to the opposite conclusion. Especially outside of the parole system, parolees are not hermetically sealed off from other defendants under the Fourth Amendment.

### 1.    Parole Status and Expectation of Privacy

First, the Government is correct that "federal cases widely recognize that parolees – even those behaving perfectly lawfully – have drastically reduced expectations of privacy, given their quasi-custodial status."[158] This is affirmed by a trio of landmark Supreme Court cases. But here, it matters not just *that* a parolee's expectation of privacy is reduced, but *how* a parolee's expectation of privacy is reduced. That nuance foils the Government's argument.

---

[157] Supplemental Brief, Doc. 144 at 10.
[158] *Id.*

In *Griffin v. Wisconsin*, the Supreme Court explained that the special needs of the parole system justified warrantless searches by parole officers supported by "reasonable grounds" for suspecting a parole violation.[159] In *United States v. Knights*, the Supreme Court upheld the constitutionality of probation search conditions requiring only reasonable suspicion to justify searches of probationers, even for a non-probation investigatory search.[160] Under the general Fourth Amendment reasonableness test, *Knights* balanced probationer and Government interests, reasoning: "[w]here an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."[161] Finally, the Supreme Court applied this logic to uphold California laws and search conditions authorizing suspicionless searches of parolees in *Samson v. California*.[162]

The Government argues that "[a]s parolees, given that status, they [the Alfords] start the day with a drastically-reduced expectations of privacy."[163] This statement is true within the legal scope of their parole waiver, but unlike *Griffin*, *Knights*, or *Samson*, the instant search is not authorized by any legislation or parole condition. Pennsylvania parole regulations, as well as the Alfords' conditions of

---

[159]  483 U.S. 868, 876 (1987) (9-0).
[160]  534 U.S. 112, 121 (2001) (9-0).
[161]  *Id.*
[162]  547 U.S. 843, 846 (2006) (6-3).
[163]  Transcript II, Doc. 145 at 9:10–12.

parole, specify only that *parole officers* may carry out parole searches pursuant to reasonable suspicion rather than probable cause.[164] So for the Alfords' parole statuses to be relevant to their expectations of privacy, a diminished expectation of privacy *within the parole waiver's scope* must be relevant to the parolee's expectation of privacy *outside of its parole scope*.

At oral argument, the Government suggested that while the Supreme Court has not held that parolees have no expectation of privacy, it would have "no issue" with such a holding given that it upheld California's suspicionless parole search legislation in *Samson*.[165] But in responding to the dissenters, the *Samson* majority stated: "Nor, as the dissent suggests, do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights. That view misperceives our holding."[166]

The Third Circuit formally rejected this argument in *United States v. Henley*, and the most natural reading of *Henley*'s rationale is that a parolee's expectation of privacy must be diminished pursuant to state statute or a condition of release.[167] In *Henley*, the Government argued that although the controlling parole regulations and conditions of parole only authorized searches supported by reasonable suspicion, a search carried out by parole officers could be suspicionless in light of

---

[164] *See* 42 Pa.C.S. 9912(d)(1)(i); Altari Parole Paperwork, Doc. 130-6; Alteriki Parole Paperwork, Doc. 130-7.
[165] Transcript II, Doc. 145 at 83:1–7.
[166] *Samson*, 547 U.S. at 850 n.2.
[167] 941 F.3d 646, 651 (3d Cir. 2019).

*Samson* because parolees have a diminished expectation of privacy.[168] The Third Circuit rejected the Government's argument by explaining that "[u]nlike in *Samson*, here neither the Pennsylvania legislature nor [the defendant's] conditions of release subject him to search at any time or for any reason."[169] "Henley's search required reasonable suspicion because neither a statute nor a condition of parole provides that he was subject to search without reasonable suspicion."[170]

If a defendant's parole waiver diminished his reasonable expectation of privacy for any search, one would expect Third Circuit courts to apply the reasonable suspicion standard to even non-parole-related investigatory searches,[171] as parole searches in Pennsylvania need only be supported by reasonable suspicion.[172] But an unpublished Third Circuit case involving a parole search and a subsequent investigatory search applies reasonable suspicion to the former and probable cause to the latter.[173] Likewise, if parole status diminished a defendant's

---

[168] *Id.* at 650.

[169] *Id.* at 651.

[170] *Id.*

[171] Some out-of-circuit decisions reason that a defendant's parolee status is a relevant factor which, under the totality of the circumstances, may diminish the quantum of proof needed for officers to justify a search. *See United States v. Marr*, Case No. 22-1104, 2023 U.S. App. LEXIS 25527, at *6–7 (6th Cir. Sep. 26, 2023).

[172] *See, e.g.*, *United States v. Baker*, 221 F.3d 438, 449 (3d Cir. 2000) (interpreting Pennsylvania law to require reasonable suspicion for parole officers to search parolees); *Keating v. Pittston City*, 643 F.App'x 219, 224 (3d Cir. 2016) ("[A] search of a parolee's residence may be reasonable even if conducted without a warrant and without probable cause."); *United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992).

[173] *United States v. Marcano*, 508 F.App'x 119, 122–23 (3d Cir. 2013) (where two searches were conducted, one by parole and one by police officers, the Third Circuit applied reasonable suspicion to the former but probable cause to the latter). Indeed, it would make little sense for the Third Circuit to reject the "stalking horse" theory on its merits if such

expectations of privacy in non-parole searches, one would expect courts to categorically deny parolees Fourth Amendment protections in jurisdictions authorizing suspicionless searches of parolees. Instead, these courts universally reject attempts to retroactively justify searches based on parolee status where officers were unaware of it at the time of the search.[174] Holding that "an officer must know of a detainee's parole status before that person can be detained and searched pursuant to a parole condition," the Ninth Circuit stated that "reliance on

---

investigatory searches could be justified by reasonable suspicion anyways. *See United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005) (rejecting the "stalking horse" argument that a parole search should be "declared invalid because its true purpose was to further a criminal investigation rather than to examine parole violations" by using a parole search to "help evade the Fourth Amendment's usual warrant and probable cause requirements") (quoting *United States v. Watts*, 67 F.3d 790, 794 (9th Cir. 1995)); *Willard v. Pa. SPCA*, 525 F.App'x 217, 220 (3d Cir. 2013) (same).

[174] *See Samson*, 547 U.S. at 856 n.5 ("Under California precedent, we note, an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee.") (citing *People v. Sanders*, 73 P.3d 496, 505–506 (Cal. 2003)); *United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008); *United States v. Payne*, 99 F.4th 495, 501–502 (9th Cir. 2024); *United States v. Job*, 871 F.3d 852,859–60 (9th Cir. 2017); *United States v. White*, 781 F.3d 858, 861–63 (7th Cir. 2019) (explaining that its analysis of a parolee's diminished expectation of privacy was "shaped by the state law that governed [defendant's] terms of parole," and engaging in a detailed analysis of state law to determine that the suspicionless search was justified by defendant's parole status); *United States v. Williams*, 702 F.Supp. 2d 1021, 1030-31 (N.D. Ill. 2010); *Muse v. Harper*, No. 3:15-cv-00615, 2017 U.S. Dist. LEXIS 135107, at *13–14 (M.D. Tenn. 2017) (Newbern, M.J.); *Taylor v. Womack*, 15-cv-3113, 2017 U.S. Dist. LEXIS 20251, *6–8 (C.D. Ill. Feb. 14, 2017); *Forbes v. Doe*, 6:18-cv-06700 EAW, 2022 U.S. Dist. LEXIS 8932, at *13–14 (W.D.N.Y. Jan. 18, 2022); *United States v. Graham*, Criminal No. 06-10040-RGS, 2007 U.S. Dist. LEXIS 11180, at *7 (D. Mass. Feb. 16, 2007); *New v. Perry*, No. 2:07-cv-723, 2009 U.S. Dist. LEXIS 14550, at *23–27 (S.D. Ohio Feb. 25, 2009); *State v. Donaldson*, 108 A.3d 500, 504–506 (Md. Ct. Spec. App. 2015); *Maxim*, 454 P.3d at 550; *State v. Siler*, 905 S.E.2d 282 (N.C. Ct. App. 2024).

cases dealing with one's 'standing' to bring a Fourth Amendment challenge, is [] unavailing."[175]

In sum, "the law requires that such greater intrusions" upon parolees must either occur pursuant to the special needs exception, or else "occur pursuant to a rule or regulation 'that itself satisfies the Fourth Amendment's reasonableness requirement.'"[176] The special-needs parole doctrine outlined in *Griffin* "rests on the rehabilitative relationship between the parolee and the parole officer, and thus [does] not extend[] to other law enforcement officers unless they are acting under the direction of the parole officer."[177] Likewise, "the *Knights-Samson* line of cases [rests] on the parolee's diminished expectation of privacy stemming from his own parole agreement and the state regulations applicable to his case."[178]

*Samson* "made it pellucidly clear that, as in *Griffin*, the Court was not analyzing the free-standing power of Government officials to search parolees *absent* explicit authorization from state law or a parole condition. Rather, as the Court emphasized, its analysis necessarily turned on the content and reasonableness of *the specific state law* authorizing the search."[179] "Parole searches are therefore an example of the rare instance in which the contours of a federal

---

[175] *Moreno v. Baca*, 431 F.3d 636, 640–41 (9th Cir. 2005) (internal citations omitted).
[176] *United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004) (quoting *Griffin*, 583 U.S. at 875).
[177] *United States v. Braggs*, 5 F.4th 183, 188 (2d Cir. 2021).
[178] *Id.* at 188.
[179] *United States v. Kone*, 591 F.Supp. 2d 593, 603 (S.D.N.Y. 2008).

constitutional right are determined, in part, by the content of state law."[180] "Thus, *Samson*, like *Griffin*, has little to no bearing on whether a warrantless search *not* authorized by statute, regulation or condition of supervision is permissible."[181]

So the Alfords' parole statuses are not relevant. As counsel argues, the parole system's more demanding incursions on privacy and the parolee's expectation of privacy in other contexts are "two legal concepts lying side-by-side."[182] These concepts do not interact here. Instead, the searches falling within the Fourth Amendment waiver accepted by parolees are a different species of search than searches outside of that waiver, such as an investigatory search under Pennsylvania's current parole regime.

### 2.    The Fugitive Cases

According to the Government, as the Alfords have a reduced expectation of privacy in their residences due to their parole, "[i]t would be a truly anomalous result if Alteriki and Altari were found to have a normal, robust expectation of privacy in the illegitimate residence they maintained and occupied as a subterfuge and means to escape the already reduced expectation of privacy that they had in their legitimate listed residences."[183] The Government then points to cases

---

[180] *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007) (McConnell, J.); *see also White*, 781 F.3d at 861.

[181] *Kone*, 591 F.Supp. at 603.

[182] Transcript II, Doc. 145 at 15–16; *see also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) ("To describe a consented search as a noninvasion of privacy and thus a non-search is strange in the extreme.") (Scalia, J.).

[183] Brief in Opposition, Doc. 130 at 35.

involving prison escapees and fugitives.[184] Indeed, several out-of-circuit authorities rely upon those cases to distinguish parolees from others for standing purposes, arguing that they should lack Fourth Amendment protections when they engage in efforts to escape supervision.[185] The Court is not persuaded that escapees and parolees are alike in this sense.[186]

In *Hudson v. Palmer*, the Supreme Court determined that prisoners lack any Fourth Amendment expectation of privacy in their cells.[187] In *United States v. Roy*, the Second Circuit considered whether a prison escapee had any expectation of privacy when driving his car.[188] *Roy* concluded that the escapee was a "trespasser on society" in "constructive custody" who could not "expand his legitimate expectations of privacy by escaping. A contrary determination would offer judicial encouragement to the act of escape and would reward an escapee for his illegal conduct."[189] Judge Henry Friendly ardently disagreed with this reasoning.[190]

---

[184] *Id.* at 32 ("Similarly, a prison escapee may not claim a legitimate expectation of privacy in his automobile.") (citing *United States v. Roy*, 734 F.2d 108, 110–12 (2d Cir. 1984)).

[185] *See United States v. Lowe*, 117 F.4th 1253, 1266 (10th Cir. 2024); *United States v. White*, 622 F.Supp. 2d 34, 43 n.8 (S.D.N.Y. 2008); *United States v. Pascual*, 199 F.Supp. 3d 670, 672–74 & n.5 (N.D.N.Y. 2016); *United States v. Melvin*, No. 20-CR-61-A, 2024 U.S. Dist. LEXIS 73044, at *5, *12–13 (W.D.N.Y. Apr. 22, 2024).

[186] The Court will turn to the "wrongful presence" dimension of these cases below.

[187] 468 U.S. 517, 526 (1984); *see also Samson*, 547 U.S. at 850 n.2 (noting that under *Hudson*, there is "no cause to resort to Fourth Amendment analysis").

[188] 734 F.2d at 112.

[189] *Id.* at 111–12.

[190] *Id.* at 112–14 (Friendly, J., Concurring on other grounds).

Although the authorities are not united[191] and the Third Circuit has not decided this issue,[192] other courts have applied such logic to escapees and fugitives.[193]

The escapee cases' logic is not persuasive here because "custodial" and "quasi-custodial" supervision are different. The driving force behind these decisions is the principle that under most circumstances,[194] a defendant cannot *expand* his Fourth Amendment rights beyond those which he would enjoy in his own home.[195] As the *Roy* court stated, applied to prisoners, escapees, and fugitives, this principle would reason that—were the escapee present in his cell—he would have no expectation of privacy. In contrast, were a parolee present in his authorized home, he would still have an expectation of privacy subject to the limitations authorized by state law and his conditions of parole.

This parolee-prisoner distinction is significant to both the Supreme Court and the Third Circuit. While recognizing that "parolees are more akin to prisoners than probationers," the Supreme Court also denied "equat[ing] parolees with

---

[191] *See Thomas*, 65 F.4th at 925.

[192] *See United States v. Donahue*, 764 F.3d 293, 299 (3d Cir. 2014) (declining to reach issue); *United States v. Robinson*, 2:14-cr-64, 2015 U.S. Dist. LEXIS 32955, at *13 n.2 (W.D. Pa. Mar. 17, 2015) (the Third Circuit has not "definitively answered this question" as applied to a halfway-house fugitive).

[193] *See United States v. Dodds*, 946 F.2d 726, 728–29 (10th Cir. 1991) (felon fleeing from police had no expectation of privacy in vacant apartment in which he had no interest, leaving the door ajar); *United States v. Edelman*, No. 5:09-CR-40 (FJS), 2010 U.S. Dist. LEXIS 147279, at *7–8 (N.D.N.Y. Feb. 1, 2010), *aff'd*, 726 F.3d 305 (2d Cir. 2013) (halfway house escapee).

[194] The Third Circuit embraced a limited exception to this rule in an unpublished decision. *United States v. Manuel*, 342 F.App'x 844, 848 (3d Cir. 2009) (probable cause required to believe probationer is present in third party's residence).

[195] *See, e.g.*, *United States v. Taylor*, 482 F.3d 315, 318 (5th Cir. 2007); *United States v. Dippre*, 695 F.Supp.3d 604, 609 (M.D. Pa. 2023) (Mannion, J.).

prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights."[196] "If that were the basis of [the Supreme Court's] holding, then [*Samson*] would have been resolved solely under *Hudson v. Palmer*, and there would have been no cause to resort to Fourth Amendment analysis."[197] This observation that parolees are "akin to prisoners" is therefore most reasonably understood as supporting California's interests in legislatively authorizing suspicionless parole searches. The Third Circuit has in fact stated many times in the context of analyzing parolees' Fourth Amendment protections that "there is no constitutional difference between probation and parole for purposes of the Fourth Amendment."[198]

Indeed, the Western District of Pennsylvania applied the same rationale as this Court in *United States v. Venson* to require reasonable suspicion in the parole search of an unauthorized residence at which the defendant-parolee was an overnight guest, as this reasonable suspicion would have been required if the parole search "had occurred in his approved residence."[199] Likewise in *Reed v.*

---

[196] *Samson*, 547 U.S. at 850 n.2.

[197] *Id.*

[198] *Keating*, 643 F.App'x at 224 (cleaned up) (quoting *United States v. Williams*, 417 F.3d 373, 376 n.1 (3d Cir. 2005)) (thereinafter quoting *United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992)).

[199] *United States v. Venson*, Criminal No. 07-364, 2009 U.S. Dist. LEXIS 46555, at *14, *20–21 (W.D. Pa. Jun. 9, 2009). The *Venson* court titled its analysis with a heading implying that the defendant had no standing but then concluded that reasonable suspicion was required to support the search. The decision therefore appears to confuse standing with probable cause or warrant protections. Notwithstanding this confusion, *Venson*'s reasoning aligns with the reasoning of this court.

*Sheppard*, the Western District of New York applied this rationale to reason that "a parolee's significantly diminished expectation of privacy follows him to premises other than his own residence."[200] As such, the warrantless search of a parolee's unauthorized residence was valid because had it occurred in his authorized residence, it would have been within the scope of his parole search waiver under state law.[201]

In the older case of *United States v. Randolph*, the Eastern District of Pennsylvania stated that to avoid the "perverse result" of a halfway-house escapee residing in his sister's home winning himself "more rights" through escape, no suspicion should be required after identifying the fugitive.[202] But the court avoided deciding this question because even assuming that defendant "occupie[d] the same legal status as a probationer," law enforcement would only require reasonable suspicion.[203] Affirming on appeal, the Third Circuit agreed that "[e]ven assuming that Randolph was entitled to the same level Fourth Amendment protection afforded to probationers," "the parole agents had reasonable suspicion to search the bedroom."[204]

---

[200] 321 F.Supp. 3d 429, 446–48 (W.D.N.Y. 2018); *see also United States v. Viserto*, 391 F.App'x 932, 933–34 (2d Cir. 2010) (summary order) (entering parolee's unauthorized residence to arrest him for absconding from supervision did not require obtaining warrant from judicial officer, because "even assuming [defendant] has standing," search and arrest were consistent with consented-to conditions of parole).

[201] *Id.*

[202] *United States v. Randolph*, 210 F.Supp. 2d 586, 590 (E.D. Pa. 2002).

[203] *Id.* at 591.

[204] 80 F.App'x 190, 193 (3d Cir. 2003).

Likewise, had the Alfords been at an authorized residence, Trooper Williamson would still have been required to muster probable cause. So parolees and escapees are distinguishable and the Alfords' parole statuses do not enter the calculus for the unwitting investigatory search of their unauthorized residence.

### B.    Wrongful Presence

As the second pillar of its argument, the Government makes the doctrinalizing assertion that based on cases involving defendants whose "wrongful presence" deprives them of their expectations of privacy, "there is a forfeiture by wrongdoing component to the Fourth Amendment, which is to say if you engage in certain wrongdoing, and it's deemed to be wrongdoing enough, you can lose an otherwise available expectation of privacy."[205] Later in the proceedings, the Government contends that there is no danger of a "slippery slope" as its argument only applies to parolees whose wrongdoing is a parole violation intended to evade supervision.[206] But in light of the foregoing analysis, the Court looks to the broader body of case law to determine the meaning of these wrongful presence cases.

The Government cites wide-ranging authorities analyzing wrongful presence. The Court concludes that forfeiture by wrongdoing is theoretically inconsistent with Fourth Amendment doctrine; that the Supreme Court's wrongful presence decisions and other wrongful presence cases undermine the prospect that

---

[205] Transcript II, Doc. 145 at 9:13–17.
[206] Supplemental Brief, Doc. 144 at 9–11.

a defendant in lawful possession of a residence could lack an expectation of privacy there; and that the cases applying this principle to parole violations are unpersuasive, distinguishable, and inconsistent with what little guidance exists.

### 1.    Forfeiture by Wrongdoing and the Fourth Amendment

At the outset, this forfeiture by wrongdoing theory is not internally consistent because it proves too much. It is well-understood that a defendant's expectation of privacy is unaffected by any illegal *activities* he may engage in while present in the premises searched,[207] as the Government concedes.[208] Otherwise, a criminal defendant's expectation of privacy might be coextensive with his guilt or innocence, and any defendant who committed crimes would be prohibited from moving to suppress evidence. The exclusionary rule would accomplish no deterrence if searches turning up wrongful conduct were unreviewable. The Fifth Circuit reached this same conclusion in *United States v. Vega*, holding that defendants do not "forfeit [their] fourth amendment protection by using the premises for illegal activities," and reasoning that any such conclusion "clearly misinterprets" the Supreme Court's "wrongful presence" cases.[209] *Vega* explained that the criminal defendant was not wrongfully present because

---

[207] *See Carter*, 525 U.S. at 91; *United States v. Washington*, 573 F.3d 279, 283–83 (6th Cir. 2009); *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002). The only exception is where the defendant's sole purpose is commercial and unlawful and he has no other connection to the home. *See, e.g.*, *Carter*, 525 U.S. at 91. That is not the case here.

[208] Brief in Opposition, Doc. 130 at 36.

[209] *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000).

"[r]egardless of the [criminal] activity conducted by [defendant] at the residence, there is no question that he 'lawfully possessed or control[led the] property.'"[210]

The Government limits its forfeiture by wrongdoing argument to wrongdoing that renders the defendant's *presence* wrongful. But that begs the question of why such a forfeiture-by-wrongdoing principle would not seep out into the broader context of criminal activities. If, as the Government argues, defendants "waive" their Fourth Amendment rights "if [they] engage in certain wrongdoing, and it's deemed to be wrongdoing enough,"[211] why would a parolee maintaining an unauthorized residence be engaging in "wrongdoing enough," but a defendant committing triple homicide in his own residence not be?

Even limiting this inquiry to just a defendant's presence does not avoid absurd consequences. The Court has only unearthed one case in which the defendant's supposedly wrongful presence in his own home had no nexus at all to disproving his lawful possession of that home. The District of Kansas applied this logic to conclude that an undocumented immigrant convicted for unlawful reentry lacked an expectation of privacy because his presence anywhere in the country is "unlawful."[212] This case underscores the absurd consequences of a broad rule that,

---

[210] *Id.*

[211] Transcript II, Doc. 145 at 9:13–16.

[212] *United States v. Gutierrez-Casada*, 553 F.Supp. 2d 1259, 1272–73 (D. Kan. 2008) (concluding that as defendant had been "'justifiably expelled' from the United States by virtue of his deportation," he is "currently an alien whose presence within the United States is forbidden and specifically prohibited by law" and so his "very presence in this country is

when a defendant is in the lay sense "wrongfully present" in his own home, this can defeat his expectation of privacy. Instead, the Government must at a minimum rebut the argument that a defendant is in lawful possession of his home before hinging its argument on other types of societal-expectation-based arguments. That is why standing analysis, for the most part, is only useful in cases involving third parties or quasi-public settings, such as phone booths.[213]

## 2.    "Wrongful Presence" in the Supreme Court

This understanding is confirmed by placing the "wrongful presence" dicta in the context of the three Supreme Court cases in which it originated.

In *Jones v. United States*, the Supreme Court held that a defendant had Fourth Amendment standing to challenge the search of his friend's house despite lacking any property interest, where he had a key and permission to use it, stored some of his clothes there, and had slept there "maybe a night."[214] *Jones*, decided before *Katz*, criticized overreliance on property concepts as the exclusive vehicle of substantiating a defendant's expectation of privacy.[215] It held that "anyone

---

'wrongful'"); *see also United States v. Esparza-Mendoza*, 265 F.Supp. 2d 1254, 1271 (D. Utah 2003) (concluding in the alternative that the defendant "is a trespasser in this country").

[213] *See Maxim*, 454 P.3d at 548 ("[W]e must correct the State's misinterpretation of Fourth Amendment standing . . . . [S]tanding is most useful in contexts where third parties are implicated . . . Maxim quite clearly asserts his Fourth Amendment rights were violated. Indeed, the State concedes that Maxim lived at the apartment which was searched by the officers. Surely, a search and seizure of Maxim's person implicated his Fourth Amendment rights. Who else would those rights belong to?").

[214] *Jones v. United States*, 362 U.S. 267, 259 (1960).

[215] *Id.* at 266 (explaining that property law "more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical.").

legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress."[216] But "[t]his would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premise searched."[217]

*Rakas v. Illinois*, which held that the passenger of a car who lacked control over it lacked an expectation of privacy, clarified *Jones* as it related to property and wrongful presence.[218] *Jones* rightly conferred standing to a defendant with a "legally sufficient interest in a place other than his own home,"[219] but recognizing standing for "anyone legitimately on premises" was overbroad as *Katz* had held that only *legitimate* expectations of privacy are protected.[220] Turning to *Jones*'s "wrongful presence" dictum, *Rakas* elaborated that "a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered;" a "burglar plying his trade in a summer cabin during the off season" would be "wrongfully present" as "his expectation is not 'one that society is prepared to recognize as reasonable.'"[221]

*Rakas* acknowledged *Jones*'s critique that common-law property interests are not the exclusive source of Fourth Amendment protections but explained that

---

[216] *Id.*
[217] *Id.*
[218] 439 U.S. 128, 150 (1978).
[219] *Id.* at 143.
[220] *Id.* at 142, 151, 153.
[221] *Id.* at 143 n.12.

"by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned the use of property concepts in determining the presence or absence of the privacy interests protected by that amendment."[222] Expectations of privacy must be substantiated "*either* by reference to concepts of real or personal property law *or* to understandings that are recognized and permitted by society."[223] On the former basis of "real or personal property law," *Rakas* stated that "[o]ne of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."[224]

Finally, in *Byrd v. United States*, the Supreme Court held that an unauthorized rental car driver given permission to drive by the authorized driver can have an expectation of privacy even though the rental contract forbids his presence.[225] Beginning by stating that "[o]ne who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it,"[226] *Byrd* elaborated that "'property concepts' are instructive in 'determining the presence or absence of the privacy interests protected by [the

---

[222] *Id.*

[223] *Id.* (emphases added).

[224] *Id.*

[225] 584 U.S. 395, 402 (2018) (9-0) (abrogating *United States v. Kennedy*, 638 F.3d 159, 165, 167–68 (3d Cir. 2011)).

[226] *Id.* at 404.

Fourth] Amendment.'"[227] Quoting *Rakas*' statement that privacy expectations are supported "either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society,"[228] *Byrd* noted that "[t]he two concepts in cases like this one are often linked."[229] The "general property-based concept" of "the right to exclude," which "in all likelihood" is a right held by "one who owns or lawfully possesses or controls property," "guide[d] resolution of this case."[230]

The Supreme Court rejected the majority rule that "the rental company's lack of authorization alone" deprived such drivers of the right to exclude as "rest[ing] on too restrictive a view of the Fourth Amendment's protections,"[231] because the terms of the rental agreement had "little to do with whether one would have a reasonable expectation of privacy in the rental car if, for example, he or she otherwise has lawful possession of and control over the car."[232] *Byrd* also rejected the argument that "the sole occupant of a rental car always has an expectation of privacy in it based on mere possession and control"[233] because, "without qualification, it would include within its ambit thieves and others who, not least because of their lack of any property-based justification, would not have a

---

[227] *Id.* at 403–404 (quoting *Rakas*, 439 U.S. at 144, n.12).
[228] *Id.* at 405 (quoting *Rakas*, 439 U.S. at 144 n.12).
[229] *Id.*
[230] *Id.*
[231] *Id.*
[232] *Id.* at 408.
[233] *Id.* at 405.

reasonable expectation of privacy."[234] Finally, as the argument was not raised below, *Byrd* punted on the Government's argument that the Defendant was not in "lawful possession" because he had "intentionally used a third party as a strawman in a calculated plan to mislead the rental company from the very outset, all to aid him in committing a crime."[235] So the court never decided whether "the law should distinguish between one who obtains a vehicle through subterfuge of the type the Government alleges occurred here and one who steals the car outright,"[236] and on remand, the Government abandoned the issue.[237]

These cases demonstrate why the Government's argument that a defendant's "wrongful presence" in his own home could void his expectation of privacy is overbroad, and support relying on the Alfords' lawful possession here. *Jones* coined the "wrongful presence" idea in opposition to its "legitimately on the premises" rule, and though *Rakas* viewed that rule as overbroad, it endorsed *Jones*'s understanding of a defendant's wrongful presence by pointing to a trespassing burglar. *Rakas* and *Jones* lend credence to property concepts, such as a defendant's property interests in his own apartment, or common authority over it, along with the attendant right to exclude, as one of multiple valid methods of showing his expectation of privacy.

---

[234] *Id.* at 405–406.

[235] *Id.*

[236] *Id.*

[237] 742 F.App'x 587, 591 (3d Cir. 2018) (remanding to district court); 388 F.Supp. 3d 406, 412 n.5 (M.D. Pa. 2019) (Connor, J.) ("The government elected to abandon its position").

*Byrd* was even more focused on property concepts. *Byrd* eschewed reliance on the rental contract to show the unauthorized defendant's wrongful presence as it had no bearing on his lawful possession of and control over the car. And its examples of "wrongful presence" were cabined to examples such as car thieves which had a nexus to disproving lawful possession. Even the "strawman" issue unaddressed by *Byrd* relied on a fraud argument, which is consistent with the principle that contracts induced by fraud are voidable. Moreover, the word "lawful" cannot be extracted from the "lawful possession" relied upon by these cases to mean any illegal conduct, as "lawful possession" is a term of art referring to property rights.[238] Granting that the phrase "thieves and others" generates some ambiguity as to who the "others" are, it does not seem consistent with *Jones*, *Rakas*, and *Byrd* to extend it to parolees in lawful possession of their unauthorized homes. Nor is this conclusion disturbed, as the Court will now discuss, by the various lower court decisions cited by the Government.

### 3.    Wrongful Presence in the Lower Courts: Trespassers, Fraud, Restraining Orders, and Unlicensed Drivers

The lower courts have developed four main applications of the "wrongful presence" rule, and the Government cites to cases emerging out of each:

---

[238] *See Lawful Possession*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("See Possession"); *Possession*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The fact of having or holding property in one's power; the exercise of dominion over property . . . . Lawful possession (16c) 1. Possession based on a good-faith belief in and claim of ownership. 2. Possession granted by the property owner to the possessor.").

trespassers; fraud; defendants violating restraining orders; and unlicensed drivers. A holistic analysis of this body of precedent undercuts the assertion that a defendant can be "wrongfully present" in his own home. In fact, these cases are illuminating about the interaction between legality and wrongful presence. They too counsel against extending "wrongful presence" to defendants in lawful possession of the premises.

First, there is broad consensus among the authorities on some defendants whose wrongful presence voids their expectations of privacy, stemming from trespass concepts. Trespassers,[239] squatters,[240] and other persons present on property without the property owner's permission[241] have no expectation of privacy. Courts have also generally denied any expectation of privacy to those who

---

[239] *Cortez-Dutrieville*, 743 F.3d 881, 884–85 (3d Cir. 2014); *United States v. Busic*, 592 F.2d 13, 22–23 (2d Cir. 1978); *United States v. Struckman*, 603 F.3d 731, 746–47 (9th Cir. 2010); *United States v. Sawyer*, 929 F.3d 497, 459–60 (7th Cir. 2019); *United States v. Brown*, 484 F.Supp. 2d 985, 992 (D. Minn. 2007) (Mayeron, M.J.), *report and recommendation adopted*, 484 F.Supp. 2d 988 (D. Minn. 2007) (despite apartment lessee's consent, defendant's presence was wrongful because building complex owner forbade his presence and labeled him a trespasser).

[240] *Cortez-Dutrieville*, 743 F.3d at 884–85; *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 12 (1st Cir. 1975) (squatters who entered land and built a home upon it had no expectation of privacy because "whether the occupancy and construction were in bad faith is highly relevant" to "whether a place constitutes a person's 'home'"); *Williams v. Sessoms-Newton*, No. 14-CV-00106 (PKC), 2017 U.S. Dist. LEXIS 131635, at *15 (E.D.N.Y. Aug. 17, 2017) (no expectation of privacy for apartment squatters).

[241] *United States v. Gale*, 136 F.3d 192, 195–96 (D.C. Cir. 1998); *United States v. Saint-Brice*, 1 F.App'x 232, 234 (4th Cir. 2001); *United States v. Bridges*, No. 21-1679, 2022 U.S. App. LEXIS 25847, at *11 (3d Cir. Sep. 15, 2022); *United States v. Phillips*, 382 F.3d 489, 497 (5th Cir. 2004); *United States v. Murray*, No. 1:10-cr-00024, 2010 U.S. Dist. LEXIS 77954, at *13–14 (D.V.I. Aug. 2, 2010).

trespass upon public lands.[242] This body of case law is self-evidently consistent with the Court's interpretation of "wrongful presence" and flows from *Jones*, *Rakas*, and *Byrd*.

What is more, courts have tailored this application of "wrongful presence" to lawful possession when dealing with defendants' purported homes. A defendant residing in his home after a court-ordered eviction,[243] or after his license to reside in there is revoked under state law,[244] is effectively a trespasser retaining no expectation of privacy. Such a locked-out tenant's overnight guests similarly have no expectation of privacy.[245] But courts have cabined this analysis through landlord-tenant law and other concepts relating to lawful possession, holding for example that tenants are not wrongfully present when behind on rent; they retain an expectation of privacy until the landlord expels them through legal action.[246] So these cases affirm the centrality of property concepts to the wrongful presence inquiry and repudiate applying such arguments against defendants whose rights are

---

[242] *United States v. Ruckman*, 806 F.2d 1471, 147–73 (10th Cir. 1986) (2-1). But there has been some uncertainty regarding the privacy expectations of campers when their tents are on federal lands. *See United States v. Sandoval*, 200 F.3d 659, 660–61 (9th Cir. 2000).

[243] *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787–89 (9th Cir. 1994); *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011).

[244] *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513–16 (7th Cir. 2020).

[245] *Woodward v. City of Tucson*, 870 F.3d 1154, 1160 (9th Cir. 2017) (evicted tenant's overnight guest had no expectation of privacy because the tenant had "no privacy rights to assign").

[246] *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859 (7th Cir. 1999) (Posner, J.); *United States v. Ross*, 43 F.App'x 751, 756–58 (6th Cir. 1997); *Washington*, 573 F.3d at 284; *United States v. Hunyady*, 409 F.3d 297, 301–303 (6th Cir. 2005) (defendant who continued living in residence after his father's death and who the landlord had served with two notices of eviction was not a tenant by sufferance under state law, and was instead a trespasser whose presence was wrongful). *See also Bonner v. Brookhaven*, No. CV 22-4690 (GRB)(ARL), 2023 U.S. Dist. LEXIS 185405, at *4–9 (E.D.N.Y. Oct. 16, 2023).

not extinguished. That this line of cases is by far the most well-developed is illuminating considering the question presented today.

Second, another pertinent line of cases cited to by the Government involves defendants who are argued to be wrongfully present because they obtained the premises to be searched through fraud. The Government claims that "another way to conceive of the 'wrongfulness' of the defendants' conduct vis-à-vis the apartment is to understand their conduct as a protracted fraud perpetrated not only against the parole department but also against the owner/lessor of the apartment."[247] But the majority approach in these cases mirrors the approach taken in the trespass cases and recognizes an expectation of privacy until the defendant's property rights are extinguished, while the minority approach nevertheless applies property concepts to argue that such defendants are not in lawful possession, consistent with the undecided "strawman" rental question in *Byrd*.

Though the Government claims that "a hotel patron who has procured the room 'by criminal fraud and deceit' lacks a legitimate expectation of privacy in the room" under the Ninth Circuit's *United States v. Cunag* decision,[248] *Cunag* actually held that a person who obtains a hotel room through fraud maintains his expectation of privacy there until the hotel revokes his possession, such as by

---

[247]  Supplemental Brief, Doc. 144 at 7.
[248]  Brief in Opposition, Doc. 130 at 33.

locking him out.[249] The Seventh Circuit aligned with this approach in the instructive case of *United States v. Thomas*, in which a fugitive-defendant rented a condominium through a fictitious alias and identification documents to avoid detection, in violation of criminal law, rendering the lease voidable.[250] The Government argued that this fraud upon the landlord made the defendant's presence wrongful,[251] but the court explained that this made the lease *voidable* rather than *void* under state landlord-tenant law, and so "Thomas was entitled to all the rights of any other leaseholder" until the landlord initiated a dispossessory proceeding and it concluded in her favor.[252]

Thomas was unlike a "burglar plying his trade" because this would require concluding that "any violation of the law in the causal chain of an interest in property eliminates the need for a warrant."[253] Like one who uses illegal drug proceeds to purchase or rent property (money laundering), or "someone who signs a lease while intending not to pay rent" (fraud), "the deed or lease is valid, even if acquiring the property was itself a criminal act."[254] *Thomas* reasoned that its conclusion was supported by *Byrd*, as even an unauthorized rental car driver has a

---

[249] *United States v. Cunag*, 386 F.3d 888, 895 (9th Cir. 2004) ("[E]ven if the occupant of a hotel room has procured that room by fraud, the occupant's protected Fourth Amendment expectation of privacy is not finally extinguished until the hotel justifiably takes 'affirmative steps to repossess the room.'") (citations omitted); *United States v. Young*, 573 F.3d 711, 716-17 (9th Cir. 2009).

[250] *Thomas*, 65 F.4th at 923.

[251] *Id.* at 925.

[252] *Id.* at 924.

[253] *Id.* at 925.

[254] *Id.*

right to exclude others; "[a]nd this case concerns a home, which is 'first among equals' in the eyes of the First Amendment."[255]

In contrast, the Tenth Circuit denied standing to a defendant whose girlfriend rented him a storage unit by using a stolen identity in *United States v. Johnson*.[256] Though *Johnson* looked to policy concerns relating to identity fraud to gauge societal expectations,[257] it also distinguished cases in which a fictitious alias rather than a stolen identity is used, noting that the defendant had no right to exclude the person whose identity was stolen as the identity fraud victim could demand access to the storage unit at any time.[258] It also reasoned that because the defendants misrepresented their identities, the rental contract was induced by fraud and "voidable at the storage unit owner's option."[259]

The Court finds *Cunag* and *Thomas* to be more persuasive because they recognize how the distinction between void and voidable leases maps onto societal expectations. But even *Johnson* and its voidable-by-fraud rationale acknowledged the importance of lawful possession and the right to exclude when determining whether one's presence is wrongful. So the fraud cases do not support extending

---

[255] *Id.* at 925–26 (citations omitted).

[256] 584 F.3d 995, 1001–1004 (10th Cir. 2009). *See also United States v. Pitshou Yunga Kafuku*, 357 F.Supp. 3d 1164, 1180 (D. Utah 2018) ("[A] person who acquires property through some wrongful means does not have a reasonable expectation of privacy on that property, even where the subject property is the person's home."). Given the Court's analysis, *Kafuku*'s understanding of a defendant's wrongful presence is overbroad.

[257] *Johnson*, 584 F.3d at 1001–1002.

[258] *Id.* at 1002–1004.

[259] *Id.*

"wrongful presence" to cover the Alfords, as record evidence did not demonstrate that Altari obtained the lease through misrepresenting his identity or with the intention of breaching the lease. The lease violations here are akin to those in *Byrd* rather than its strawman hypothetical, as they reflect not fraud in the contract itself, but violations of a lease which was validly obtained.

Third, every case to have considered defendants present in violation of a protective order has held that they lack an expectation of privacy.[260] The Third Circuit reached this conclusion in *United States v. Cortez-Dutrieville*, holding that an overnight guest had no expectation of privacy where, despite the permission of the homeowner, that homeowner had previously obtained a protective order against him.[261] "Dutrieville's mere presence in the home violated the [protection] order and exposed him to criminal liability," so the resident's "consent could not override the terms of the protection order."[262] "Consequently, like a trespasser, a squatter, or any individual who 'occup[ies] a piece of property unlawfully,'" the defendant's "presence in the home was 'wrongful,'" and therefore any expectation of privacy he may have had was not one that society was prepared to recognize as

---

[260] *United States v. Schram*, 901 F.3d 1042, 1049 n.3 (9th Cir. 2018) (collecting cases); *see also Commonwealth v. Morrison*, 710 N.E.2d 584, 586 (1999); *Cottman v. Rodriguez*, C/A No. 2:23-03104-RMG-MHC, 2024 U.S. Dist. LEXIS 104224, at *14–15 (D.S.C. Apr. 2, 2024).
[261] 743 F.3d 881, 885–86 (3d Cir. 2014).
[262] *Id.* at 885.

reasonable."[263] The defendant accordingly had no "privacy interest located in a place he is legally prohibited from entering."[264]

*Cortez-Dutrieville* used broad language, but its statement that "any individual who 'occup[ies] a piece of property unlawfully'" has no expectation of privacy should not be read sweepingly and does not extend to this case.[265] This language is quoted from the Seventh Circuit's decision in *United States v. Curlin*, but *Curlin* and subsequent Seventh Circuit cases demonstrate that this language has not been read to apply literally to any illegal presence.[266] Moreover, *Cortez-Dutrieville* cited approvingly to *United States v. Baker*, in which a defendant-parolee driving without a license in violation of parole and criminal law had standing, for the principle that "standing depends on 'the strength of [a person's] interest' in the searched property and 'the nature of his control over it.'"[267]

It is logical to consider protection order violations as trespassory notwithstanding nominal consent, because seeking a protection order is a more accurate representation of the resident's will than consent at the time of entry. One who violates a protective order does not likely call the residence his home or have

---

[263] *Id.*

[264] *Id.*

[265] *See Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2281 (2024) (Gorsuch, J., Concurring) ("[I]t would be a mistake to read judicial opinions like statutes.").

[266] *See Curlin*, 638 F.3d at 565 (following this statement by solely citing to cases involving trespassers and squatters, and denying Fourth Amendment standing to tenant who resided in his apartment after being served a court-ordered eviction); *Walton*, 763 F.3d at 662–667 (unlicensed driver had standing); *Thomas*, 65 F.4th at 923–24 (defendant who rented condo by criminal use of alias had standing).

[267] *Id.* at 885 (quoting *Baker*, 221 F.3d at 442).

control over it, as was the case with the defendant in *Cortez-Dutrieville* who was at most an overnight guest. A restraining order does not only make the defendant's presence illegal but does so in a way that necessarily diminishes his control over the premises and his right to exclude. To extend *Cortez-Dutrieville* to this case, one would have to reason that if the defendant's wife had been an overnight guest at *his* home, he would still lack standing. That would be a strange and unwelcome outcome.

Even reading this language literally, it still does not reach the Alfords, as *Cortez-Dutrieville* relied on the criminality of the defendant's presence.[268] Parole violations are not criminal offenses; they lay between the guideposts of criminality and rental contract violations, albeit much closer to the criminal side. Whether they result in revocation is up to the parole board's discretion.[269]

Fourth, several post-*Byrd* cases have divided on whether a rental car driver who is *both* unauthorized by the rental agreement *and* driving without a license in violation of state criminal law maintains his expectation of privacy.[270] These cases' facts are far afield, but their reasoning is telling.

The majority approach rejects the argument that driving without a license is relevant to a defendant's wrongful presence. In *United States v. Bettis*, the Eighth

---

[268] *Id.* at 884 & n.2 ("Dutrieville's mere presence in the home violated the order and exposed him to criminal liability.").

[269] *See* 37 Pa.C.S. §§ 63.3, 65.3.

[270] *See Montalvo-Flores*, 81 F.4th at 345 n.10 (highlighting this question without resolving it).

Circuit held that such an unauthorized-and-unlicensed rental car driver maintained his expectation of privacy,[271] reasoning that "the Supreme Court's examples of wrongful presence, such as a 'burglar plying his trade' or a car thief, involve criminal conduct that interferes with another's valid property interest;" as "the illegal act of unlicensed driving does not interfere with a valid possessory interest," it has no bearing on Fourth Amendment standing.[272] Otherwise, "common traffic infractions would eviscerate the Fourth Amendment's protections."[273] The Eleventh Circuit's decision in *United States v. Cohen* endorsed *Bettis* and applied the same reasoning.[274]

The Second Circuit's contrary decision in *United States v. Lyle* held that unauthorized-and-unlicensed rental car drivers have no expectation of privacy; though "a defendant does not lose all his Fourth Amendment rights simply by engaging in illegal acts," "he may still lack standing to challenge a search when the law prevents him from being there in the first place, even with the owner's permission."[275] To distinguish *Byrd*, *Lyle* observed its dictum that "there may be countless innocuous reasons why an unauthorized driver might get behind the

---

[271] 946 F.3d 1024, 1028 (8th Cir. 2020).

[272] *Id.* at 1028.

[273] *Id.* at 1029.

[274] 38 F.4th 1364, 1370 (11th Cir. 2022) ("taken to its logical conclusion, [this argument would] threaten[] to eviscerate standing for those engaged in similarly continuous unlawful activity," such as those driving with obscured license plates; "the common theme in the Supreme Court's examples of individuals whose activities equate to wrongful presence—a burglar plying his trade or a car thief—is that their conduct 'interferes with another's valid property interest.'").

[275] 919 F.3d 716, 729–30 (2d Cir. 2019).

wheel of a rental car" and its reference to "*lawful* possession," as opposed to unlicensed driving, which "was *unlawful* the moment [the defendant] started driving."[276]

But *Lyle* did not rely only upon the act of unlicensed driving to conclude that the defendant was wrongfully present. It explicitly pointed to the *combination* of this fact and the driver's unauthorized status, and highlighted the possibility of an authorized-but-unlicensed rental car driver's expectation of privacy in a citation to *United States v. Walton*.[277] *Walton* recognized the standing of a driver who "somehow manage[d] to become the authorized driver of a rental car without having a valid license," holding that "[a] driver does not lose all Fourth Amendment protections simply because his license is invalid" because "[t]he opposite principle would lead to absurd results."[278] *Walton*, like *Bettis* and *Cohen*, rejected the notion that illegal presence is relevant to a defendant's Fourth Amendment standing where the illegality "has nothing to do with his immediate possessory interest in the vehicle."[279] Likewise, in *United States v. Baker*, the Third

---

[276] *Id.* (emphases added).

[277] *Lyle*, 919 F.3d at 730 (citing *United States v. Walton*, 763 F.3d 655, 662–63 (7th Cir. 2014)).

[278] *Walton*, 763 F.3d at 662–63.

[279] *Id.* at 666–67 ("At its core the government's argument conflates Walton's alleged illegal behavior with his expectation of privacy . . . . [I]f the Fourth Amendment suppression rule means anything, it must require that the police have a reasonable basis for searching other than that—as it turns out—the search uncovered illegal activity. That protection is compromised if Walton loses his standing even to challenge a car search simply because of his alleged unlawful conduct that has nothing to do with his immediate possessory interest in the vehicle.").

Circuit held that a defendant with a suspended license and driving a borrowed car to his parole meeting maintained an expectation of privacy in the car.[280]

The Court finds *Bettis* and *Cohen* to be more persuasive than *Lyle*, which did not account for the Supreme Court's property-based rationale and wrongful presence examples, disregarded *Byrd*'s analysis of the rental agreement, and isolated the word "lawful" in "lawful possession" instead of reading it as a term of art referring to property concepts. Still, *Lyle* is consistent with recognizing the Alfords' property rights because it relied on the unauthorized-*and*-unlicensed scenario, which combination could be understood to rebut both *Rakas* prongs.[281] So *Lyle* does not undercut pegging an unauthorized parolee's expectation of privacy in his home to his lawful possession; these cases do not support depriving unlicensed drivers of an expectation of privacy in their own cars. Analogously these cases support the Alfords, whose lawful possession is undisputed notwithstanding that their unauthorized residence violates parole.[282]

---

[280] *Baker*, 221 F.3d at 443.

[281] To reiterate, a defendant's expectation of privacy must be legitimated "*either* by reference to concepts of real or personal property *or* to understandings that are recognized and permitted by society." 439 U.S. 128, 143 n.12 (1978) (emphases added).

[282] Although the Court could adopt *Lyle*'s rationale to find that Alteriki (but not Altari) lacks Fourth Amendment standing due to his unauthorized (per the lease) and illegal (per his conditions of parole) presence, it is not convinced that this is proper here. First, as discussed, Alteriki's presence violated parole but was not illegal. Second, this "would be a dramatic expansion of the Second Circuit's vehicular decisions." *Bonner*, 2023 U.S. Dist. LEXIS 185405, at *8–9. Third, of course, there remains this Court's view that *Lyle* is unpersuasive to begin with.

### 4.    "Wrongful Presence" And Parole Violations

This case law furnishes the necessary context to weigh in on the divided authorities analyzing parole violations. The Government states that "the intentional, coordinated nature of the Alfords' conduct is what ultimately distinguishes this case from some of the other cases involving 'parolees doing bad things.'"[283] The Government would have this Court read the fugitive cases discussed above to mean that Courts must punish a parolee's attempts to "escape" parole supervision by denying him standing. But the foregoing analysis, along with the Court's analysis of these authorities, indicates that such parolees retain an expectation of privacy, and that Fourth Amendment protections are not withheld to accomplish punitive ends.

Few authorities exist that speak to this issue. Two district court cases opined in dicta that supervised releasees or parolees living in unauthorized residences are "wrongfully present" there but provided little analysis.[284] But two recent cases develop this argument further. In *United States v. Melvin*, the Western District of New York held that a parolee had no expectation of privacy while staying as his girlfriend's overnight guest, as he was staying in an unauthorized residence in

---

[283] Supplemental Brief, Doc. 144 at 9.

[284] *See White*, 622 F.Supp. 2d at 43 n.8 (supervised releasee's "wrongful presence at the apartment present[ed] an alternative basis on which his motion to suppress could be denied"); *Pascual*, 199 F.Supp. 3d at 672–73 & 674 n.5 (noting that "there is a fair argument to be made that Pascual lacks standing to challenge the search at all, since his unapproved residence at the Syracuse apartment constituted a violation of the conditions of this parole agreement.").

violation of parole.[285] Relying exclusively on cases involving escapees and fugitives, *Melvin* held that "society does not—and ought not—recognize as objectively reasonable a parolee's ability to gain an enhanced and cognizable expectation of privacy by breaching the conditions of his parole release," given "society's 'overwhelming interest' in supervising its parolees" and the peril of "offer[ing] judicial encouragement to the act of escape."[286]

In the recent case of *United States v. Lowe*, the Tenth Circuit analyzed whether a supervised releasee who stored contraband in an apartment storage unit without his landlord's permission, and in violation of the terms of his supervised release, maintained an expectation of privacy there.[287] *Lowe* held that the defendant had no Fourth Amendment standing, first because he had not introduced evidence that he had occupied or used the storage unit, and second because no evidence substantiated his legitimate possession of the storage unit as he had not paid his landlord for its use.[288]

*Lowe* then reached a third alternative holding that "even if Mr. Lowe had somehow obtained authorization to use the storage unit, '*Rakas* makes clear that wrongful presence at the scene of a search would not enable a defendant to object

---

[285] 20-CR-61-A, 2024 U.S. Dist. LEXIS 73044, at *5, *12–13 (W.D.N.Y. Apr. 22, 2024).
[286] *Id.* at *13.
[287] 117 F.4th 1253, 1258–59, 1264 (10th Cir. 2024) (Tymkovich, J.).
[288] *Id.* at 1262–64.

to the legality of the search.'"[289] As the defendant had twice denied possession of any storage unit to the probation officer,[290] *Lowe* reasoned that his "unauthorized acquisition of, and denial of ownership in, the storage unit directly violated [defendant's] legal obligations and afforded him a greater opportunity to 'conceal criminality.'"[291] "Recognizing Fourth Amendment interests in arrangements that evade legal supervision fundamentally contradicts the purpose and rationale of those release conditions," so any expectation of privacy "'cannot be reconciled,' with the principles governing supervised release or society's interests in enforcing supervised release conditions."[292] Accordingly, *Lowe* held that the "acquisition and use of the unit was 'wrongful'"[293] and the defendant lacked Fourth Amendment standing.

*Melvin* and *Lowe* articulate persuasive policy rationales, but they do not articulate persuasive reasons why parolees in lawful possession of the premises searched could lack an expectation of privacy. To understand why these cases do not control this case's resolution today, I will attempt to apply the lessons discussed above.

Parolees may be different, but they are not different here, since the search isn't authorized by the special-needs exception, state law, or a condition of parole.

---

[289] *Id.* at 1265.
[290] *Id.*
[291] *Id.* at 1266 (quoting *Samson*, 547 U.S. at 854).
[292] *Id.*
[293] *Id.*

And it is unpersuasive to simply apply the escapee and fugitive cases to parolees in unauthorized residences, who do not obtain *more* rights at unauthorized residences. The wrongful presence cases also do not support extinguishing Fourth Amendment protections through a forfeiture rationale. That's an overbroad reading of the "wrongful presence" dicta in *Jones*, *Rakas* and *Byrd*, which has been applied in trespass, fraud, restraining order, and unlicensed driver cases to have a nexus with lawful possession. As *Rakas* and *Byrd* observe, Fourth Amendment standing is substantiated "*either* by reference to concepts of real or personal property law *or* to understandings that are recognized and permitted by society."[294] So when it comes to a defendant's lawful possession, societal expectations are superfluous.[295] This Court finds Judge Frank Easterbrook's analysis in *Thomas*, which recognized that a fugitive's property interest in his lease established his expectation of privacy notwithstanding that he obtained it through the criminal act of using a fictitious alias, to be more consistent with Fourth Amendment standing cases' reliance on property concepts and the lawful possession inuring via Altari's lease.

Still, *Lowe* would bridge the gap between parolees and escapees by pointing out that the defendant's expectations of privacy are only one side of the story. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of

---

[294] *Rakas*, 439 U.S. at 143 n.12 (emphases added).

[295] The Court notes that its analysis is specifically limited to defendants in lawful possession. Defendants hinging their privacy expectations on societal expectations who lack lawful possession must introduce convincing arguments consistent with such expectations.

a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."[296] The Court's wrongful presence inquiry only pertained to the Alfords' privacy interests. But *Lowe*'s approach to this balancing of interests cannot be applied in the same way here. As discussed, it seems to be the Third Circuit's view that for parolees, the balancing of interests inhering in the Fourth Amendment reasonableness inquiry takes place through legislation or conditions of parole. So although such reasonableness analysis is the spring from which Fourth Amendment doctrine flows, *Lowe*'s ad hoc balancing of those interests against parolees is inconsistent with that logic, at least as to a non-parole search.

Moreover, though it may be that many courts measuring a defendant's reasonable expectation of privacy consider facts unknown to the searching officer, that logic is only valid for measuring the defendant's privacy interests. On the other side of the scale, the Government cannot retroactively justify searches through interests it did not know it had.[297] That lack of knowledge defeats the requirement that the incursion on privacy is necessary for the promotion of

---

[296] *Knights*, 534 U.S. at 591.

[297] *See Randolph*, 210 F.Supp. 2d at 590, *aff'd*, 80 F.App'x 190 (3d Cir. 2003) ("a sensible rule would only require that all law enforcement officers need to do is to identify the fugitive and then they are free to search"); *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *Siler*, 905 S.E.2d at 284 (applying this principle to conclude that officer could not rely on defendant's probationary status where he did not know of it at the time of the search); *Maxim*, 454 P.3d at 550.

legitimate government interests. Trooper Williamson did not know he was searching any parolee's residence, much less an unauthorized one.[298] It's true that extinguishing Fourth Amendment rights for even unwitting searches of unauthorized residences might deter criminal acts, but that rationale applies to voiding anyone's Fourth Amendment protections and only garners "legitimacy" in hindsight. And despite speaking in sweeping language, *Melvin* and *Lowe* did not perceive the scenario before us, involving both the lesser Government interests of unwittingly searching unauthorized residences and greater privacy interests. As noted above, the home is first among equals under the Fourth Amendment, but *Melvin* involved a parolee who was an overnight guest, and *Lowe* involved a parole officer searching a storage unit.

Aside from *Melvin* and *Lowe*, what other authority exists also supports the Court's conclusion. In *United States v. Baker*, a parolee whose parole conditions forbade driving without a license, confusingly, drove to his parole meeting without a license.[299] Despite this violation, the Third Circuit held that the defendant had an expectation of privacy in the car, so the parole officer needed reasonable suspicion of a violation to search it.[300] As there was no reasonable suspicion to believe that evidence of this parole violation would be found in the trunk, that search was

---

[298] Williamson knew that Alteriki was on parole but did not know he lived at the Apartment; Williamson knew that Altari lived at the Apartment, but the Government did not elicit testimony that he knew Altari was on parole.

[299] 221 F.3d at 441.

[300] *Id.* at 441–43.

invalid.[301] *Baker* never discussed the parole violation and illegal conduct when analyzing standing.[302]

Likewise, in the *Walton* case discussed above, a defendant violated the terms of his parole, both by driving a rental car without a license and by leaving his state of supervision without authorization, and the Government argued that he was wrongfully present in the car and outside of his state of supervision after the car was stopped.[303] Relying on *Baker*, *Walton* concluded that finding wrongful presence in the car because the defendant left Kentucky without permission "would still deny virtually any parolee standing to challenge a search."[304] "Society is prepared to accept that parolees have an expectation of privacy, even if they are up to no good."[305]

Though not discussing standing, several unpublished Third Circuit cases analyze whether probation or parole officers had reasonable suspicion to search unauthorized residences.[306] In such cases, reasonable suspicion of violations was a self-fulfilling prophecy, as living at an unauthorized residence *is* a violation.[307] Yet

---

[301] *Id.* at 444–45.

[302] *Id.*

[303] 763 F.3d at 657, 660–61.

[304] *Id.*

[305] *Id.*

[306] *United States v. Manuel*, 342 F.App'x 844 (3d Cir. 2009); *United States v. Crutchfield*, 444 F.App'x 526 (3d Cir. 2011); *United States v. Marcano*, 508 F.App'x 119 (3d Cir. 2013).

[307] *Manuel*, 342 F.App'x at 847–48 ("the officers had 'reasonable suspicion' to search the Washington Street Address to determine whether Manuel had violated the terms and conditions of his probation by failing to obtain approval before changing his residence"); *Crutchfield*, 444 F.App'x at 528 ("the agents did possess probable cause that Crutchfield was

none of these cases thought to consider whether the defendants had standing; each applied reasonable suspicion.[308] And, due to the privacy concerns of invading third party residences, the Third Circuit has also required probable cause rather than reasonable suspicion to believe that a probationer lives there even without authorization.[309] That rule is at least inconsistent with holding that probationers have no expectation of privacy in unauthorized residences.

As discussed above, the *Venson*, *Reed*, and *Randolph* decisions support this Court's understanding that a parolee in an unauthorized residence should simply receive the same Fourth Amendment protections as in his own home based on the kind of search—whether that be reasonable suspicion or probable cause, and whether that extends to searches by just parole officers or searches by any officer. *Venson* applied reasonable suspicion to the parole search of the unauthorized residence where a parolee was an overnight guest; *Reed* looked to the scope of a

---

living at 524 East Basin Street"); *Marcano*, 508 F.App'x at 122 ("reasonable suspicion exists that Marcano had violated the terms of his parole by living at 133 Tilghman Street."); *Keating*, 643 F.App'x at 223–25 ("These facts establish that Agent Coslett reasonably believed that Keating was living at 90 Market Street in violation of his parole conditions and, thus, had reasonable suspicion to believe that 90 Market Street would contain evidence of Keating's unauthorized change of residence.").

[308] However, because Fourth Amendment standing is non-jurisdictional, it can be waived by the government. *United States v. Dowdell*, 70 F.4th 134, 146 (3d Cir. 2023) (citing *Stearn*, 597 F.3d at 551 n.11). So these cases are not controlling.

[309] *Manuel*, 342 F.App'x at 847–48 ("probable cause is required to believe a probationer resides at a location, but [] only reasonable suspicion is needed to investigate a possible probation violation") (citations omitted); *Shea v. Smith*, 966 F.2d 127, 131 (3d Cir. 1992) (probation officer may enter third party home to confirm whether probationer has violated condition of probation where officer "reasonably believes" that probationer resides there); *see also United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006); *United States v. Thabit*, 56 F.4th 1145, 1151 (8th Cir. 2023).

parolee's search waiver to determine if a search was reasonable; and *Randolph* stated that had the halfway house fugitive received the same protections as a probationer when living in his sister's home, reasonable suspicion would have been required for the search.[310]

The District of Connecticut's decision in *United States v. Robertson*, which held that a supervised releasee maintained his Fourth Amendment standing in an unauthorized residence, aligns remarkably well with the Court's reasoning.[311] *Robertson* viewed the Government's wrongful presence arguments to be "legally superfluous" to whether the searches intruded on the defendant's expectation of privacy; found the defendant's supervised release status to be irrelevant as the challenged search was outside of the scope of his search waiver; and found the escapee cases to be disanalogous.

I note the Government's concern that this ruling could incentivize parolees to obtain unauthorized residences. But parole searches can be justified by reasonable suspicion of parole violations, and living in an unauthorized residence *is* a violation. Officers not seeking to retroactively justify unwitting searches upon unauthorized residences can simply inform the parole office, which can and should search the residence. What is more, at least at the federal level, even suppressed

---

[310] *See Venson*, 2009 U.S. Dist. LEXIS 46555, at *14 & *20–21; *Reed*, 321 F.Supp. 3d at 446–48; *Randolph*, 210 F.Supp. 2d at 590, *aff'd*, 80 F.App'x 190, 193 (3d Cir. 2003).
[311] 239 F.Supp. 3d 426, 448–49 (D. Conn. 2017).

evidence remains admissible in a parole revocation hearing.[312] And Fourth Amendment standing is only the beginning. It only lets defendants *bring* challenges—it doesn't let them win. This ruling only favors defendants if the *Government* has engaged in behavior justifying suppression. Indeed, holding otherwise would offer judicial encouragement for *that* behavior.

* * *

Given the broader context of wrongful presence within Fourth Amendment standing cases, the beginning and end of the analysis is that the Apartment is the Alfords' home. The Government's two pillars collapse under scrutiny. The Alfords' statuses as parolees have no bearing on Trooper Williamson's search here, and the Court's analysis of wrongful presence reveals that there is little support for the Government's "forfeiture by wrongdoing" argument, nor are the contrary parole violation cases persuasive here. These two pillars also do not combine to nullify standing. "We decline to transform two flawed contentions into a single winning argument, as if through some sort of legal alchemy."[313] "Though new, the fact pattern here continues a well-traveled path in this Court's Fourth Amendment jurisprudence," positioning property concepts like lawful possession

---

[312] *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 359 (1998). However, the Pennsylvania State Constitution provides broader protections than the federal constitution and does require excluding such evidence in state revocation hearings. *Commonwealth v. Arter*, 151 A.3d 149, 543–44 (Pa. 2016).

[313] *Walton*, 763 F.3d at 666 (rejecting the same argument).

and the right to exclude as a legitimate source of a defendant's expectation of privacy.[314]

Having determined that the Alfords have a right to challenge the search in this case, the Court now turns to whether that challenge successfully presents a constitutional violation.

## IV.    *FRANKS* ANALYSIS

There are four situations in which an officer's reliance on a warrant is not objectively reasonable.[315] As relevant here, such a situation arises where, as recognized by the Supreme Court in *Franks v. Delaware*, "the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit."[316] The Third Circuit subsequently extended this logic to material omissions.[317] Under these circumstances, "the protection afforded by the magistrate's review [of the affidavit] is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are."[318]

*Franks* tasks courts with a three-step process. First, a court must assess the evidence the defendant asserts was omitted or falsely asserted, either intentionally or recklessly, from the affidavit. Next, a court must reconstruct an affidavit that

---

[314] *Byrd*, 584 U.S. at 411.
[315] *United States v. Williams*, 3 F.3d 69, 71 n.2 (3d Cir. 1993).
[316] *United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1106 (3d Cir. 1989) (citing *United States v. Medlin*, 798 F.2d 407, 409 (10th Cir. 1986)).
[317] *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).
[318] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).

includes any such omissions and strikes any such false statements. And finally, a court must assess the materiality of the omitted information to the probable cause determination by examining the reconstructed affidavit.

## A.    Identifying Intentional or Reckless False Statements or Omissions

Consistent with the deterrence rationale undergirding the exclusionary rule, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[319] So whether assertions or omissions are at play, "[a]llegations of negligence or innocent mistake are insufficient,"[320] which is why, "in general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth."[321]

*Wilson v. Russo* sets out guidance for determining when an officer's assertions or omissions in an affidavit evidence a reckless disregard for the truth:

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.[322]

---

[319] *Herring v. United States*, 555 U.S. 135, 144 (2009); *United States v. Brown*, 631 F.3d 638, 649 (3d Cir. 2011) (looking to this language from *Herring* to inform whether a false assertion was made with a reckless disregard for the truth under *Franks*).

[320] *Franks*, 438 U.S. at 171.

[321] *Brown*, 631 F.3d at 648 (quoting *United States v. Dale*, 991 F.2d 819, 844 (D.C. Cir. 1993)).

[322] *Wilson v. Russo*, 213 F.3d 781, 787, 783 (3d Cir. 2000).

Subsequent cases have clarified that the standard for reckless omissions, which require that "any reasonable person would want to know" the omitted evidence, implements a "lower threshold" than materiality.[323]

As *Wilson* makes clear, the distinction between omissions and false assertions is crucial. Because "reckless disregard for the truth means different things when dealing with omissions and assertions," assessing these errors involves "different methodologies."[324] Whereas omissions are cured by "supplying the omitted information to the original affidavit,"[325] assertions are cured by "excis[ing] the false statement from the affidavit."[326]

The Defendants have raised thirteen facts which they contend are either omissions or false assertions, including ten allegedly material omissions and three allegedly false statements.[327] The Court will begin by clarifying a relevant ambiguity in the legal standard for omissions to determine whether omitting any clarification of Altari and Alteriki's distinct identities could be reckless here. It will then determine whether each fact is truly an omission or false assertion under the test articulated in *Wilson v. Russo*, and whether each omission or false assertion

---

[323] *Dempsey*, 834 F.3d at 471 n.9.

[324] *Wilson*, 213 F.3d at 787.

[325] *Sherwood v. Mulvihill*, 113 F.3d 396, 399–400 (3d Cir. 1997).

[326] *Wilson*, 213 F.3d at 788.

[327] Some of these facts were presented in different form by defense counsel or developed into multiple distinct facts through testimony, but the *Franks* analysis demands a high degree of precision as it tasks the Court with analyzing Williamson's state of mind for each fact and applying distinct methodologies for curing them. For clarity of this analysis, the Court has derived thirteen distinct facts from the briefings and hearing transcript.

was made with an intentional or reckless disregard for the truth. This process will winnow down the relevant facts to be considered when reconstructing Trooper Williamson's affidavit.

### 1.    Intentional or Reckless Omissions

#### a.    Alteriki and Altari: Inadvertent Omissions and Recklessness

The most egregious and significant omission in the affidavit is referring to "Daquan Alford" throughout it, and omitting either their middle names or any other method of clarifying which Defendant was being discussed. The key relevance is indisputable. Uncorrected, the warrant details how the same "Alford" who rents the premises searched provided a Confidential Informant with drugs near his apartment caused her death by overdose, and these facts alone likely establish probable cause, at least on their face.[328]

However, the Court finds that the Defendants have not shown, by preponderance of the evidence, that Trooper Williamson was aware of this conflation of Altari and Alteriki when he drafted the affidavit. Considering the nature of this omitted fact—that the Alfords are only distinguishable by their middle names and were both key persons described in the affidavit—it is more

---

[328] *See United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (court can infer that drugs are kept at suspect's home if (1) the person suspected of drug dealing is actually a drug dealer, (2) the place to be searched is possessed by, or the domicile of, the dealer; and (3) the home contains contraband linking it to the dealer's activities); *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (proximity of criminal activity and defendant's home supported probable cause that defendant stored drug-related evidence in his home).

plausible to believe that Williamson unwittingly failed to realize that a magistrate without the context known to him could not distinguish the Alfords due to hasty and careless drafting, than to believe that he was engaging in a calculated attempt to exploit the Alfords' shared names to shore up his affidavit for the magistrate judge.

At the same time, the Court finds based on the strong circumstantial evidence of this key omission itself (as well as the other deficiencies apparent from the record) that if Trooper Williamson did fail to realize that he made this omission, he must have drafted the affidavit with a shocking degree of carelessness. After all, Williamson agreed that he had "ample time" to draft the affidavit in this case and is an experienced officer who has drafted "hundreds" of affidavits. [329] And Williamson himself clearly recognized the risk of his confusion when he returned to this case to draft criminal complaints for Alteriki and Altari, since he referred to them by using their middle names in those documents.

The specific question of law this novel scenario poses is whether it is ever possible for an officer to recklessly omit a fact when he is aware of the fact but does not even *realize* he has omitted it due to his carelessness—or whether, instead, an officer who lacks such subjective awareness of making the omission necessarily does not make it with a reckless disregard for the truth as a matter of law. This Court has considered controlling Third Circuit precedent to conclude that

---

[329] Transcript I, Doc. 129 at 75:17–23; 75:24–76:14.

such omissions are nevertheless reckless, and notes alternatively that a finding of recklessness can be consistent with a subjective standard under the extreme facts presented.

"[U]nfortunately, the Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake is insufficient.'"[330] There are two articulations of recklessness – "the subjective recklessness used in the criminal law, which requires that a person disregard a risk of harm of which he is *aware*, or the objective recklessness used in the civil law, which permits liability to be founded upon the disregard of a risk that is 'so obvious that it should be known.'"[331] This Court's reading of the Third Circuit's holding in *Wilson* is that it weighed competing interests to adopt a two-step objective test for reckless omissions.

Many courts have held that the *Franks* recklessness inquiry is always subjective. But in *Wilson v. Russo*, the Third Circuit held that "omissions are made with reckless disregard if an officer [(1)] withholds a fact in his ken [(2)] that 'any reasonable person would have known that this was the kind of thing the judge

---

[330] *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979) (quoting *Franks*, 438 U.S. at 171).

[331] *United States v. Anderson*, No. CR417-090, 2017 U.S. Dist. LEXIS 212765, at *8 n.4 (S.D. Ga. Nov. 30, 2017) (Smith, M.J.). (quoting *Farmer v. Brennan*, 511 U.S. 825, 836–37 (1994)).

would wish to know."[332] Read literally, this test would self-evidently cover Williamson's omission of the Alfords' distinct identities—any reasonable person would be aware that failing to distinguish them would misrepresent the truth to the reviewing magistrate. Indeed, the Third Circuit stated more recently that "the recklessness inquiry asks *only* whether the omitted fact bears on probable cause such that it should be presented to the magistrate."[333] And as *Wilson* appears to be an objective standard requiring this outcome, the Court asked counsel at oral argument whether *Wilson*'s test was objective or subjective; all counsel agreed that it is objective.[334]

Perhaps regretting its concession, the Government develops a new understanding of *Wilson* in supplemental briefing. Without citation, the Government articulates the following view of the *Wilson* test:

> It is not the case that the only required showing for reckless falsity is that the particular omitted fact was such that any reasonable person would have recognized that the judge would want to know about it. That is the *first* part of the standard, and it looks to the degree of relevance of the omitted material. However, it is not true under *Wilson* that any time any officer omits information that satisfies that first part of the standard – which, after all, reads like a reasonable person *negligence* standard – that the officer has made a *recklessly* false omission. The officer has made an "omission" worthy of further scrutiny. However, in order to reach the further conclusion that the omission was recklessly false requires a showing that the officer actually behaved "recklessly." This broader inquiry considers, not just

---

[332] *Wilson*, 213 F.3d at 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).
[333] *Dempsey*, 834 F.3d at 471 n.9 (emphasis added).
[334] Transcript I, Doc. 129 at 119:2–6; 137:13–20.

the relevance of the omitted material, but also the overall affidavit and the broader context and conduct of the officer.[335]

This Court's reading of *Wilson*, however, is that it weighed competing interests to adopt an *objective* standard for reckless omissions. Unlike assertions, the *Wilson* court reasoned, omissions may justifiably be excluded from an affidavit because "[a]ll storytelling involves an element of selectivity."[336] On the other hand, the *Wilson* court considered the competing consideration that "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him- or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence."[337]

The resulting "common sense approach" to be applied to omissions, borrowed from the Eighth Circuit's decision in *United States v. Jacobs*, was that "omissions are made with reckless disregard if an officer [(1)] withholds a fact in his ken [(2)] that 'any reasonable person would have known that this was the kind

---

[335] Brief in Opposition, Doc. 130 at 16. The Government may have been prompted to raise this "second step" argument by the fact that, on the first page of the opinion, the word "recklessly" appears in *Wilson*'s definition of reckless omissions: "omissions are made with reckless disregard for the truth when an officer *recklessly* omits facts that any reasonable person would know that a judge would want to know." *Wilson*, 212 F.3d at 783. Yet later in *Wilson*—when the Court delves into analysis—this word disappears in an otherwise identical definition: "omissions are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Id.* at 788. In the absence of any other indication supporting the Government's reading, it would not be wise to read too closely into this language.

[336] *Wilson*, 212 F.3d at 787.

[337] *Id.*

of thing the judge would wish to know."[338] Stating that omissions *are* made with reckless disregard under such circumstances is consistent with an objective standard. Indeed, the *Wilson* court specifically contrasted such reckless omissions from recklessly false assertions, by stating that whether an *assertion* is reckless "is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth."[339]

The Government's reading requires importing a second step of evaluating recklessness into the *Wilson* court's definition of when "recklessness" has occurred—it is not clear, at least on a semantic level, why anything more would be required under *Wilson*. The Court is of course aware of the perils of parsing judicial opinions like statutes. But one would think that if the *Wilson* court had in mind such a second step, then it, or any of the Third Circuit decisions that have followed, would say so.

It is noteworthy that the Government postulated its reading of *Wilson* without any citations. After articulating this reckless-omission test, the Government contends: "[t]hat this two-step analysis is the proper one is made clear, for example, in *United States v. Desu*."[340] The Government points to a paragraph in which the *Desu* court explained that several omissions were not reckless because a "court reviewing the affidavit would [have understood] the full

---

[338] *Id.* at 788 (quoting *Jacobs*, 986 F.2d at 1235).
[339] *Id.* at 788.
[340] Brief in Opposition, Doc. 130 at 16–17.

extent of the [informants'] motive to lie" based on other information in the affidavit.[341] But nothing about this one-paragraph discussion supports the Government's reading.

Instead, the *Desu* court highlighted the factual matter identified by the Defendants—that key witnesses faced other potential charges when they pled guilty and that the Government had agreed to make a departure motion at sentencing—and explained why that factual matter could be relevant to the reviewing magistrate: because "[t]hese omissions allegedly made it appear that the [witnesses] did not have a motivation to lie to obtain a better result for their own criminal cases."[342] These facts were not recklessly omitted because based on other facts included in the affidavit, a "court reviewing the affidavit would understand the full extent of the [witnesses'] motivation to lie."[343]

The simple, commonsense thrust of this reasoning is that the duplicative nature of omitted facts can neutralize their relevance. Placed in context, the *Desu* court's analysis only demonstrates that no relevant fact was omitted from the affidavit. This analysis contains no discussion of the officer's subjective state of mind when drafting the affidavit; *Desu*'s sole focus is on whether a *magistrate* would be misled by the omission of the facts identified. Even granting for the sake of argument that this paragraph is ambiguous (and the Court does not see how it

---

[341] *United States v. Desu*, 23 F.4th 224, 236 (3d Cir. 2022).
[342] *Id.*
[343] *Id.*

is), it is telling that *Desu* is the only authority the Government has located in support of its claim. If the Third Circuit were to explain that there is an additional step to the *Wilson* test, it is not clear to the Court that it would do so through hints and implications.

This Court has identified no guidance from the Third Circuit which would authorize it to depart from *Wilson*.[344] Nor has this Court located any district or circuit court decision from this circuit which unambiguously considered facts bearing upon an officer's state of mind in measuring his reckless omissions. The Court has also located substantial out-of-circuit authorities observing (quite often with criticism) that *Wilson* adopted an objective reckless omissions test.[345] These

---

[344] Some very confusing dicta, discussed in Part V below, appears to imply that officers may at times recklessly omit information under *Wilson* in good faith; this dictum is perplexing both because satisfying *Franks* is definitionally tantamount to showing bad faith and because other decisions hold that the good faith exception does not apply to *Franks* motions. Nevertheless, while these cases may arguably imply that the Court could apply the good faith exception, they also support this Court's understanding of when a reckless omission occurs. *See Dempsey*, 834 F.3d at 473 n.13 (stating in a section 1983 case that officers "may at times omit information recklessly but in good faith); *United States v. Williams*, 974 F.3d 320, 353 (3d Cir. 2020) ("when good faith is concerned, the proper question is not simply whether the allegedly omitted information was known to the affiant and relevant to the magistrate's probable-cause inquiry, but also whether the deliberate or reckless omission, if it occurred, was 'so objectively culpable as to require exclusion'").

[345] *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 U.S. Dist. LEXIS 143175, at *33 n.13 (S.D.N.Y. Nov. 24, 2010) ("There is some disagreement among the Courts of Appeals, and within this Court, as to whether recklessness can be established where a reasonable affiant would know that omitted information would be important to the reviewing court. That divide stems from the Third Circuit's statement [in *Wilson v. Russo*].''), *rev'd*, *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (while observing that the reckless omissions test should be subjective, providing "*but see*" citation to *Wilson*); *United States v. Simmons*, 711 F.Supp. 2d 908, 921 n.3 (N.D. Ill. 2011) ("[T]he Third Circuit's holding [in *Wilson v. Russo*] . . . sounds somewhat like a negligence standard, which does not met the *Franks* standard for 'reckless disregard.'"); *United States v. Cerda*, No. 21-CR-451 (GRB), 2023 U.S. Dist. LEXIS 96510, at *16 (E.D.N.Y. June 2, 2023) (setting out the "long-running split

authorities, while non-binding, demonstrate that a substantial body of jurists read *Wilson* in the same way as this Court. And if those jurists' criticisms are valid, it is the province of our Court of Appeals—not this Court—to evaluate them.

In any case, the Third Circuit is not alone in applying an objective standard to reckless omissions,[346] and it is worth reiterating that *Wilson* did not simply adopt a negligence test and is at least consistent with the conventional definition of recklessness in civil law. "The civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so

---

among the circuit courts" and describing *Wilson* as "implementing an objective test" for reckless omissions); *United States v. Lahey*, 967 F.Supp. 2d 698, 710 n.11 (S.D.N.Y. 2013) (referring to "disagreement among the Courts of Appeals" and stating: "For the viewpoint contrary to the Second Circuit's, *see Wilson v. Russo*."); *United States v. Washington*, No. 14-CR-25V, 2017 U.S. Dist. LEXIS 218079, at *32 (W.D.N.Y. Oct. 19, 2017) (Schroeder, M.J.) (same); *United States v. Vilar*, No. S3 05-CR-621 (KMK), 2007 U.S. Dist. LEXIS 26993, at *84–85 (S.D.N.Y. Apr. 4, 2007) (same); *United States v. Perez*, 247 F.Supp. 2d 459, 474 (S.D.N.Y. 2003) (Chin, J.) (in applying *Wilson* before *Rajaratnam*, stating that the defendant need only show "by a preponderance of the evidence that any reasonable person would have known that this was the kind of information that the magistrate judge would have wanted to know"); *United States v. Harding*, 273 F.Supp. 2d 411, 427 (S.D.N.Y. 2003) (same); *Odom v. Kaizer*, No. 1:10-cv-00085, 2014 U.S. Dist. LEXIS 46600, at *46–53 n.9 (D.N.D. Mar. 3, 2014) (explaining that *Wilson* adopted *Jacobs*' definition of recklessness, which is an "objective" standard "more akin to the common law tort definition of recklessness").

[346] *See, e.g.*, *United States v. Marino*, No. 22-13883, 2024 U.S. App. LEXIS 7953, at *7 (11th Cir. Apr. 3, 2024) ("Recklessness occurs when an officer *'should have* recognized the error, or at least harbored serious doubts' about the information.") (internal citations omitted); *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) ("The burden is on the plaintiff to 'make a substantial showing of deliberate falsehood or reckless disregard for truth' by the officer seeking the warrant. This test is an objective one . . . '[a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.'") (then citing *Wilson v. Russo* with approval); *United States v. Hays*, Nos. 87-5164, 87-5166, 87-5168, 1993 U.S. App. LEXIS 33510, at *6 (9th Cir. Dec. 10, 1993) (unpublished).

obvious that it should be known."[347] Moreover, the Supreme Court held in *Herring v. United States* that "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[348] After extracting this generally applicable exclusionary-rule standard by drawing an "analogy" to *Franks*'s intentional or reckless standard, *Herring* stated that "[t]he pertinent analysis of deterrence and culpability is objective, not an 'inquiry into the subjective awareness of arresting officers.'"[349] Other Third Circuit cases have used this "analogy" in the reverse direction, looking to *Herring*'s discussion of the state of mind necessary to trigger the exclusionary rule to understand *Franks* recklessness.[350] So construing *Wilson*'s reckless omissions test to be an objective one is not as absurd of an outcome as the Government would suggest, and it does not conflict with *Herring* or otherwise collapse the distinction between negligence and recklessness.

Alternatively, it is not clear that the Government would prevail merely by applying a subjective standard here. It would at first appear that applying a subjective standard favors the Government. As the Fourth Circuit has put it, "the particular affiant must have been subjectively aware that the false statement or

---

[347] *Farmer*, 511 U.S. at 836–37. *See also* Restatement (Second) of Torts § 500 cmt. a (Am. L. Inst. 1968) (defining two types of recklessness, one of which is an "objective" standard); Restatement (Third) of Torts § 2 (Am. L. Inst. 2001) (defining recklessness).

[348] *Herring*, 555 U.S. at 144.

[349] *Id.* at 45.

[350] *Brown*, 631 F.3d at 649.

omission would create a risk of misleading the reviewing magistrate judge and nevertheless chose to run that risk."[351] Indeed, in the only factually analogous case this Court could find, the Seventh Circuit held in *United States v. Williams* that where circumstantial evidence suggested that "errors and omissions reflected only haste and honest negligence" due to "rushing to draft an application for a warrant," the district court did not commit clear error by finding that the officer acted negligently—not recklessly—as this "provides a reasonable basis to believe that the police did not intend to mislead."[352] Yet *Williams* definitionally elides intentional and reckless omissions by requiring that "a *Franks* violation based on an omission requires a showing that the material information was omitted deliberately or recklessly *to mislead* the issuing magistrate."[353] These words—"to mislead"—erase the recklessness standard by requiring that one acts with a specified *intent*. This conflicts with the Third Circuit's ruling in *Wilson v. Russo*, which sets out a specific definition of reckless omissions. That is why, though *Williams* is one of the few factually analogous cases known to the Court, it is not instructive here.

However, one line of cases which has developed in courts applying both objective and subjective reckless omissions standards reasons that the fact of a "clearly critical omission" demonstrates an objectively reckless disregard of the

---

[351] *United States v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021).
[352] 718 F.3d 644, 650 (7th Cir. 2013).
[353] *Williams*, 718 F.3d at 650.

truth, or can raise a strong inference of a subjectively reckless disregard of the truth.[354] "In such cases, the analytical concepts of materiality and recklessness are [often] 'bound together,' collapsing the dual inquiry of *Franks* into a single inquiry about materiality."[355] Applying a subjective standard to reckless omissions in *United States v. Rajaratnam*, the Second Circuit held that one "does not *necessarily* act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical'" because the inquiry focuses on the officer's state of mind.[356]

But *Rajaratnam* nevertheless agreed that "the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information,"[357] and explained that "[w]hether an omission would have strengthened or weakened the [warrant] application is [] probative of whether the omission occurred with 'reckless disregard for the truth.'"[358] "Subjective intent, after all, is often demonstrated with objective evidence."[359]    So while the

---

[354] *Jacobs*, 986 F.3d at 1235 (quoting *Reivich*, 793 F.2d at 961) (thereinafter quoting *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980)) (while "the failure to include the information and a reckless disregard for its consequences can be inferred from the fact that the information was omitted . . . in order for this inference to be valid, the defendant must show that the omitted material would be '"clearly critical" to the finding of probable cause'"); *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1994) (holding that recklessness may be inferred from the fact of omitting a clearly critical fact).

[355] *United States v. Flowers*, Criminal Action No: 04-15 Section: "R", 2005 U.S. Dist. LEXIS 2446, at *7 (E.D. La. Feb. 17, 2005) (citing *Martin*, 615 F.2d at 329.

[356] *Rajaratnam*, 719 F.3d at 154.

[357] *Id.* at 154.

[358] *Id.* at 154–155 & n.18.

[359] *Id.* at 154.

*Rajaratnam* court considered the fact that it "never occurred to [the AUSA]" to include the omitted information as relevant, it also concluded that recklessness was lacking because "the omission was the result of a considered and reasonable judgment that the information was not necessary," as "the evidence indicate[d] that the wiretap application was reviewed by supervisors at the USAO, none of whom thought that additional information about the SEC's civil investigation needed to be included."[360]

This Court is aware of no case analyzing an unwitting clearly critical omission, but these cases' reasoning can logically extend to this situation. The clearly critical nature of the omission permits a fair inference that the officer acted with such carelessness that he was subjectively aware of the fact that his conduct could cause key inaccuracies—even if he did not know which inaccuracies. More extreme examples prove the point.

An officer who copy-pastes random paragraphs of his notes into his affidavit without knowing which paragraphs—or an officer who feeds his notes into an artificial intelligence chatbot and asks it to generate an affidavit of probable cause, without reviewing the output before submitting it—does not know what, if anything, has been omitted. But based on his conduct, the officer is subjectively aware of the substantial risk that such an omission will occur and misrepresent the truth to the magistrate if he does not review his work. The same kind of inference

---

[360] *Id.*

can be drawn when an officer has drafted an affidavit so carelessly that he does not realize two distinct people of critical importance are not distinguished within it. In this sense, it is more accurate to say that the officer has acted "with a reckless disregard for the accuracy of the *affidavit*."[361]

Accordingly, *Wilson*'s objective standard means that because Trooper Williamson was aware of the Alfords' distinct identities and a reasonable magistrate would want to know this information, omitting it was reckless. Alternatively, strong circumstantial evidence demonstrates by a preponderance of the evidence that due to the central significance of this "oversight" to the affidavit, Williamson must have reviewed his work with extreme carelessness, and his awareness of that risk of inaccuracy as to his affidavit is sufficient to satisfy any subjective component which may exist.

### b.    Other Omissions in the Affidavit

Having clarified that Trooper Williamson omitted the Alfords' distinct identities with a reckless disregard for the truth, the nine remaining omissions are simple to resolve.

First is the affidavit's allegation that "the landlord confirmed the 3rd floor apartment was rented by Daquan ALFORD." Williamson testified that the landlord never stated Alteriki rented the Apartment, and that he knew the landlord was referring to Altari. Any reviewing magistrate would want to know who rented the

---

[361] *Madiwale*, 117 F.3d at 1326 (citing *Martin*, 615 F.2d at 329) (emphasis added).

premises searched, because clarifying that Altari rented it creates a gap between Alteriki's criminal activities and the premises which must be filled with other evidence. This omission was reckless.

Second, the omission that Trooper Williamson did not know Pardoe until the investigation described in the affidavit is not something a judge would want to know. This simply amounts to a "subjective misgiving regarding information in the affidavit" rather than "objective information" a magistrate would want to know.[362] Third and relatedly, that Pardoe was seeking to have her prior record expunged falls in the same bucket. Although "as a matter of good practice the affiant should [inform] the magistrate of the benefits an informant hope[s] to receive from his cooperation,"[363] most courts have held that such information is "not the type of omission with which *Franks* or *Wilson* were concerned,"[364] as the nature of confidential-informant status already imports to experienced magistrates that such witnesses are self-interested.[365] So "information about the C.I.'s motivation for

---

[362] *See United States v. Larnerd*, 314 F.Supp. 3d 660, 671 (M.D. Pa. 2021) ("[I]n examining alleged omissions, the court needs to be concerned about the omission of objective information that is material to the magistrate judge's determination of probable cause rather than an affiant's subjective misgivings regarding information in the affidavit.").

[363] *United States v. Gladney*, 48 F.3d 309, 315 (8th Cir. 1995).

[364] *United States v. King*, No. 4:20-CV-00158, 2022 U.S. Dist. LEXIS 8024, at *28 (M.D. Pa. Jan. 14, 2022) (quoting *United States v. Darby*, No. 1:14-cr-00123, 2015 U.S. Dist. LEXIS 193981, at *6 (M.D. Pa. Aug. 19, 2015)).

[365] *See, e.g.*, *United States v. Weeks*, 160 F.3d 1210, 1213 (8th Cir. 1998) ("judicial officers issuing warrants are aware of deals made with informants who themselves are facing charges. Therefore, failure to inform the issuing officer of a deal is not fatal to the validity of the warrant.") (quoting *United States v. Wold*, 979 F.2d 632, 635 (8th Cir. 1992)).

cooperating with the State Police does not [ordinarily] qualify as 'the kind of thing the judge would wish to know.'"[366]

Fourth and fifth, the Court considers Pardoe's discontinued status as a confidential informant, and the reason for her discharge—that she defrauded her supervising officer by lying about the quantity of drugs she received during controlled buys to retain some for herself. Pardoe's discontinued CI status is significant—to be reinstated, PSP policies would require debriefing, an interview, and permission from the Bureau of Criminal Investigation Director. These steps are implemented to ensure that self-interested confidential informants with criminal histories are reliable. So omitting Pardoe's deactivated status made her appear to be much more credible than she was.[367]

It goes without saying regarding why Pardoe was deactivated—a confidential informant's history is key to her reliability. Unlike Pardoe's motivations for cooperating, her discontinued status as a CI and the reasons for it are more than subjective misgivings: they are key to the credibility of her information and would not be clear to a magistrate absent inclusion in the affidavit.[368] Holding that an officer intentionally or recklessly omitted an identical

---

[366] *King*, 2022 U.S. Dist. LEXIS 8024, at *28 (quoting *Wilson*, 212 F.3d at 788).

[367] *See Gerth v. State*, 51 N.E. 368, 374–75 (Ct. App. Ind. 2016) (applying *Wilson* and reasoning that "[a]ny reasonable person asked to issue a search warrant in this case would have wanted to know that the CI was deactivated after giving the tip" and describing the informant's deactivated status as "highly material").

[368] *See, e.g.*, *Larnerd*, 514 F.Supp. 3d at 672 (determining that omission of affiant's history as a meth user was relevant to her credibility, and therefore recklessly omitted from the affidavit);

fact concerning an informant's concealment of drugs on his person following a controlled buy, the Fourth Circuit stated that the "trustworthiness of the confidential informant lies at the heart of the reliability determination, and so the relevance of this information should have been obvious to [the investigator]. This is especially so because the affidavit contained no other statement concerning the informant's credibility or experience working as a confidential informant."[369] The same is true here. Because of the gravity of this history as it relates to Pardoe's reliability and the fact that Pardoe's description of events is the affidavit's only link between Alteriki and Altari's residence, any reviewing magistrate would want to know of such damaging information when assessing this affidavit.

The Government argues that "the Trooper testified believably when he indicated that he did not strategically leave [these facts] out in the instant case so as to mislead the reviewing judge as to the CI's relative reliability."[370] But the Government is arguing against a strawman. Limiting reckless omissions to such strategic ploys reflects the Seventh Circuit's overly narrow reading of when cognizable *Franks* omissions occur rather than the Third Circuit's reckless omissions standard. Indeed, the *Wilson* court was motivated to adopt its reckless omissions standard not by concerns of such malicious and strategic deception of

---

*United States v. Hall*, 113 F.3d 157, 160 (9th Cir. 1997) (informant's prior false reports undermined his reliability); *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014) (failure to provide important information regarding non-police source's credibility).

[369] *United States v. Lull*, 824 F.3d 109, 119 (4th Cir. 2016).

[370] Brief in Opposition, Doc. 130 at 18.

the magistrate, but rather, by situations where a police officer decides for himself

what information should be deemed relevant.

> [O]ne of the reasons for requiring a neutral magistrate to evaluate
> probable cause is that an uninterested party is presumably better suited
> to review and evaluate facts than an officer pursuing a lead . . . . [A]
> police officer cannot make unilateral decisions about the materiality
> of information, or, after satisfying him- or herself that probable cause
> exists, merely inform the magistrate or judge of inculpatory
> evidence.[371]

These concerns fears directly align with Trooper Williamson's testimony

explaining why he omitted these facts:

> That's something that I typically don't include unless it is rather
> significant or I just won't utilize the informant if I don't believe
> they're being truthful. In this specific case, I was under the impression
> that she was living a clean, sober life for the better part of three years,
> and that she was otherwise providing truthful information.[372]

Indeed, Williamson himself recognized the significance of Pardoe's history, as he

contacted the Lycoming County District Attorney's office, briefed them on her

background, asked whether "this is something that we're interested in because of

her past,"[373] and initially devised a plan which would keep Pardoe away from any

controlled substances. In other words, Williamson omitted Pardoe's deactivated

status, and the reason for her deactivation, because despite his initial doubts he

eventually satisfied himself that she was credible and took that determination out

---

[371] *Wilson*, 212 F.3d at 787.
[372] Transcript I, Doc. 129 at 32:14–23.
[373] *Id.* at 15:11–15.

of the magistrate's hands. That is the exact conduct *Wilson*'s reckless omissions test is designed to deter.

Sixth and seventh, that Pardoe's ride along with Alteriki and receipt of drugs were both unplanned and did not follow Pennsylvania State Police controlled buy policies are not relevant omissions under *Wilson*. Whatever significance noncompliance with PSP policies has to reliability is marginal at best when a reviewing magistrate does not even know what policies are being violated—this could span the gamut from pro forma technical violations to serious and damaging ones. What really must be reviewed for relevance is the *conduct* causing PSP policy violations—here, that Pardoe's operation was not supervised in any way, because it was unplanned. And *this* fact is already clear from the affidavit, which never claims or implies that it was planned or supervised.[374] So these arguments do not support the existence of any relevant omission.

Eighth, the Alfords point to the alleged omission of the fact that Pardoe "was a drug user and a drug addict" at the time of the search, but the affidavit already reveals that Pardoe had contact with the defendant drug dealer described in the affidavit, used the fentanyl-laced heroin she received from him, and died by overdose.[375] So this fact is already reflected in the affidavit.[376] Ninth, the alleged

---

[374] *See Desu*, 23 F.4th at 236 (employing similar reasoning).

[375] *See* Affidavit of Probable Cause, Doc. 88-1 at 5 ¶20.

[376] *See also United States v. LaMorie*, 100 F.3d 547, 555 (8th Cir. 1996) (where officer disclosed that informant had confessed to participating in burglary and torching of post office

fact that Pardoe was likely under the influence of drugs while relaying information to Williamson based on the time of her overdose is an inference counsel have drawn from the facts stated in the affidavit itself.[377] So that information is not omitted either and can be considered without making insertions into the affidavit.

In sum, Trooper Williamson recklessly failed to distinguish which Alford he was referring to in each section of the affidavit, including when describing who was named on the lease, and he recklessly omitted that Pardoe was both discontinued as a Confidential Informant and that the reason for this was that she defrauded the Pennsylvania State Police by concealing additional drugs on her person during controlled buy operations. The relevant aspects of the remaining allegedly omitted facts are already reflected within the affidavit.

## 2.    Intentional or Reckless False Statements

Turning to intentionally or recklessly false statements, the Court measures such falsehoods "not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth."[378] That is why "assertions can be made with reckless disregard for the truth even if they involve minor details."[379] An intentional false statement, like an intentional omission, is made "knowingly and

---

among other crimes, omission of fact that informant was convicted felon was not material, as the "judge could hardly have been under the impression that Allen was a model citizen").

[377] *See Desu*, 23 F.4th at 236 (employing similar reasoning).

[378] *Wilson*, 212 F.3d at 788.

[379] *Id.*

deliberately."[380] "[S]imilar to the actual malice standard set forth in First Amendment defamation claims,"[381] "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting."[382]

First, Paragraph 17 alleges that Trooper Williamson "spoke with the CI [Pardoe], who related the following," including that "ALFORD drove the CI to the area of the 700 blk of First Avenue, Williamsport."[383] As Williamson testified, Pardoe never identified the 700 block of First Avenue, which based on the maps provided by the Government and Alfords, appears to refer to an area near the intersection of First Avenue and High Street. Williamson testified that Pardoe identified the starting point of 688 Wildwood Boulevard and then described where the car had turned; Williamson traced the car's direction on a map and deduced that it arrived at the 700 block.

One might ordinarily argue that Williamson has distorted the truth by omitting the gap between what Pardoe explained and what he deduced, which could be viewed to undermine reliability. However, Williamson credibly testified that Pardoe identified the intersection of High Street and First Avenue. So while Pardoe did not identify the "700 block" in literal terms, she identified its functional

---

[380] *Sherwood*, 113 F.3d at 399.
[381] *Yusuf*, 461 F.3d at 383.
[382] *Wilson*, 212 F.3d at 783.
[383] Application for Search Warrant, Doc. 88-1 at 4 ¶17.

equivalent as the car's destination. It would have been more accurate for Williamson to relay Pardoe's description with more precision, but his summarization of the car's destination does not demonstrate a willingness to distort the truth to the Court. Nor was the substance of Pardoe's identification misrepresented.

Second, Paragraph 17 alleges in similar fashion that Trooper Williamson "spoke with the CI [Pardoe], who related" that after Alteriki handed off a backpack with drugs to an unknown black male, "[t]he unknown black male then proceeded to carry the backpack he received from ALFORD towards the residence of 832 High Street."[384] As Williamson testified at the evidentiary hearing, however, Pardoe never identified the address of 832 High Street; she identified the intersection the car stopped near, but was only "able to narrow down the location to one of these two houses,"[385] 830 and 832 High Street, nor did she identify these addresses by name.[386] Several steps were required to connect the dots between what Pardoe related, and what Williamson said she related. Had Williamson communicated truthfully, this paragraph would have read:

> The CI related that . . . the unknown black male proceeded to carry the backpack he received from Daquan Alteriki ALFORD towards one of

---

[384] *Id.*
[385] Transcript I, Doc. 129 at 61:14–23.
[386] It is also unclear how Pardoe described the two residences over the phone to Williamson when she did not know their addresses, but this may have been possible considering that she could identify the intersection the car stopped at. This distinction is immaterial in any event because even granting this fact, this is a false statement that would be stricken from the reconstructed affidavit either way.

> two residences visible to her from the car. Another witness, who was
> following the CI and Daquan Alteriki ALFORD from behind, was
> taken back to the intersection after the CI's death by Trooper
> Thompson. He pointed to the specific building he observed the
> unknown black male walking towards. I identified that building as
> 832 High Street.

The Court recognizes Williamson's desire to simplify the affidavit to concisely present the facts to the reviewing magistrate judge. There are many instances where summarizing the evidence in this way is both appropriate and desirable, as demonstrated when analyzing the preceding allegedly false statement. But Williamson is communicating what Pardoe related she saw. And as written, the affidavit's only link between Alteriki's transaction and the premises searched is this one statement. So omitting these steps makes Pardoe's identification appear more reliable and specific as to her most crucial statement and solidifies the connection between this drug transaction and 832 High Street, the premises to be searched. This representation of Pardoe's identification is in fact a false statement rather than a summary, and it intentionally distorts the truth of what *Pardoe* said.

The third alleged false statement is: "While Tpr. THOMPSON was speaking with the landlord, he/she related he/she has received several complaints of a high volume of foot traffic coming/going from the 3rd Floor apartment of the same residence."[387] As specified in the statement of facts above, however, Thompson's subsequent report stated that according to the landlord who owned both 830 and

---

[387] Application for Search Warrant, Doc. 88-1 at 5 ¶22.

832 High Street, "tenants from 830 had complained about excessive traffic in the area."[388] On cross-examination, Williamson stated that he "composed the search warrant based off of the conversation that Trooper Thompson and [he] had on May 1st."[389]

Williamson's testimony never explicitly clarified what Thompson actually represented on this issue, however—whether Thompson stated during this conversation that the landlord had complained of high foot traffic through the Third Floor 832 High Street, as reflected in the affidavit, or instead, whether Thompson stated during this conversation that the landlord had referenced complaints of "excessive traffic in the area" from "tenants from 830," as reflected in Thompson's May 4 report. One argument Altari raises in support of this statement's distortion is that, as Thompson's report only identified complaints about "excessive traffic in the area," the "tenants could have been, and likely were, complaining about the vehicle traffic in the shared parking lot behind the building."[390]

In isolation, this is a close issue of fact, and one with nuances strongly favoring the Government. The Supreme Court instructed in *Herring* that "[u]nder *Franks*, negligent police miscommunications in the course of acquiring a warrant

---

[388] Defendant's Exhibit 110, Homicide Action Report, at 1 ("Smith further related that DGM also owns the building at 830. He said that tenants from 830 had complained about excessive traffic in the area."); Transcript I, Doc. 129 at 39:8–23.

[389] Transcript I, Doc. 129 at 40:18–41:7

[390] Supplemental Brief, Doc. 135.

do not provide a basis to rescind a warrant and render a search or arrest invalid."[391] This means that "[h]ad [Williamson] merely negligently misheard [Thompson], or had [Thompson] merely negligently misspoken, *Herring* would control."[392] So finding that this is a false statement requires finding that Thompson's May 4 report and his conversation with Williamson communicated the same content: that residents of 830 High Street complained to the landlord of high traffic in the *area*, rather than into the Third Floor of 832 High Street. It also requires finding that Williamson did not negligently mishear Thompson, but rather took it upon himself to embellish or make the complaints the landlord had received more specific.

The Government never elicited testimony from Trooper Williamson about what Thompson actually said. And Trooper Thompson did not testify at either evidentiary hearing. However, it is at least likelier than not that Thompson's May 4 report reflects his original statement; it would be unlikely that Thompson would relate such specific complaints to Williamson and then fail to communicate this in his report just three days later. Indeed, if the residents of 830 High Street *did* complain to the landlord about high foot traffic into 832 High Street, it is not immediately clear that they would be able to tell that the foot traffic was directing itself to the Third Floor.

---

[391] *Herring*, 555 U.S. at 145.
[392] *United States v. Brown*, 631 F.3d 638, 650 (3d Cir. 2011).

The Court would still, in ordinary circumstances, be highly skeptical of this alleged false statement and be inclined to chalk it up to a miscommunication.[393] But the Court considers Trooper Williamson's admitted distortion of Pardoe's statement to create a closer connection between Alteriki and the premises searched to be highly relevant. The false statement here is a distortion of a very similar nature. Although this is a close question, the Court finds by a preponderance of the evidence that Williamson's representation of high foot traffic to 832 High Street, Apartment 3 was an intentionally or recklessly false statement, misrepresenting Thompson's statement by embellishing its specificity. The Government has not produced any evidence to counter this inference, and it favors the Alfords based upon the record that was produced in this case.

In sum, the Court finds by a preponderance of the evidence that Trooper Williamson intentionally distorted the truth as to Pardoe's description of which residence the unknown black male walked towards, as well as the landlord's description of tenants' foot traffic complaints. Williamson altered both statements to tie the drug transaction more closely to 832 High Street, Apartment 3. In contrast, because Pardoe identified the intersection of First Avenue and High Street and Williamson merely described this destination in equivalent terms, his

---

[393] That would certainly be the Court's conclusion if the distinction had solely been one between vehicle traffic and foot traffic.

description of where the car stopped is an appropriate summarization of what Pardoe related to him and as such is not intentionally or recklessly false.

## B.    Reconstructing the Affidavit

The Court now proceeds to "perform a word-by-word reconstruction of the affidavit."[394] This "reconstructive surgery required by our jurisprudence"[395] involves curing omissions by "supplying the omitted information to the original affidavit"[396] and curing false statements by "excis[ing] the false statement from the affidavit."[397]

Some out-of-circuit authorities decided in the Section 1983 context have instructed courts to examine missing inculpatory information when reconstructing affidavits.[398] But courts within the Third Circuit have held that "at *Franks* step 2, the Court must analyze probable cause within the four corners of the redacted affidavit, without extrinsic evidence."[399] Courts conducting a *Franks* analysis within this circuit do not "consider information from other portions of the record" so as to avoid "infusing extraneous information into the probable cause determination" and "allow[ing] the government to receive the benefit of its

---

[394]  *Dempsey*, 834 F.3d at 470.

[395]  *Wilson*, 212 F.3d at 789.

[396]  *Id.* at 788.

[397]  *Sherwood*, 113 F.3d at 399–400.

[398]  *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004); *Ganek v. Leibowitz*, 874 F.3d 73, 85 n.6 (2d Cir. 2017); *Loftin v. City of Prentiss*, 33 F.4th 744, 782 (5th Cir. 2022); *see also Butler v. Smith*, 85 F.4th 1102, 1120–21 (11th Cir. 2023) (Carnes, J., Concurring).

[399]  *See United States v. Christopher*, No. 20-491 (KM), 2021 U.S. Dist. LEXIS 165847, at *28 (D.N.J. Sep. 1, 2021) ("[A]t *Franks* step 2, the Court must analyze probable cause within the four corners of the redacted affidavit, without extrinsic evidence.").

misconduct."[400] That creates an especially harsh penalty when false statements are excised.[401]

A significant exception to this rule is that the Court *will* insert "other information in the record that gives context to or affects the weight to be accorded the recklessly omitted information, such that it also should be considered by the reviewing court in determining materiality."[402] This information should be included in the reconstructed affidavit where it "bears on the materiality of the recklessly omitted information to probable cause,"[403] in order to "reveal whether there is a causal connection between [the officer's] failure to disclose and [probable cause]."[404] However, the Court applies this context rule considering the Third Circuit's guidance that it should not do so lightly. As to the omissions concerning Pardoe's history as a discontinued confidential informant, no additional context, such as Trooper Williamson's testimony that Pardoe had been a reliable confidential informant in the past, appears relevant to the Court in correcting these omissions. In contrast, the Alfords argue that Altari and Alteriki's father-son relationship, which was never included in the original affidavit, should not be included in the corrected affidavit. Yet as this father-son relationship is necessary

---

[400] *Yusuf*, 461 F.3d at 388 n.12.

[401] Those harsh effects and their damaging impact on the probable cause analysis are immediately apparent when the Court excises Williamson's false statements regarding what Pardoe and Thompson related, rather than revising them to reflect what was actually communicated.

[402] *Dempsey*, 834 F.3d at 474 (citing *United States v. Frost*, 999 F.2d 737 (3d Cir. 1993)).

[403] *Id.*

[404] *Frost*, 999 F.2d at 743.

context to correcting their identities and would have been included within an accurate affidavit, the Court includes that context in the insertions below.

The Court will now reconstruct the affidavit in relevant part accordingly:[405]

Occupant/Renter-Daquan    **[Altari]**    ALFORD    12/12/96    PA
OLN:31321123
. . . .
Based on training and experience, your affiant knows:
. . . .
3) That it is common for dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, residences of relatives and associates, safe deposit boxes, vehicles and/or other locations over which they maintain dominion and control for their ready access and to conceal these items from law enforcement authorities.
4) That in order to accomplish this concealment, drug traffickers frequently build "stash" places within their residences, businesses, vehicles (including compartments therein), the residence of relatives and associates, safe deposit boxes and/or other locations (including buried on the grounds thereof). There are a number of publications available instructing where and how to build "stash" places, and copies of these types of publication have been found in the aforementioned location utilized by drug traffickers.
5) That it is common for persons involved in drug trafficking to maintain evidence relating to their obtaining, secreting, transferring, concealing and/or expending drug proceeds . . . within their residences, at their businesses, in their vehicles, at the residences of relatives and associates, safe deposit boxes, and/or other locations over which they maintain dominion and control.
. . . .
9) That it is common for drug traffickers, to exchange "street money" (small denominations) for larger denominations of currency, which can be concealed in secure locations within their residences, their businesses, the residences of relatives and associates, safe deposit

---

[405] The Court omits in large part the preceding description of Trooper Williamson's history and qualifications. It omits the general background regarding drug trafficking except for the paragraphs which are most relevant to its subsequent analysis. Deletions are represented by bolded strikethroughs. Insertions are represented by bolded and bracketed text.

boxes, and/or other locations in order to amass a larger amount of currency in a concealed area.

. . . .

13) That drug traffickers commonly will conduct drug transactions with associates that are known to them. It is common for them to meet their suppliers and/or buyers at a predetermined location (and then change the location during just prior to the transaction), or they will conduct their business from the drug traffickers or associate's residence. When drug transactions take place at a residence. It is common to have an increase of foot traffic where visitors will only stay for brief periods of time.

14) That drug traffickers commonly transport their illegal drugs and/or drug proceeds in third party vehicles (that is a vehicle registered and/or rented/leased to someone other than them or someone else inside the vehicle with them). This is done so that if a drug trafficker needs to flee from law enforcement, he/she can abandon the vehicle and the vehicle cannot be traced back to them. It is also done to preserve any vehicle/s owned/registered to the drug trafficker from forfeiture.

15) **[Pennsylvania Confidential Informant 2410-17-0472, who was utilized in this investigation, is currently deactivated from Confidential Informant status due to an incident in 2017, wherein she deceived officers by inaccurately relaying the quantity of drugs she received during a controlled buy transaction and kept those drugs for herself.]** On April 29, 2021 I made contact with Pennsylvania Confidential Informant 2410-17-0472 who related and identified that a known male, the Defendant, **[Daquan Alteriki Alford, also known as]** Daquan "Baby" ALFORD requested her to rent a vehicle for him, in order to travel to Newark, New Jersey to procue an unknown amount of heroin. The CI related it is known to her-from making previous trips with **[Daquan Alteriki]** ALFORD-that he traffics large amount of heroin to the Williamsport area.

16) On April 29, 2021, at approximately 0930 hrs, the CI proceeded to rent a vehicle from Enterprise rental company and provided pictures of said rental vehicle to myself. The vehicle was identified as a black 2020 Hyundai Ioniq, bearing PA Reg LBY-4337. On this same date, **[Daquan Alteriki]** ALFORD related he left the Williamsport area at approximately 1253 hrs.

17) **[Daquan Alteriki]** ALFORD did not return to the Williamsport/Lycoming County area until approximately 0826 hrs. I spoke with the CI who related the following:

-At approximately 0215 hrs, the CI met with **[Daquan Alteriki]** ALFORD in the area of 688 Wildwood Blvd, Williamsport City, Lycoming County, Pennsylvania.

-**[Daquan Alteriki]** ALFORD asked the CI to "take a ride" with him, which she did so.

-**[Daquan Alteriki]** ALFORD drove the CI to the area of the 700 blk of First Avenue, Williamsport City, Lycoming County, Pennsylvania and made a phone call to an unknown black male.

-**[Daquan Alteriki]** ALFORD proceeded to meet with unknown black male and provided subject with a backpack containing the drugs he obtained from the Newark, New Jersey area. Prior to handing the backpack to the unknown male, **[Daquan Alteriki]** ALFORD showed the informant a large quantity of suspected cocaine (identified by **[Daquan Alteriki]** ALFORD) and a large quantity of heroin (identified by **[Daquan Alteriki]** ALFORD) to the CI.

-**[Daquan Alteriki]** ALFORD related he did not have cash on his person to pay the CI for renting the Hyundai rental car, however provided the CI with what she related to be two (2) bundles of heroin. The bundles of heroin were described as being white bags with a purple stamp with the words "Roxanne".

-The unknown black male then proceeded to carry the backpack he received from **[Daquan Alteriki]** ALFORD ~~towards the residence of 832 High Street, Williamsport City, Lycoming County, Pennsylvania~~.

-The CI and **[Daquan Alteriki]** ALFORD departed.

The phone call concluded at approximately 0800 hrs.

18) Through a separate witness, the CI returned directly home (119 Broad Street, Montgomery Borough, Lycoming County, Pennsylvania) at approximately 0230 hrs. The CI went directly to her bedroom.

19) At approximately 1038 hrs an emergency 911 call was placed to the Lycoming County Communications Center in regards to a medical emergency located at 119 Broad Street, Montgomery Borough, Lycoming County, Pennsylvania. The result of the call was discovered to be a deceased person within a bedroom of that residence.

20) From the initial investigation of the death investigation the following facts are known:

-The deceased was positively identified as CI 2410-17-0472 and laying partially in the closet/on the floor within the bedroom

-Located within the top center drawer of a dresser within the bedroom was a black purse with contained a used hypodermic needle, one (1) bundle of heroin (nine (9) white waxen baggies with a purple stamp with "Roxanne"), and one (1) white waxen baggie matching the above described which was open/partially used.

-Also, located in the same drawer were two (2) additional bundles of heroin (totaling twenty (20) white waxen baggies with a purple stamp with "Roxanne" on them).

-The deceased was discovered to have a fresh/recent injection mark on her right arm.

Furthermore, After reviewing the cell phone of the deceased the following messages on Facebook Messenger were discovered with **[Daquan Alteriki]** ALFORD.

-At approximately 0343 hrs, the CI sent **[Daquan Alteriki]** ALFORD a message relating "Yo shit is fire, think its been awhile since I had some that good"

-**[Daquan Alteriki]** ALFORD responded "Don't text me here" "Text my phone" "Number"

21) Later at the PSP Montoursville barracks, the seized white waxen baggies with a purple stamp with the words "Roxanne" did field test positive for Fentanyl.

22) On May 1, 2021 at approximately 1800 hrs, Tpr. Jonathan THOMPSON contacted the landlord of the 832 High Street, Williamsport City, Lycoming County, Pennsylvania residence. At this time, the landlord confirmed the 3rd Floor apartment was rented by Daquan **[Altari]** ALFORD**[, who is the son of the Defendant, Daquan Alteriki ALFORD,]** and Kiam ALFORD. ~~While Tpr. THOMPSON was speaking with the landlord, he/she related he/she has received several complaints of a high volume of foot traffic coming/going from the 3rd Floor apartment of the same residence.~~

23) Based on the above information, I have probable cause to believe that 832 High Street, Apt 3 in the City of Williamsport, Lycoming County, Pennsylvania is currently being utilized by Daquan **[Alteriki]** ALFORD and possibly others to store, distribute suspected heroin/fentanyl and/or cocaine in the Williamsport area. Therefore, I

respectfully request the authority to search said residence for the items listed on attachment 'A' of this search warrant application.

The Court has accordingly reconstructed the affidavit of probable cause, curing false statements by excising them entirely and curing omissions through insertions clarifying the falsehoods implied thereby.

I now proceed to analyze whether this reconstructed affidavit establishes probable cause to search the premises.

### C.    Materiality Analysis

As reconstructed, the affidavit generally alleges in relevant part that drug traffickers often store evidence in various places, including the residences of relatives and associates; that according to a previous Confidential Informant who was deactivated for deceiving officers by concealing drugs obtained from controlled buys, at approximately 2:15 a.m., Daquan Alteriki Alford and the Confidential Informant drove a rental car with drugs to the 700 block of First Avenue and gave a backpack of drugs to an unknown black male, who walked away; and that the landlord of 832 High Street confirmed that Daquan Alteriki Alford's son, Daquan Altari Alford, lived in Apartment 3 of that building, which is in close proximity to where Alteriki handed off the drugs.

"[C]ourts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner."[406] "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual context – not readily, or even usefully, reduced to a neat set of legal rules."[407] "It is enough that there was a fair probability" of criminal conduct rather than "the certainty we associate with formal trials"[408] to establish probable cause. Assuming that a magistrate would understand that the 700 block of First Avenue refers to the intersection of First Avenue and High Street from which Altari's building was visible, the reconstructed affidavit still fails to establish probable cause to search the premises. Considering both Pardoe's mostly uncorroborated account coupled with her history, as well as the information she provided, there are two independently sufficient reasons to conclude that probable cause was lacking here.

## 1.  Pardoe's Tip Cannot Be Credited

The reconstructed affidavit requires discrediting Pardoe's tip. Analyzing the totality of the circumstances here, I first conclude that the detailed and firsthand nature of Pardoe's tip provides some support for its reliability, but that support is somewhat undermined because the tip's most crucial details are not readily verifiable. Second, the tip's partially corroborated nature appears to provide some

---

[406] *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)) (cleaned up).
[407] *Id.* at 232.
[408] *Id.* at 246.

support for its reliability, but this support is substantially undermined by the fact that some of these details were contradicted and by the relatively modest nature of the corroboration here. Third, I conclude that much more substantial corroboration was needed to compensate for Pardoe's extremely low level of credibility, corroboration which was lacking here.

The elements of an informant's "basis of knowledge," "veracity," and "reliability" are all relevant to assessing probable cause, but because they are not "understood as entirely separate and independent requirements to be rigidly exacted in every case," "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."[409] This is often accomplished through "independent '[police] corroboration of details of an informant's tip' as an important method for establishing a tip's reliability."[410] The totality of the circumstances in this case requires weighing three relevant reliability criteria: the specificity of Pardoe's firsthand report; its partial corroboration; and her credibility.

One well-understood indicium of reliability is that "an explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitle[s] [the informant's] tip to greater weight than might

---

[409] *Stearn*, 597 F.3d at 555 (quoting *Gates*, 462 U.S. at 230, 233, 241).
[410] *Id.* (quoting *Gates*, 462 U.S. at 241).

otherwise be the case."[411] Here, Pardoe described the general starting and stopping points of the car's route and provided especially rich detail as to the kinds of drugs Alteriki showed to her, although she was more vague in describing where the unknown black male walked "towards."[412]

However, the persuasive thrust of detailed accounts is partly grounded in the rationale that, if an informant provides information so specific that it is "readily verifiable upon a subsequent search by the police," then "if the warrant issued, lies would likely be discovered in short order and favors falsely curried would dissipate rapidly."[413] In *United States v. Foree*, for example, the tip of a confidential informant whose history of veracity was virtually absent from the affidavit was nevertheless credited because she communicated a tip rich in details alleged to be grounded in her personal observation.[414] But the Court held that "the DEA surveillance" of the controlled operation described by the informant "constituted

---

[411] *Gates*, 462 U.S. at 234; *Spinelli v. United States*, 393 U.S. 410, 416 (1969) (specificity weighs towards reliability); *United States v. Torres*, 534 F.3d 207, 211-13 (3d Cir. 2008) (finding the highly specific nature of an informant's personal observations, along with the fact that he was not completely anonymous, to be sufficient to muster reasonable suspicion); *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) ("An informant's information is considered reliable if the informant speaks with personal knowledge."); *United States v. Brundridge*, 170 F.3d 1350, 1362-53 (11th Cir. 1999) ("The CI's basis of knowledge was good . . . . The CI's basis of knowledge made up for any weaknesses in the CI's veracity . . . the level of detail meant that the CI was unlikely to lie."); *United States v. Barnes*, 195 F.3d 1027, 1028 (8th Cir. 1999) (weighing the informant's "first-hand knowledge of the facts" as highly persuasive evidence of reliability); *United States v. Songamere*, 30 F.3d 51, 53 (6th Cir. 1994) (same).

[412] This was already true for what Pardoe actually said and is even more true in the reconstructed affidavit.

[413] *Foree*, 43 F.3d at 1576; *Brundridge*, 170 F.3d at 1453.

[414] *United States v. Foree*, 43 F.3d 1572, 1576 (11th Cir. 1995).

sufficient corroboration of the CI's veracity to support an overall finding of probable cause" because, while not "[i]ndependently confirming that *what* she said is true," the surveillance created corroboration by "creating circumstances under which she is unlikely to lie."[415] Despite reviewing the affidavit's facial validity, the *Foree* court still cautioned that the case "demarcate[d] the outer bounds of probable cause in this context."[416]

Here, the most readily verifiable details regarded Pardoe's highly specific description of the drugs she received from Alteriki, which were subsequently falsified as to quantity. In contrast, the comparably general geographical description of she and Alteriki's route of travel and the subsequent handoff of drugs, as well as her vague statement of where the unknown black male walked, is less readily verifiable due to the lack of supervision.[417] So the significance of Pardoe's detailed firsthand account upon her reliability is undermined by its partial contradiction and less readily verifiable nature of its most relevant aspects. Nevertheless, another reason detailed tips bolster reliability is that, if true, they

---

[415] *Id.*; *see also United States v. Eddings*, No. 2:21-CR-141-CCW, 2021 U.S. Dist. LEXIS 218795, at *32-33 (W.D. Pa. Nov. 12, 2021); *United States v. Sanchez*, 246 F.App'x 803, 806 (3d Cir. 2007) (noting that a "closely supervised and controlled purchase of narcotics establishes ample probable cause to search a residence").

[416] *Id.* at 1576 n.6. The Eleventh Circuit subsequently eschewed any per se rule that corroboration is always required in the absence of facts demonstrating an informant's veracity, and therefore cast doubt upon Foree's "outer bounds" dictum. *See Brundridge*, 170 F.3d at 1353 & n.2. But given the Third Circuit's guidance in *Yusuf*, *Foree* still appears to be instructive.

[417] *See Glover*, 755 F.3d at 816 (finding that the tip's "fairly specific" descriptions of the illegal firearms was of little persuasion considering that the tipster "gave no indication of where they were in the house").

demonstrate a better basis of knowledge than "casual rumor[s] circulating in the underworld:" firsthand observation.[418] That reasoning remains persuasive here.

But absent corroboration, Pardoe's somewhat specific account is not independently sufficient to prop up probable cause. "[W]here there is no basis for determining the reliability of a tip from the informant, the information contained in the tip cannot by itself be sufficient to provide probable cause or even reasonable suspicion to justify a *Terry* stop. Instead, police must investigate further to provide independent corroboration of the tip."[419] As the Third Circuit stated in *United States v. Yusuf*: "Informants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation."[420]

In line with this principle, the Eighth Circuit stated in *United States v. Robertson* that a tip replete with "the richness and detail of a first hand observation" required "some independent corroboration or verification" "because

---

[418] *Gates*, 462 U.S. at 234, 279.

[419] *United States v. Nelson*, 284 F.3d 472, 479–80 (3d Cir. 2010).

[420] *Yusuf*, 461 F.3d at 384–85; *King*, 2022 U.S. Dist. LEXIS 8024, at *32 (explaining that the government must show "*either* that the informant has provided reliable information in the past *or* that the information has been corroborated through independent investigation"). *See also United States v. Dretke*, 540 U.S. 668, 701 (2004) ("This Court has long recognized the 'serious questions of credibility' informers pose.") (quoting *On Lee v. United States*, 343 U.S. 747, 757 (1952)); 27 Daniel R. Coquillette et al., *Moore's Federal Practice – Criminal Procedure* § 641.10 (Matthew Bender 3d ed.) (rev'd 2024) ("When a tip by a confidential informant serves as the basis of probable cause, the information must be at least partly corroborated . . . .").

the informant and the alleged criminal activity were previously unknown."[421] Similarly, as described above, the *Foree* case involved an informant with no detailed history (instead of a history of dishonesty) whose surveillance created some degree of corroboration, and that case *still* existed at the "outer bounds" of probable cause. [422] So as *Yusuf*, *Robertson*, and *Foree* would imply, the specificity of Pardoe's account regarding the car's route of travel cannot alone salvage her tip absent corroboration, much less under these circumstances.[423]

No part of Pardoe's story regarding her drive with Alteriki is corroborated in the affidavit.[424] But it might be argued that Pardoe's tip was partially corroborated in some respects, even if no details of its most important aspect were corroborated—the evidence discovered after Pardoe's death backed up both her claims that she had communicated with Alteriki regarding drug transactions[425] and had received the described waxen baggies, stamped with the word "Roxanne,"

---

[421] *United States v. Robertson*, 39 F.3d 891, 893-94 (8th Cir. 1994). *See also Glover*, 755 F.3d at 818 ("When information about credibility is not available, other factors such as extensive corroboration may overcome the doubt inherent in relying on an informant without a track record.").

[422] *Foree*, 43 F.3d at 1576.

[423] *Id.*; *United States v. Eddings*, No. 2:21-CR-141-CCW, 2021 U.S. Dist. LEXIS 218795, at *32-33 (W.D. Pa. Nov. 12, 2021); *United States v. Sanchez*, 246 F.App'x 803, 806 (3d Cir. 2007) (noting that a "closely supervised and controlled purchase of narcotics establishes ample probable cause to search a residence").

[424] Except that "a separate witness" (who we now know to be Logan Charles) saw Pardoe return "directly home" afterwards. Application for Search Warrant, Doc. 88-1 at 4, ¶18.

[425] *See United States v. Barnes*, No. 2:17-cr-00171, 2021 U.S. Dist. LEXIS 241876, at *37 (W.D. Pa. Dec. 20, 2021) ("that the informant could easily contact [defendant] over Snapchat and make significant purchases of heroin on short notice lend credence to the statement that the confidential informant had previously purchased drugs from [him]").

from him. However, the force of this partial corroboration is weak at best, if not entirely nullified by its partial contradiction by subsequently discovered evidence.

The persuasive value of partial corroboration upon veracity is that "[if] an informant is right about some things, he is more probably right about other facts."[426] The rationale behind this observation is that "[p]resent good performance shows [the informant] to be probably 'credible' just as surely as does past good performance."[427] That is why "where the tip contains information that later investigation contradicts . . . there is no reasonable suspicion,"[428] much less probable cause. The overall inquiry is whether "verification of part of an informant's story make[s] it sufficiently likely that the crucial part of the informant's story (i.e., allegations that criminal activity has occurred and that evidence pertaining thereto will be found in the location searched) is true."[429] Partial corroboration is a weightier indicium of reliability where there is "independent corroboration by the police of *significant* aspects of the informer's" information.[430]

*Alabama v. White*, for example, involved an anonymous tip that "Vanessa White would be leaving 235-C Lynwood Terrace Apartments at a particular time

---

[426] *Stearn*, 597 F.3d at 557 (quoting *Gates*, 462 U.S. at 244).

[427] 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.3(f) (6th ed.) (rev'd 2024) (quoting *Stanley v. State*, 313 A.2d 847, 861 (Md. App. Ct. 1974)).

[428] *Nelson*, 284 F.3d at 480.

[429] *United States v. Khounsavanh*, 113 F.3d 279, 284 (1st Cir. 1997).

[430] *White*, 496 U.S. at 332 (emphasis added).

in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's Motel, and that she would be in possession of about an ounce of cocaine inside a brown attache case."[431] The Supreme Court held that a subsequent vehicular stop was supported by reasonable suspicion after investigating officers partially corroborated some of these details: namely, that an unidentified woman left the apartment building at the identified time of departure and traveled to the aforementioned hotel.[432] Corroborated "details relating not just of easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted," lent credibility to the belief that the informant had a "special familiarity with respondent's affairs."[433] Despite this vehicular search only requiring reasonable suspicion, the *White* court still viewed these facts as presenting a "close case" given officers' reliance on an anonymous tip.[434]

In comparison to *White*, the partial corroboration in the case at bar is weak. Like the anonymous tip in *White*, corroborating evidence verified that Pardoe had familiarity with Alteriki's affairs. But the most "significant aspects" of Pardoe's account, specifically the location and fact of a drug handoff, were not only uncorroborated but also unverifiable; in contrast, officers verified the anonymous

---

[431] *Id.* at 327.
[432] *Id.* at 331.
[433] *Id.* at 332.
[434] *Id.* at 327, 331. Subsequent analysis explains why Pardoe's tip is at least similarly suspect to an anonymous tip, if not more suspect.

tip in *White* by observing the suspect's route of travel towards the specified destination. The extent and specificity of corroborated information also pales in comparison to that in the "close" case (under a reasonable suspicion standard) of *White*, as only Pardoe's contact with Alteriki and her possession of the drugs she described were corroborated.[435] But most alarming is that Pardoe's report as to the quantity of drugs she received from Alteriki was contradicted by subsequent evidence, and based on Pardoe's history, she almost certainly distorted this detail with the intent to deceive Trooper Williamson. Under these circumstances, the reasoning that "[if] an informant is right about some things, he is more probably right about other facts,"[436] becomes unpersuasive at best. In fact, this principle may do more harm than good to the Government's case. For its corollary is that, if an informant is wrong about some things, she is more probably wrong about other facts.

It "is difficult to define with precision the quantity of corroboration necessary to demonstrate the informant's veracity."[437] "[A] few minor elements of the story" are not sufficient to corroborate an untested informant, but it is "equally certain, though, that the police need not corroborate every detail."[438] Based on

---

[435] *See Glover*, 755 F.3d at 816 (finding that the tip's "fairly specific" descriptions of the illegal firearms was of little persuasion considering that the tipster "gave no indication of where they were in the house").

[436] *Stearn*, 597 F.3d at 557 (quoting *Gates*, 462 U.S. at 244).

[437] *United States v. Bush*, 647 F.2d 357, 363 (3d Cir. 1981).

[438] *Id.*

Pardoe's extremely damaged credibility in this case, the Court concludes that a very significant degree of corroboration was needed to credit her tip.

"[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."[439] This is simply the converse of *Gates*' reasoning that in the totality of the circumstances analysis, an "informant's 'veracity,' 'reliability,' and 'basis of knowledge,'" though all "highly relevant," "should be understood simply as closely intertwined issues" rather than "entirely separate and independent."[440] In line with this commonsense approach to reliability, "it is useful to think of reliability and corroboration as a sliding scale,"[441] demanding "no corroboration" for informants "known from past practice to be reliable,"[442] "a significant amount of corroboration" for "completely anonymous" informants,[443] and "a lesser degree of corroboration" where informants are "only partially known (i.e., her identity and reliability are not verified, but neither is she completely anonymous.)"[444]

The general principle in this area is that "known informant[s] whose reputation[s] can be assessed and who can be held responsible if [their] allegations

---

[439] *Ala. v. White*, 496 U.S. 325, 331 (1990).
[440] *Gates*, 462 U.S. at 230.
[441] *United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007).
[442] *Id.*; *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).
[443] *Elmore*, 482 F.3d at 181; *United States v. Robertson*, 39 F.3d 891, 893–94 (8th Cir. 1994).
[444] *Elmore*, 482 F.3d at 181.

turn out to be fabricated" are more reliable than anonymous tipsters.[445] But it is not clear that this proposition holds true here. If at least some corroboration is demanded for anonymous or untested informants, it goes without saying that the absence of corroboration is damning for informants with histories of dishonesty.[446] With respect to the degree of corroboration required in the absence of a history of reliability, such informants may even be viewed as a tier below untested or anonymous informants if the dishonesty is significant. As the Ninth Circuit stated regarding an informant with a prior conviction for making false reports in *United States v. Hall*, a "known liar is less worthy of belief than an individual about whom nothing is known."[447]

Especially informative is the Fourth Circuit's decision in *United States v. Lull*.[448] In *Lull*, a confidential informant carried out a controlled buy at the home of defendant's mother, was caught attempting to keep additional money and drugs left over from the controlled buy for himself, and was terminated as an informant as a result; similar to the matter at hand, the affidavit failed to explain any facts about the informant's history of veracity and detailed no corroboration of the information

---

[445] *Fla. v. J.L.*, 529 U.S. 266, 270 (2000).

[446] Even granting the dubious proposition that such informants are closer to informants "only partially known," this affidavit does not garner the "lesser degree of corroboration" generally demanded from such informants in light of the weakening effect of its partial contradiction.

[447] *Hall*, 113 F.3d at 159; *see also Glover*, 755 F.3d at 815 (informant's history of trying to deceive the police undermined reliability).

[448] 824 F.3d 109 (4th Cir. 2016).

he relayed about the controlled buy.[449] The *Lull* court explained that "the egregious nature of the informant's actions was clear" as demonstrated by the informant's "immediate arrest on felony charges and discharge from service," and reasoned that the informant's dishonesty "seriously calls into question the informant's reliability . . . the Sheriff's Office essentially admitted as much when, upon discovering the theft, it immediately discharged the informant."[450] Given the lack of corroboration or details relating the informant's history of veracity or reliability, the court entirely "set aside the information provided exclusively by the informant." [451]

*Lull* is highly analogous, and highly persuasive here. The fact of Pardoe's termination as a confidential informant is already damaging, as it demonstrates both that she was not subject to the screening process for such informants at the time of her tip, and that the Pennsylvania State Police had decided that she was unreliable. As to the deception which occurred in *Lull*, the exact same facts played out in Pardoe's case, except that they had *already* resulted in her termination before the events described in the affidavit, and then Pardoe engaged in the exact same deception *again* in this case.

Other facts further damage Pardoe's credibility, supporting this Court's demand for more corroboration to credit her tip. The nature of this "uncontrolled

---

[449] *Id.* at 112, 118.
[450] *Id.* at 117–18.
[451] *Id.* at 118.

buy" being carried out outside of police supervision after Pardoe and Trooper Williamson had already made contact also indicates Pardoe's untrustworthiness. Pardoe had established communication with Williamson and yet still chose to go rogue and orchestrate this uncontrolled buy outside of his supervision, likely because she premeditated, at a minimum, the deception which ultimately caused her death by overdose. For this reason, Pardoe's report to Williamson gains no credibility for being against her penal interest,[452] as she apparently intended to remit most of the drugs she received from Alteriki to Williamson as evidence of the transaction and conceal the criminal wrongdoing that later became apparent. The affidavit also demonstrates that Pardoe had intravenously used Alteriki's fentanyl-laced heroin and was under the influence around 3:43 a.m., when she messaged Alteriki, and again before her death by overdose which was discovered at 10:28 a.m—shortly after she relayed information to Williamson around 8:00 a.m.[453]

---

[452] *See United States v. Holmes*, 69 F.App'x 66, 69 (3d Cir. 2003) (fact that informant's "statements were made against his penal interest and from his direct involvement . . . clearly supports [his] reliability"); *United States v. Harris*, 403 U.S. 573, 583 (1971) (plurality opinion) ("Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.").

[453] Defendants argue that this undermines Pardoe's reliability by showing that she was likely under the influence or otherwise affected at the time of her conversation with Williamson, around 8:00 a.m. The Court agrees that it undermines her reliability to some degree but is hesitant to afford this fact any significant weight under these circumstances. The "mere fact that [a] CI was under the influence" of controlled substances "does not" necessarily "mean that [s]he could not provide accurate information," and so several courts have credited confidential informants when convinced that their intoxication did not affect their ability to relay information, whereas others have stated that such a fact reduces reliability. *Compare Cabello v. Torres*, Civil Action No. DR-CV-0078-AM-CW, 2014 U.S. Dist. LEXIS 207055,

In the face of Pardoe's severely damaged credibility, the affidavit provides no information at all indicating that Pardoe has been a reliable confidential informant in the past. Nor did Trooper Williamson speak with Pardoe face-to-face when she relayed her report, which some courts have held can support reliability by giving the opportunity to assess the informant's honesty in person.[454]

All told, the moderate specificity of Pardoe's firsthand account and the modest corroboration of her partially contradicted report are insufficient to compensate for the startlingly low level of reliability here, as demonstrated by Pardoe's pattern of dishonesty and deception while serving as an informant and the circumstances of her conduct in this case.

---

at *38 (W.D. Tex. Jan. 3, 2014) *and United States v. Dubrowski*, Criminal Action No. 5:15CR15 (STAMP), 2015 U.S. Dist. LEXIS 56639, at *11 (N.D. W.Va. Apr. 30, 2015) *with United States v. Boyce*, 601 F.Supp. 947, 953 (D. Minn. 1985). In the absence of additional evidence, either through testimony as to how Pardoe specifically was impacted at the time of the phone call with Williamson, through expert testimony assisting the Court in understanding the influence of taking fentanyl-laced heroin on the ability to recall and communicate information several hours later, or by some other means, the Court is hesitant to speculate on its impact on reliability. *See United States v. Allen*, 297 F.3d 790, 796 (8th Cir. 2002) ("Allen provides no authority for the proposition that persons under the influence of methamphetamine cannot provide accurate information. The affiant, a narcotics officer who had substantial experience in dealing with persons who had ingested methamphetamine, testified that Craycraft was lucid and coherent and that persons under the influence of methamphetamine are generally functional."). Because Defendants prevail in disproving probable cause anyways I need not specify how these facts would interact with reliability in the absence of such additional evidence.

[454] *See, e.g.*, *United States v. Carter*, 413 F.3d 712, 715 (8th Cir. 2005).

## 2.     Insufficient Nexus to the Searched Premises

While "[t]he probable cause assessment does not require *direct* evidence linking a place to be searched to a crime,"[455] "the Fourth Amendment precludes the search of a home lacking a 'nexus' to the alleged crimes."[456] This means that to find probable cause, the reviewing court must conclude that "viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[457] Even assuming the truth of everything Pardoe stated to Trooper Williamson, the reconstructed affidavit does not establish probable cause.

The familial connection between Altari and Alteriki is insufficient to sustain the warrant because "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."[458] And while proximity of criminal activity to the premises to be searched can support probable cause that the defendant stores drug-related

---

[455]   *United States v. Coles*, 264 F.Supp. 3d 667, 679 (M.D. Pa. 2017) (emphasis added).

[456]   *Stearn*, 597 F.3d at 558.

[457]   *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (quoting *Gates*, 462 U.S. at 238).

[458]   *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *see also Fisher v. Volz*, 496 F.2d 333, 342 (3d Cir. 1974) ("A warrant for the arrest of a suspect may indicate that the police officer has probable cause to believe the suspect committed a crime; it affords no basis to believe that the suspect is in some stranger's home."); *United States v. Rodriguez,* Criminal Action No. 13-619-6, 2014 U.S. Dist. LEXIS 124814, at *8 (E.D. Pa. Sep. 8, 2014) ("Although evidence of association with drug dealers is relevant as to whether a suspect is himself a drug dealer, the probative value of such evidence is low.").

evidence there,[459] this in combination with the Alfords' familial relationship is still insufficient to show that the drug dealer, Alteriki, habitually lived at or used the residence, as the Government concedes.[460]

After all, as the Third Circuit stated in *United States v. Burton*, the "reasonable inference . . . that drug dealers often store evidence of drug crimes in their residences . . . is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities."[461] Courts have generally required less speculative indicia tying a drug dealer to the premises searched than simple familial relation and proximity of criminal activity, such as observing the drug dealer entering and exiting the residence or parking in front of it;[462] that the drug dealer owns keys to the residence,[463] is named on the lease of the

---

[459] *See Hodge*, 246 F.3d at 307 (proximity of criminal activity and defendant's home supported probable cause that defendant stored drug-related evidence in his home).

[460] Brief in Opposition, Doc. 130 at 27.

[461] *Id.* at 104.

[462] *Burton*, 288 F.3d at 104; *United States v. Bangaroo*, No. 3:15-CR-00174, 2017 U.S. Dist. LEXIS 130109, at *28–29 (M.D. Pa. Aug. 15, 2017); *United States v. Herrera*, Criminal Action No. 23-96, 2023 U.S. Dist. LEXIS 166095, at *15–16 (E.D. Pa. Sep. 18, 2023); *United States v. Johnson*, 187 F.Supp. 3d 548, 552–53 (M.D. Pa. 2016); *United States v. Gaskins*, No. 06-1152, 2007 U.S. App. LEXIS 25021, *6–7 (3d Cir. Oct. 25, 2007); *United States v. Harris*, No. 06-1286, 2007 U.S. App. LEXIS 25022, at *6 (3d Cir. Oct. 25, 2007); *United States v. Walker*, 776 F.App'x 784, 786 (3d Cir. 2019); *United States v. Rosario*, 837 F.App'x 117, 120 (3d Cir. 2020).

[463] *United States v. Majeed*, Criminal No. 08-186, 2009 U.S. Dist. LEXIS 68130, at *8–9 (E.D. Pa. Aug. 4, 2009) (defendant had keys and a garage door opener for his girlfriend's residence).

residence,[464] receives mail at the residence or lists it on a driver's license[465] or other Government documents;[466] provides this residence to the probation office;[467] or confirmation from a resident[468] or confidential informant that the defendant resides at the specified address.[469] This is not an exhaustive list, but it is illustrative of the simple yet critical showing necessary. Many kinds of evidence are available to show that a suspect resides at or uses a residence. But all such evidence is absent from the affidavit.

The Government argues that "the facts in the affidavit established, not some generalized nexus between Alteriki's drug dealing activity and the residence to be searched, but a more specific nexus between a specific store of drugs and the residence to be searched."[470] "[T]his may be the odd case where there was likely not a fair probability that any other drugs or drug evidence other than the very specific drug evidence observed by the CI would be located in the residence, but there *was* that fair probability, and that tight nexus, as to those specific drugs."[471]

---

[464] *United States v. Abdul-Ganui*, No. 2:10cr16, 2010 U.S. Dist. LEXIS 131993, at *27 (W.D. Pa. Dec. 14, 2010).

[465] *United States v. Freeman*, 666 F.Supp. 2d 454, 462 (D. Del. 2009); *United States v. Harris*, No. 06-1286, 2007 U.S. App. LEXIS 25022, at *6 (3d Cir. Oct. 25, 2007).

[466] *United States v. Adam*, No. 2:23-cr-180-2-NR, 2024 U.S. Dist. LEXIS 53459, at *8-9 (W.D. Pa. Mar. 26, 2024).

[467] *United States v. Harper*, No. 2:20-cr-00806 (BRM), 2021 U.S. Dist. LEXIS 162543, at *12–13 (D.N.J. Aug. 26, 2021).

[468] *United States v. Smith*, 224 F.App'x 194, 198-99 (3d Cir. 2007).

[469] *United States v. Jones*, No. 3:21-CR-126, 2023 U.S. Dist. LEXIS 33429, at *14-15 (M.D. Pa. Feb. 28, 2023).

[470] Brief in Opposition, Doc. 130 at 27.

[471] *Id.*

The Court agrees that such a theory could fairly support probable cause to search,[472] but that is not the case here. The Government appears to rely mainly upon the affidavit's statement that the unknown black male walked "towards" 832 High Street to resuscitate probable cause, even though this unknown person was never seen walking *into* 832 High Street (which contained at least three apartments). Considering the commonsense reasoning that should drive probable cause, the Court might be inclined to agree that such a course of events could support probable cause, if coupled with the facts that drug dealers often hide evidence within the homes of family members and that a high amount of foot traffic had been observed coming in and out of the Third Floor of 832 High Street.

However, the Court need not analyze this scenario under the reconstructed affidavit, which now reflects merely that an unknown black male walked away with the backpack of drugs provided by Alteriki at the intersection of First Avenue and High Street, which was close to Altari's Apartment. Absent this evidence, the only connection distinguishing Altari from any other person living near the intersection of First Avenue and High Street is that he is Alteriki's son, which is of extremely low probative value absent any other facts. Because the sins of the father are not the sins of the son, this information is not enough to tie Alteriki's criminal activities to Altari's nearby apartment.

---

[472] *See, e.g.*, *Barnes*, 2021 U.S. Dist. LEXIS 241876, at *33 (although whether *Burton* applied was a "close call," it did not matter because clear evidence connecting defendant's drug dealing activities to the apartment in question existed).

The Eastern District of Pennsylvania has generated an analogous decision in *United States v. Rodriguez*, which held that a search warrant executed upon the apartment of a defendant whose father was a drug dealer lacked probable cause; it continues to be instructive.[473] The only additional evidence in *Rodriguez* was that the father had used the defendant's car to collect drug proceeds and this car was parked near the defendant's apartment; the defendant had met with other drug dealers in public; and the defendant appeared "extremely nervous" when agents visited his home.[474] The *Rodriguez* court concluded not only that probable cause was lacking to search the defendant's home, but also that the good faith exception did not apply, because "the logical connection between the evidence presented in the warrant application and probable cause to search [Defendant's] apartment was [so] extremely attenuated and speculative" that "no objectively reasonable police officer could believe that the search of [Defendant's] apartment was lawful."[475]

Accordingly, the reconstructed affidavit lacks probable cause.

## V.    SUPPRESSION ANALYSIS

But that is not the end of the analysis, for "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean the exclusionary rule applies."[476] "[T]he exclusionary rule is a prudential doctrine designed solely to

---

[473] 2014 U.S. Dist. LEXIS 124814, at *12–13.
[474] *Id.* at *14.
[475] *Id.* at *14–15.
[476] *Herring*, 555 U.S. at 140.

deter future Fourth Amendment violations," not to remedy past ones.[477] The overall

inquiry in whether evidence should be suppressed is a "'rigorous' cost-benefit

analysis"[478] to determine whether the "deterrence benefits" of exclusion "outweigh

its substantial social costs."[479] The exclusionary rule is also subject to various

deterrence-based exceptions, none of which the Government has argued are

applicable here.[480]

Because the costs of suppressing evidence are always substantial,

suppression "has always been our last resort, not our first impulse."[481] "Those costs

include interfering with courts' truth-seeking function, and more specifically,

concealing 'reliable, trustworthy evidence bearing on guilty or innocence' and, in

some instances, 'set[ting] the criminal loose in the community without

punishment.'"[482]

---

[477] *Katzin*, 769 F.3d at 181.

[478] *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021) (citing *Davis v. United States*, 564 U.S. 229, 237–38 (2011)).

[479] *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) (quoting *Scott*, 524 U.S. at 363).

[480] As this case involved two related drug-dealing defendants residing in the same apartment, one of which was already under investigation, the Court initially inquired into whether the inevitable discovery doctrine may apply here; the Court suspected that a search relating to Altari's drug activities may have been inevitable. But the Government did not introduce facts into the record to support inevitable discovery, so it is inapplicable here. *See United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (inevitable discovery applies when "the Government has shown by a preponderance of the evidence that routine police procedures inevitably would have led to the discovered" evidence); *United States v. Alexander*, 54 F.4th 162, 174 (3d Cir. 2022) ("[i]nevitability is a high threshold" which must be supported by "historical facts capable of ready verification, and not speculation") (citations omitted).

[481] *Hudson*, 547 U.S. at 591.

[482] *Caesar*, 2 F.4th at 169 (quoting *Davis*, 564 U.S. at 237-38). The cost of "set[ting] the criminal loose in the community without punishment" is arguably blunted here as suppression would not affect Alteriki's Distribution of Controlled Substance Resulting in

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."[483] "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue," and "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."[484] Satisfying the *Franks* test necessarily shows conduct carried out in bad faith, whether intentionally or recklessly. This is precisely why the good faith exception to the exclusionary rule[485] is inapplicable in the *Franks* context, as the Supreme Court and Third Circuit have held.[486]

---

Death charge; much of the evidence of this crime was discovered at the scene of Pardoe's death and not through the search warrant.

[483] *Herring*, 555 U.S. at 144.

[484] *Davis*, 564 U.S. at 238 (quoting *Herring*, 555 U.S. at 143, 144).

[485] The good faith exception precludes applying the exclusionary rule based on an officer's "objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984).

[486] *See id.* at 923 (stating that "[s]uppression therefore remains an appropriate remedy" for *Franks* violations); *Am. Investors of Pittsburgh, Inc.*, 879 F.2d at 1106; *Caesar*, 2 F.4th at 170. Some very confusing dicta from the Third Circuit creates tension with this rule, but "[w]hen binding precedent squarely addresses an issue, the District Court may not deviate from that precedent based on dicta." *Burns v. Colvin*, 156 F.Supp.3d 579, 583 (M.D. Pa. 2015) (Cohn, M.J.). *See Dempsey*, 834 F.3d at 473 n.13 (stating in a section 1983 case that officers "may at times omit information recklessly but in good faith"); *United States v. Williams*, 974 F.3d 320, 353 (3d Cir. 2020) ("when good faith is concerned, the proper question is not simply whether the allegedly omitted information was known to the affiant and relevant to the magistrate's probable-cause inquiry, but also whether the deliberate or reckless omission, if it occurred, was 'so objectively culpable as to require exclusion'").

Indeed, as discussed above, the Supreme Court has analogized to *Franks* recklessness when describing what kind of conduct the exclusionary rule must deter in *Herring*, and the Third Circuit has analogized to *Herring* in the opposite direction when describing what kinds of false statements are reckless under *Franks*.[487] It would appear then that there is a close (if not synonymous) interrelation between the kinds of conduct satisfying *Franks* intentionality or recklessness, and the kinds of conduct sufficiently deliberate to trigger the exclusionary rule.

That is certainly the case here. All but one of the omissions and false statements made in this affidavit were made knowingly and clouded the magistrate's judgment in this case. The Government attempts to avoid suppression by arguing that Trooper Williamson's omission of the Alfords' identities was "rooted, at worst, in negligence" and "the unintended result of hasty drafting that was motivated by the understandable desire to neutralize as quickly as possible a stash of dangerous drugs that had already claimed one life."[488]

The Government's argument is, in substance, nothing more than an attempt to rehash its unsuccessful claim that there is a more searching subjective component to *Wilson*'s recklessness standard. By reaching the question of deterrence in a *Franks* case, the Court has necessarily determined that the officer

---

[487] *Herring*, 555 U.S. at 144; *Brown*, 631 F.3d at 649.
[488] Brief in Opposition, Doc. 130 at 39–40.

acted intentionally or recklessly. Nor is *Wilson*'s peculiar reckless omissions test unaligned with the deterrence analysis. *Herring* teaches that the "analysis of deterrence and culpability is objective, not an 'inquiry into the subjective awareness of arresting officers;"[489] on an objective level, the totality of the omissions and false statements in this affidavit are beyond the pale. Even if the Government's negligence argument were not inherently self-defeating, it would still fail. "Reckless or grossly negligent conduct is enough to justify suppression," and considering the magnitude of this omission, this conduct "was, at a minimum, grossly negligent."[490]

The Government's "hasty drafting" reference, which has sometimes appeared in judicial opinions with minimal explanation, is nothing more than an effort to circumvent substantively engaging with whether the officer's conduct was reckless. After all, an officer can be hasty and negligent, or hasty and reckless, so relying on "hasty drafting" does not rebut the unavoidable conclusion that this conduct was reckless. And the "understandable desire to neutralize as quickly as possible a stash of dangerous drugs" is present in any case involving drugs and does not insulate the Government from the consequences of its actions. Our Supreme Court has observed with concern that "[t]he point of the Fourth Amendment, which often is not grasped by zealous officers," is that "[i]ts

---

[489] *Herring*, 555 U.S. at 145.
[490] *People of the Virgin Islands v. John*, 654 F.3d 412, 420–21 (3d Cir. 2011).

protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."[491] So too here; arguing that any constitutional violation was caused by overzealousness only underscores the magnitude of this problem and the need for deterrence.

To avoid suppression, "all the investigator must do is comply with the well-known duty to spell out the complete factual basis for a finding of probable cause within the affidavit's four corners."[492] It would be perplexing to state that avoiding inaccuracies when applying for warrants—the very stuff of policework—places too much of a burden on police officers. If "hasty drafting" makes such errors more likely, perhaps the answer is not to say that policing the consequences of that drafting is too burdensome, but rather, for officers to review their work.

The Supreme Court has stated that "marginal deterrence does not 'pay its way'" to supporting exclusion.[493] So the Government also argues that suppression would only result in modest deterrence benefits because the novel nature of this omission makes similar violations unlikely to occur in the future.[494] Curiously, another *Franks* motion was filed before me on the basis of a nearly identical factual omission concerning a father and son with the same name within the last

---

[491] *Johnson v. United States*, 333 U.S. 10, 13–14 (1948); *Wilson*, 212 F.3d at 787 (citing this language).

[492] *John*, 654 F.3d at 420.

[493] *Herring*, 555 U.S. at 147–48 (quoting *Leon*, 468 U.S. at 907–908, n.6).

[494] Brief in Opposition, Doc. 130 at 41.

year.[495] Nevertheless, based on the absence of analogous precedent involving co-defendants with the same name described in the same affidavit, the Court agrees that a reckless omission involving these precise facts is quite factually unique.

But this argument still misses the forest for the trees. Analyzing deterrence centers on whether "police *conduct* [is] sufficiently deliberate,"[496] not whether similar fact patterns will recur. While these facts are unlikely to present themselves in many future cases, the conduct leading to these omissions and false statements is conduct that could infect any warrant, and the risk of recurrence is endemic to a large swath of police work. It is noteworthy that Trooper Williamson testified to his habitual omission of similar information regarding confidential informants because of his own judgment that those informants remained reliable.[497] In brief, the conduct at issue here is "sufficiently deliberate that exclusion can meaningfully deter it,"[498] and it is the deliberateness of that conduct—not the uniqueness of its setting—that matters.

---

[495] *See* Motion to Suppress Evidence, Doc. 55, and Memorandum Opinion, Doc. 61, *United States v. Casher*, No. 4:23-cr-00170 (M.D. Pa. 2023).

[496] *Herring*, 555 U.S. at 144.

[497] Indeed, this is not even the first time that this Court has reviewed a *Franks* motion prompted by Trooper Williamson's omission of a confidential informant's history. *See* 2022 U.S. Dist. LEXIS 8024, at *32. Although the omission was ultimately immaterial in *King*, it bears repeating that including such information is a "good practice," and a win-win for magistrates and officers. *Gladney*, 48 F.3d at 315. Magistrates receive a fuller view of the relevant evidence; officers significantly lessen the risk of suppression if these facts turn out to be material. If officers are unsure of whether to include information of unclear relevance in their affidavits, the best practice is to err on the side of caution. In this circumstance, less is not more.

[498] *Herring*, 555 U.S. at 132–33.

The Court is aware of no case in which a *Franks* violation has been found but the evidence has not been suppressed, absent an exception such as the inevitable discovery rule. Instead the Supreme Court has stated that if a *Franks* violation is shown, the warrant is "voided."[499] This is for good reason. The importance of deterrence benefits in *Franks* cases cannot be understated. Deterring false assertions or omissions is critical because "the hearing before the magistrate not always will suffice to discourage lawless or reckless misconduct . . . . The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations."[500] So "[p]olicing this requirement easily passes the cost-benefit analysis set forth in *Herring* . . . And deterring police from submitting (and magistrates from accepting) affidavits that completely omit crucial factual allegations is a preeminently worthy goal."[501] It is worth noting that while suppression imposes the weighty cost of interfering with the Court's "truth-seeking function,"[502] the benefit of doing so is deterring *Franks* violations which themselves threaten to interfere with the magistrate's "truth-seeking function."

---

[499] *Herring*, 555 U.S. at 145 (quoting *Franks*, 438 U.S. at 171).

[500] *Franks*, 438 U.S. at 168.

[501] *John*, 654 F.3d at 420–21. This discussion in *John* involved not a *Franks* analysis, but a warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," wherein the officer apparently assumed that those who have committed sex crimes necessarily possess child pornography. *Id.* at 418. Its analysis is far more persuasive in this context, which involves a more culpable state of mind.

[502] *Id.*

## VI.    CONCLUSION

Despite the Alfords' parole statuses and despite their living in an unauthorized residence, they maintain Fourth Amendment rights here because the Apartment is their home. The "wrongdoing" of living in an unauthorized residence does not change that fact. Likewise, Trooper Williamson's omissions and false assertions here are alarming. By omitting the distinction between Altari and Alteriki, and Pardoe's prior informant termination and the reason for it, Williamson's affidavit tells a significantly different story than the facts on the ground. The same is true for the Williamson's distortions of what Pardoe and the landlord of 830 and 832 High Street said. Inserting this recklessly omitted information and striking these false statements, the reconstructed affidavit does not establish probable cause to search.

The magistrate's independent review is a key safeguard of the individual liberties protected by the Fourth Amendment. To protect this integral component of our constitutional system, it is imperative to ensure that officers are deterred from recklessly omitting material information or making false statements within affidavits of probable cause. It is therefore clear that due to the nature of the constitutional violations in this case, the benefits of suppression outweigh the costs.

Accordingly, Altari and Alteriki's motions to suppress evidence will be granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge