# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

DAQUAN ALTERIKI ALFORD,

Defendant.

No. 4:22-CR-00010-01

(Chief Judge Brann)

## MEMORANDUM OPINION

### JANUARY 24, 2025

## I.    BACKGROUND

In January 2022, the Government filed an indictment against Defendant Daquan Alteriki Alford ("Alteriki") based in part on evidence seized from a search of his co-defendant Daquan Altari Alford's apartment. The three-count indictment against Alteriki charges him with Distribution of Controlled Substance Resulting in Death in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and Maintaining Drug-Involved Premises in violation of 21 U.S.C. § 856(a)(1).[1]   A superseding indictment with the same counts against Alteriki was filed in May 2024.[2] After filing a motion to suppress the evidence seized from Daquan Altari Alford's apartment,[3] Alteriki filed a motion to dismiss

---

[1]    Indictment as to Daquan Alteriki Alford, Doc. 3.
[2]    Superseding Indictment, Doc. 70.
[3]    Motion to Suppress, Doc. 94.

Count I of the superseding Indictment, Distribution of Controlled Substance Resulting in Death, in June 2024.[4]

Before resolving Alteriki's motion to dismiss, the Court resolved the Defendants' motions to suppress. In July 2024 and October 2024, this Court convened evidentiary hearings to consider the motions to suppress filed by both Defendants.[5] The Court granted both motions to suppress evidence on January 24, 2025.[6] Now pending is Alteriki's motion to dismiss for outrageous government conduct. The motion is now ripe for disposition; for the reasons that follow, is denied.

## II.    FACTUAL BACKGROUND

The first evidentiary hearing was primarily convened regarding Defendants' motions to suppress evidence, but relevant testimony was elicited regarding Alteriki's motion to dismiss. All the testimony elicited at the hearing is consistent with Alteriki's factual allegations in his original motion to dismiss, his brief, and his supplemental brief, the latter of which relies in substantial part on this testimony.[7] Accordingly, the Court will rely on the evidence elicited at this

---

[4]    Motion to Dismiss Count One Based Upon Outrageous Government Conduct ("MTD"), Doc. 96.
[5]    *See* Scheduling Order, Doc. 112; Scheduling Order, Doc. 137.
[6]    Order, Doc. 152.
[7]    Where facts are both alleged in Alteriki's papers and elicited at the hearing, the Court will cite to both. Where facts which support or add context to Alteriki's allegations were elicited at the hearing but are absent from his papers, the Court will only cite to the hearing transcript.

suppression hearing insofar as it is consistent with the allegations made in Alteriki's motion to dismiss papers.

Alteriki's motion is premised on Pennsylvania State Police Trooper Robert Williamson's contact with a confidential informant, now identified as Krista Pardoe, and Alteriki's ultimate charge for causing her death by overdose.[8] Williamson's first contact with Pardoe was when her former handler, Tyler Morse, referred her to Williamson, who met with Pardoe at the Montoursville Barracks on April 28, 2021.[9] Pardoe explained that Alteriki had "contacted her wanting her to rent a rental car so that he could travel to New Jersey to get drugs."[10] According to Williamson, Pardoe related that she was sober, had no current addictions, was currently employed, and did not appear to be under the influence of drugs when he spoke to her, although he did not test her for the presence of drugs or search her person for drugs.[11] She explained that she was coming forward to have her criminal history expunged or removed and had no current charges.[12]

Trooper Williamson also learned of some critical facts relied upon by Alteriki's motion to dismiss. First, Pardoe stated that she had previously been a drug addict, "which was confirmed also by now Corporal [Morse]."[13] Williamson

---

[8] MTD, Doc. 96 ¶6.
[9] Transcript I, Doc. 129 at 13:22–25; MTD, Doc. 96 ¶6.
[10] Transcript I, Doc. 129 at 13:22–25; MTD, Doc. 96 ¶8.
[11] Transcript I, Doc. 129 at 14:1–3; 67:1–18; 103:4–104:1.
[12] *Id.* at 14:3–8; MTD, Doc. 96 ¶7.
[13] Williamson's testimony was that Pardoe had only been known to use crack cocaine. Transcript I, Doc. 129 at 8–11. Alteriki originally alleged that Pardoe had previously been

also learned from Morse that "during her [Pardoe's] last incident . . . in which she cooperated with the State Police, she conducted a controlled buy with him, received an extra amount of crack cocaine than what was actually ordered, and concealed that extra amount on her person."[14] Pardoe was discontinued as an informant once a search revealed those drugs.[15] Given Pardoe's checkered past, Williamson contacted the Lycoming County District Attorney's office, briefed them on the situation and Pardoe's background, and asked whether "this is something that we're interested in because of her past."[16]

A plan was devised for Pardoe to rent the vehicle which would be stopped via a traffic stop, with the plan of "orchestrat[ing] it in a way that she would not ever be in contact with the controlled substances."[17]  In furtherance of this plan, Pardoe paid for the rental vehicle with her own funds rather than PSP funds on the morning of April 29, 2021,[18] and, while Trooper Williamson had considered putting a tracker on the vehicle, he did not have time to do so.[19] As Alteriki sees this evidence, Williamson allowed Pardoe to provide this vehicle to Alteriki

---

addicted to heroin. MTD, Doc. 96 ¶7. After the hearing, Alteriki's allegation became that "Trooper Williamson knew that Pardoe had a history of drug abuse." Supplemental Brief, Doc. 136 at 18.

[14]  Transcript I, Doc. 129 at 14:15–15:1; 68:22–25; Supplemental Brief, Doc. 136 at 18.

[15]  Transcript I, Doc. 129 at 14:15–15:1; 68:22–25.

[16]  *Id.* at 15:11–15.

[17]  *Id.* at 15:15–18; 33:14–24; Supplemental Brief, Doc. 136 at 17.

[18]  Transcript I, Doc. 129 at 77:13–25; MTD, Doc. 96 ¶¶8-9, 14(a); Supplemental Brief, Doc. 136 at 16–17.

[19]  Transcript I, Doc. 129 at 52:25–53:1; Supplemental Brief, Doc. 136 at 17.

"without any law enforcement oversight or control or surveillance"[20] "for the purpose of making a drug run to New Jersey,"[21] and therefore "failed to put in place any proper measures to ensure that" Pardoe was never in contact with drugs.[22] To carry out the traffic stop, Williamson was relying on Pardoe to provide him with intelligence regarding when Alteriki would return to Williamsport after obtaining the drugs, but in part because Pardoe did not contact Williamson after Alteriki had returned to Pennsylvania, the vehicle was never intercepted.[23]

After this initial plan failed, Pardoe took matters into her own hands. Around 8:26 a.m. on May 1, Pardoe called Williamson and revealed that "she took it upon herself, along with her fiancée at the time, to travel to Williamsport" to meet with Alteriki.[24] After Alteriki had asked Pardoe to "take a ride" with him earlier that same day, she met up with Alteriki around 2:15 a.m.[25] Alteriki and Pardoe drove to the intersection of First Avenue and High Street, where Alteriki passed a backpack full of the drugs he had obtained to an unknown black male, who Pardoe saw walk

---

[20]  MTD, Doc. 96 ¶14.
[21]  Supplemental Brief, Doc. 136 at 16–17.
[22]  *Id.* at 17.
[23]  Transcript I, Doc. 129 at 16:5–11; Supplemental Brief, Doc. 136 at 17. The reason for Pardoe's failure to communicate is not clear, but it appears that Alteriki did not clearly indicate the time of his return to her.
[24]  Transcript I, Doc. 129 at 16:16–23; MTD, Doc. 96 ¶10.
[25]  Transcript I, Doc. 129 at 16:16–20; 56:5–14.

towards one of two buildings visible to her from the car. [26] Lacking money to pay Pardoe with for renting the car, Alteriki paid her with several bundles of heroin.[27]

According to Trooper Williamson, where an informant arranges a drug deal, the informant and their vehicle are ordinarily thoroughly searched, multiple law enforcement assets would be utilized to surveil the informant, and the informant would return to law enforcement to be searched again after the transaction.[28] But because Pardoe had gone off script, no officer surveilled Pardoe's interactions with Alteriki during the drive; the events were completely unsupervised.[29]

While Pardoe was speaking with Williamson around 8:26 a.m. on May 1, she stated that she gave the drugs she had received to her fiancée so that she would not be tempted to use them.[30] Pardoe "convinced" Williamson, and he relied on her word and did not send anyone to immediately intercept the drugs that were in Pardoe's possession.[31] Just before 11:00 a.m. that day, Williamson received another call from Pardoe's phone—this time from her fiancée—who related that Pardoe was deceased.[32] She had consumed Alteriki's drugs and died by overdose.[33] Worse, as a search of Pardoe's phone revealed, a message sent to Alteriki around

---

[26]  Transcript I, Doc. 129 at 16:16–23; 17:10–15; MTD, Doc. 96 ¶11.
[27]  Transcript I, Doc. 129 at 17:24–18:4; MTD, Doc. 96 ¶11.
[28]  Transcript I, Doc. 129 at 34:8–24.
[29]  *Id.* at 67:9–12; 76:22–77:12; MTD, Doc. 96 ¶11.
[30]  Transcript I, Doc. 129 at 65:13–66:13; 98:25–99:3.
[31]  Transcript I, Doc. 129 at 67:19–24; 99:4–15; MTD, Doc. 96 ¶¶12, 14; Supplemental Brief, Doc. 136 at 17.
[32]  Transcript I, Doc. 129 at 18:21–25.
[33]  *Id.* at 19:4–15; MTD, Doc. 96 ¶13.

3:30 a.m. of that day indicated that she had already used his drugs at least once prior to calling Williamson.[34] Alteriki was subsequently charged in a multiple count indictment, including a charge for Distribution of a Controlled Substance Resulting in Death.[35]

In sum, the essence of Alteriki's motion is that "Williamson helped facilitate the transport of illicit drugs to Lycoming County" but "failed to provide proper safeguards to protect CI Pardoe and the community at large from the distribution of these drugs."[36] The motion is now ripe for disposition; because these facts cannot support dismissal for outrageous government conduct, the motion is denied.

## III.   DISCUSSION

### A.    Motion to Dismiss for Outrageous Government Conduct

A defendant is entitled to a pretrial evidentiary hearing on a motion to dismiss for outrageous government conduct when his moving papers demonstrate a "colorable claim" for relief.[37] "In order to be 'colorable,' a defendant's motion must consist of more than mere bald-faced allegations of misconduct. There must be issues of fact material to the resolution of the defendant's constitutional

---

[34]  Transcript I, Doc. 129 at 31:7–22; Alteriki Preliminary Hearing Transcript, Doc. 88-2 at 4:9–21.

[35]  Indictment as to Daquan Alteriki Alford, Doc. 3; Superseding Indictment, Doc. 70; MTD, Doc. 96 ¶1.

[36]  Supplemental Brief, Doc. 136 at 18.

[37]  *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) (citing *United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994)).

claim."[38] So long as the defendant raises an issue of material fact "which if resolved in accordance with [his] contentions would entitle him to relief," the court should grant an evidentiary hearing on a motion to dismiss based on outrageous government conduct.[39]

Alteriki states in supplemental briefing that "a full-blown evidentiary hearing is necessary to corroborate the evidence Mr. Alford has received to date and provide additional and essential details concerning the government misconduct."[40] But Alteriki does not support these "bald-faced allegations of misconduct" with any factual matter specifying what additional and essential details he refers to, so this statement in his briefing cannot alone create a material issue of fact warranting an evidentiary hearing. And taking the factual allegations in Alteriki's motion to dismiss papers as true, even after consulting the relevant portions of the suppression hearing transcript, the motion fails to raise any material issue of fact pertaining to his outrageous government conduct theory. The conduct here is so far afield from meeting the standard for outrageous government conduct that the Court can conceive of no set of facts which would result in granting the motion, much less are the facts set forth in Alteriki's papers sufficient to do so.

Alteriki's motion to dismiss implicates the "outrageous government conduct" theory, an "offshoot of the entrapment defense with roots in the due

---

[38]  *Id.* (internal citations omitted).
[39]  *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980).
[40]  Supplemental Brief, Doc. 136 at 18.

process clause of the United States Constitution."[41] "Entrapment and its related due process defense are based on the notion that it 'serves no justifying social objective' for the Government to 'creat[e] new crime for the sake of bringing charges against a person [it] had persuaded to participate in wrongdoing.'"[42] But entrapment and outrageous government conduct "are not identical and require distinct inquiries to apply properly."[43] Alteriki appears to apply simple but-for causation principles to the Government's involvement in this case,[44] but the outrageous government conduct inquiry is far more rigorous than that.

Outrageous government conduct must be "'so outrageous' as to be 'shocking to the universal sense of justice,'" such that "the Due Process Clause can function as an 'absolute bar on the Government from invoking judicial processes to obtain a conviction.'"[45] This requires showing "the most intolerable government conduct"[46] and is "reserved for only the most egregious circumstances."[47] That bar is so insurmountably high that the last appellate decision within this circuit to uphold

---

[41] *United States v. Lough*, No. 4:17-CR-00139, 2019 U.S. Dist. LEXIS 34654, at *39 (M.D. Pa. Mar. 5, 2019).

[42] *United States v. Lakhani*, 480 F.3d 171, 177 (3d Cir. 2007) (quoting *United States v. West*, 511 F.2d 1083, 1085 (3d Cir. 1975)).

[43] *Lakhani*, 480 F.3d at 177.

[44] *See* Brief in Support, Doc. 97 at 4 ("Here, no crime of Distribution of a Controlled Substance Resulting in Death would have occurred absent the government conduct in this case.").

[45] *Lakhani*, 480 F.3d at 177–78 (quoting *United States v. Russell*, 411 U.S. 423, 431032 (1973)) (cleaned up).

[46] *United States v. Jannotti*, 673 F.2d 578, 608 (3d Cir. 1982).

[47] *Nolan-Cooper*, 155 F.3d at 231 (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992).

dismissal on this basis, *United States v. Twigg*, was decided in 1978.[48] And since *Twigg*, the Third Circuit has cautioned that the outrageous government conduct defense "is hanging by a thread,"[49] "moribund,"[50] and rejected "with almost monotonous regularity."[51] The Third Circuit has "repeatedly noted that [it is] extremely hesitant" to grant this defense.[52]

"[A]dmittedly, it is difficult to know what standards to apply in order to conclude that a given course of action is outrageous.'"[53] But the Third Circuit has stated that the "defense of outrageous government conduct examines whether a defendant's due process rights have been violated because the government created the crime for the sole purpose of obtaining a conviction."[54] "In determining whether the government's conduct is outrageous, we look to the totality of the circumstances."[55]

Moreover, as the outrageous government conduct defense is "based on an alleged defect in the institution of the prosecution itself,"[56] the Tenth Circuit has

---

[48]  *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978).

[49]  *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998).

[50]  *Lakhani*, 480 F.3d at 181 (quoting *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)).

[51]  *Lakhani*, 480 F.3d at 181 (quoting *Santana*, 6 F.3d at 4).

[52]  *United States v. Hoffecker*, 530 F.3d 137, 154 (3d Cir. 2008) (quoting Voigt, 89 F.3d at 1065).

[53]  *Twigg*, 588 F.2d at 385.

[54]  *United States v. Pitt*, 193 F.3d 751, 759–60 (3d Cir. 1999); *see also United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (citing *Mosley*, 955 F.2d at 911) ("To succeed on an outrageous government conduct defense, the defendant must show either: (1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.").

[55]  *Pedraza*, 27 F.3d at 1521 (citing *Mosley*, 965 F.2d at 910).

[56]  *Pitt*, 193 F.3d at 760.

wisely elaborated that the defendant "must still prove that the government's conduct directly affected *him*."[57] "No matter how outrageous the government's conduct, due process is not offended unless the government's actions 'had a role in inducing the defendant to become involved in the crime.'"[58] So a "defendant may not assert an outrageous conduct claim based on conduct that harms third parties."[59] In other words, one may view Government conduct which harms third parties to be "outrageous" in the lay sense, but in the constitutional sense, the only relevance of this conduct is the degree to which the Government has created the crime or coerced the defendant to commit the crime.

This guidance is persuasive and consistent with *Twigg*'s facts and rationale. Given that *Twigg* is the only binding, in-Circuit precedent upholding the grant of dismissal for outrageous government conduct, its facts operate as a compelling yardstick for measuring the boundaries of that theory. In *Twigg*, a cooperating informant named Kubica contacted his longtime acquaintance Neville at the DEA's request, proposing that the two set up a laboratory to produce methamphetamine.[60] Neville raised capital and arranged for distribution of the drugs, Kubica acquired all of the equipment, materials, and a production site, and the DEA supplied Kubica with the key ingredient to produce methamphetamine,

---

[57]  *Pedraza*, 27 F.3d at 1522 (citing *Mosley*, 925 F.2d at 914) (emphasis added).
[58]  *Id.* (quoting *United States v. Gamble*, 737 F.2d 852, 858 (10th Cir. 1984)).
[59]  *Id.* (citing *Mosley*, 965 F.2d at 914).
[60]  *Id.* at 375.

20 percent of the glassware required, a rented farmhouse to serve as a laboratory location, and helped to purchase the remainder of the needed chemicals from nearby chemical supply houses.[61] A second defendant, Twigg, was pulled into the enterprise by Neville to repay a debt; he accompanied Kubica to chemical supply houses and ran groceries and coffee errands.[62] As all the production assistance provided by Neville and Twigg was directed by Kubica, the Third Circuit determined that the cumulative effect of the Government conduct violated due process.

The *Twigg* court looked to two cases in support of this defense's viability, one in which "the government's own agent has set the accused up . . . creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing,"[63] and one in which the Government "involve[d] itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations . . . from beginning to end," such that "the same underlying objections which render entrapment repugnant to American criminal justice are operative."[64] And it distinguished situations in which the defense would not apply wherein the "criminal plan originated with the

---

[61] *Id.* at 375–76.
[62] *Id.* at 376.
[63] *Id.* at 379 (quoting *West*, 511 F.2d 1083 (3d Cir. 1975)).
[64] *Id.* (quoting *Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971)).

defendant,"[65] and "the Government did not sow the seeds of criminality" because "the defendant concocted the scheme and began implementing it before the [Government] got involved" and "was completely in charge of the operation."[66] Concerned with "government-induced criminality"[67] and "government involvement in the criminal activities,"[68] *Twigg* was persuaded by the argument that "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of due process of law."[69]

The Eastern District of Pennsylvania's decision in *United States v. McLean* accurately and persuasively distilled *Twigg*'s rationale into four factors: "1) Infiltration of an Already-Existing Criminal Enterprise; 2) Fleeting Nature of Elusiveness of the Crime; 3) Government Instigation/Origination; and 4) Control of Operations."[70] As the facts and reasoning of *Twigg* show, the "outrageousness" that is relevant to this defense is rooted in the Government's involvement in creating the crime.

Accordingly, harm to third parties does not garner independent legal significance to this analysis. Pardoe and Williamson's operation might have been successful earlier—and therefore avoided the tragedy of Pardoe's death—had

---

[65] *Id.* at 379–380 (distinguishing *United States v. Leja*, 563 F.2d 244 (6th Cir. 1977))
[66] *Id.* (distinguishing *United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976)).
[67] *Id.*, 588 F.2d at 380 (quoting *United States v. Archer*, 486 F.2d 670, 677 (2d Cir. 1973)).
[68] *Id.* at 380.
[69] *Id.* at 377.
[70] *Lough*, 2019 U.S. Dist. LEXIS 34654, at *48 (M.D. Pa. Mar. 5, 2019) (quoting *United States v. McLean*, 85 F.Supp.3d 825, 833–35 (E.D. Pa. 2015)).

Williamson more competently orchestrated and supervised the operation after Pardoe obtained the rental car for Alteriki. Pardoe's death by overdose was also avoidable through Williamson's intervention, had he sent an officer to immediately take custody of the heroin Pardoe received from Alteriki. Indeed, Williamson should have known of the urgent risk that Pardoe would deceive him about her intent to use these substances because of the reason for her prior discharge as a confidential informant. But Williamson's failure to act, even in the face of red flags, cannot be labeled "outrageous" simply because it had devastating consequences. Consistent with *Twigg*, the yardstick of outrageousness here is Williamson's involvement in creating the Distribution of Controlled Substances Resulting in Death charge against Alteriki by causing Pardoe's death, not his failure to take additional precautions, or even his passive tolerance of it.

Even providing known addicts with narcotics is not necessarily "outrageous government conduct," although it has been hypothesized that this may be the case under extreme circumstances.[71] The Government's conduct here—or rather, the lack thereof—does not even come close to that level. Trooper Williamson unsuccessfully attempted to orchestrate Pardoe's involvement so that she would

---

[71] *See, e.g.*, *United States v. Harris*, 997 F.3d 812, 816–18 (10th Cir. 1993) (discussing whether providing narcotics to known addicts can be outrageous government conduct, and speculating that such a circumstance may arise where "a government agent entered a drug rehabilitation treatment center and sold heroin to a recovering addict, and the addict was subsequently prosecuted for possession of a controlled substance").

never be in contact with drugs.[72] Between learning of the drugs Pardoe received during her unsupervised drive with Alteriki around 8:26 a.m. and learning of Pardoe's death by overdose around 10:43 a.m., Williamson did not send a PSP officer to check on her or confiscate the drugs.[73] He testified that he failed to do so because Pardoe had stated that she had left the drugs in her fiancé's custody, so that she would not be tempted to use them.[74] So the offending conduct comes down to naivete, negligence, or both, within a very slim window of time. That is far from "engineer[ing] and direct[ing] the criminal enterprise from start to finish."[75]

There was simply no Government involvement in Pardoe's death. Instead, Williamson at most passively tolerated Pardoe's custody of the drugs for less than three hours. "Passive tolerance . . . of a private informant's questionable conduct" "is less egregious than the conscious direction of government agents typically present in outrageous government conduct challenges."[76] So when the Government continues to "use . . . a confidential informant even as he continued to engage in illegal conduct," or where it is "negligent in its handling of . . . an informant," "its conduct does not rise to the level required for a finding of a due process violation."[77]   As the Government observes, "what Alteriki is really attempting

---

[72]   Transcript I, Doc. 129 at 15:9–16:11.
[73]   Transcript I, Doc. 129 at 16:12–18:7.
[74]   Transcript I, Doc. 129 at 18:5–20; 65:20–66:13.
[75]   *Gardner*, 658 F.Supp. at 1576.
[76]   *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991).
[77]   *United States v. Fernandez*, 388 F.3d 1999, 1238–39 (9th Cir. 2004).

through this motion is to extend this already seldom-applied doctrine, which is premised on government *conduct*, to instances of mere government *inaction*."[78]

These facts pale in comparison to the Government involvement in *Twigg*. Alteriki was not "lawfully and peacefully minding his own affairs" absent "egregious conduct on the part of government agents" which "generated new crimes by the defendant merely for the sake of pressing criminal charges against him."[79] He was already involved in a drug distribution enterprise and had arranged to acquire those drugs from Newark, New Jersey, and decided to use Pardoe to acquire a rental car that could not be traced to him and pay her in drugs all on his own initiative.

Alteriki plucks dictum out of context from one of the few district court decisions dismissing for outrageous government conduct, *United States v. Gardner*. There the Western District of Pennsylvania stated that "[t]he Court is shocked by the lack of supervision exercised by the Postal Inspectors over its informant."[80] But even assuming that *Gardner*'s reasoning is valid after subsequent Third Circuit precedent has cast substantial doubt upon the outrageous government conduct defense, *Gardner* is also distinguishable.

---

[78] Brief in Opposition, Doc. 130 at 43.
[79] *Twigg*, 588 F.2d at 381.
[80] *See* Brief in Support, Doc. 97 at 5 (quoting *United States v. Gardner*, 658 F.Supp. 1573, 1576-78 (W.D. Pa. 1987)); Supplemental Brief, Doc. 136 at 18 (same).

The problem in *Gardner* was not just that the Government allowed its informant to run amok without supervision, but more specifically what that lack of supervision enabled the informant, while acting as an agent of the Government, to do: he "utilized his position as a postal employee to acquire [defendant's] friendship and utilized promises of assisting him in repairing his car to induce [defendant's] cooperation in obtaining [the informant] drugs for his personal use."[81] The informant, and by extension the Government, exerted "psychological coercion" to repeatedly badger a defendant with no criminal history into obtaining cocaine for him over the course of a month until he finally relented.[82] So the *Gardner* court was "shocked" not because of the "lack of supervision" in the abstract, but because the result was that the "government here through its informant created crime rather than uncovered crime and as such engineered and directed the criminal enterprise from start to finish."[83]

The same facts showing why *Twigg* is distinguishable also distinguish *Gardner*. Pardoe's lack of supervision enabled her to engage in activities causing harm to herself, not to engage in activities to intentionally set up Alteriki. She certainly did not intentionally overdose to set Alteriki up, even if one could argue that she accepted drugs from Alteriki to do so. Even putting this all aside, Trooper Williamson utilized Pardoe as an informant to "infiltrate an already-existing

---

[81] *Id.* at 1576.
[82] *Id.* at 1574-76.
[83] *Id.*

criminal enterprise" of drug trafficking, and Alteriki's self-directed role in orchestrating that criminal enterprise cleanly distinguishes him from the defendants in *Twigg* and *Gardner*.

Alteriki had all the means to commit this crime without Government involvement (except for, at most, Pardoe obtaining the rental car). He initiated and planned this criminal enterprise by asking Pardoe to rent a car to travel to Newark and acquire drugs, at which point she contacted Corporal Morse and ultimately Williamson. And Alteriki planned and arranged the entire scheme, directed all of Pardoe's activities (only some of which were approved by Williamson), and directed the drive during which he independently, and unprompted, decided to pay Pardoe in heroin, which Williamson only learned of several hours later.

Trooper Williamson certainly did not orchestrate Pardoe's death to set Alteriki up, nor did he or Pardoe coerce, instigate, or even suggest any of this activity. Even as to the rental car, Williamson and Pardoe only followed Alteriki's lead. Moreover, the Third Circuit has stated that "more extreme methods of investigation" will be tolerated as non-outrageous for "more fleeting and elusive crime[s] to detect" such as "combating drug distribution."[84] That factor is readily applicable to the Government's involvement in Alteriki's distribution scheme as well as Pardoe's payment in drugs for her involvement in that scheme. All this would thwart an outrageous government conduct defense even if Williamson had

---

[84]  *Twigg*, 588 F.2d at 278.

done nothing at all to prevent the obvious danger of Pardoe using controlled substances here. That he recognized the danger at hand but implemented deficient means to mitigate it is not sufficient to show his involvement in the creation of this crime.

*United States v. Ward* is analogous.[85] In *Ward*, the Third Circuit rejected an outrageous government conduct defense premised on the government's conduct in a marijuana distribution operation because the defendants were "ready, willing and able to participate in distribution activities," made active efforts to promote and execute their distribution scheme—including travel to arrange the transportation of contraband—and had enough experience in their drug trafficking roles that they did not need to rely on the direction of Government operatives.[86] As the foregoing analysis demonstrates, the same can be said about Alteriki.

The facts alleged in Alteriki's papers, which align with those elicited at the suppression hearing, do not rise to outrageous government conduct. Instead, Alteriki relates Williamson's facilitation of Pardoe's vehicle rental for Alteriki, his poor supervision of the entire operation, his insufficient implementation of measures to ensure that Pardoe was not in contact with controlled substances, and

---

[85]  793 F.2d 551 (3d Cir. 1986).

[86]  *Id.* at 554–55 (3d Cir. 1986); *Twigg*, 588 F.2d at 381 ("Unlike other cases rejecting this defense, the police investigation here was not concerned with an existing laboratory; the illicit plan did not originate with the criminal defendants; and neither of the defendants were chemists an indispensable requisite to this criminal enterprise.").

his failure to promptly act to secure possession of the drugs.[87] This motion raises no material issue of fact, and therefore, no colorable claim for relief.[88] As resolving the motion "in accordance with [the defendant's] contentions" would still not "entitle him to relief"[89] it can be denied without another evidentiary hearing.

### B.    Dismissal Under the Court's Inherent Supervisory Authority

Alteriki also argues alternatively that "the Court can still dismiss Count One under its inherent supervisory authority."[90] But this misunderstands the nature of that authority: a Court's supervisory authority is "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[91] A court's supervisory authority allows it to, "within limits, formulate procedural rules not specifically required by the Constitution or Congress."[92] The "exercise of inherent authority must satisfy two requirements: (1) it 'must be a reasonable response to the problems and needs confronting the court's fair administration of justice,' and (2) it 'cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute.'"[93]

---

[87]  *See* Brief in Support, Doc. 97 at 2–4; Supplemental Brief, Doc. 136 at 16–18.

[88]  *Voigt*, 89 F.3d at 1067.

[89]  *Irwin*, 612 F.2d at 1187.

[90]  Brief in Support, Doc. 97.

[91]  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

[92]  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983).

[93]  *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019) (quoting *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016)).

As this test makes clear, a Court's supervisory authority is not a free-ranging power to dismiss any indictment for any reason at all; it is a power of supervision allowing courts to take those measures necessary to manage their own affairs. By way of example, it may be an appropriate use of supervisory authority to *sua sponte* dismiss an indictment for failure to prosecute,[94] to vacate judgments procured by fraud,[95] or to dismiss an indictment to remedy Government misconduct infecting the proceedings and prejudicing the defendant, in the absence of a less severe remedy.[96] In this case, no interference with the Court's administration of justice, such as prosecutorial misconduct, has occurred. So dismissing Count I of the indictment would not be an appropriate use of this Court's supervisory authority.

## IV.    CONCLUSION

To have "created the crime for the sole purpose of obtaining a conviction,"[97] Trooper Williamson would have had to have orchestrated a plan to kill Krista Pardoe by overdose so that he could set Alteriki up for a Distribution of Controlled Substances Resulting in Death charge, or involved himself in the criminal conduct causing her death through similarly outrageous Government involvement. That level of malfeasance is so far from the facts elicited, alleged, or even imaginable in

---

94    *Link*, 370 U.S. at 631–32.
95    *Chambers*, 501 U.S. at 44.
96    *Bank of Nova Scotia*, 487 U.S. at 254–56.
97    *Pitt*, 193 F.3d at 759–60.

this case, that no colorable defense of outrageous government conduct is apparent to the Court. Dismissal under the Court's inherent supervisory authority is also inappropriate in this case, as no misconduct is alleged to have affected the administration of justice here. The Court will therefore deny the motion to dismiss without conducting another evidentiary hearing.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge